1

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT

DUKES, ss.

SUPERIOR COURT
CIVIL ACTION NO. 2374CV00017

| | |
|---|---|
| AERO HEC ACQUISITION I, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS BRANSFORD, PATRICIA BRANSFORD; and DENIS RICHARD MCDONOUGH, in his capacity as SECRETARY OF VETERAN AFFAIRS OF THE UNITED STATES,<br><br>Defendants. | ) |

FILED
SUPERIOR COURT
COUNTY OF DUKES COUNTY
APR 14 2023
REC'D
_____ CLERK

## VERIFIED COMPLAINT

## PARTIES

1. Plaintiff Aero HEC Acquisition I, LLC ("Aero") is a Delaware limited liability company with a registered agent address at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle, Delaware.

2. Defendant Thomas L. Bransford is an individual who resides at 25 Broad Street, Apt. 8i, New York, New York ("Mr. Bransford").

3. Defendant Patricia S. Bransford is an individual who resides at 25 Broad Street, Apt. 8i, New York, New York ("Mrs. Bransford").

4. Defendant Denis Richard McDonough, Secretary of Veterans Affairs, is an Officer of the United States, with an address of 810 Vermont Avenue NW, Washington, D.C. 20420 ("Secretary of Veteran Affairs").

## FACTS

5. This dispute concerns property located at 484 Main Street, Tisbury, Massachusetts (the "Property"). By Quitclaim Deed, on March 25, 2019, Harriet Brownson Sayre McCord, Trustee, conveyed the Property to Defendants Mr. Bransford and Mrs. Bransford (Mrs. Bransford, and with Mr. Bransford, the "Bransfords") for consideration of $1,345,000.00. On March 28, 2019, the Quitclaim Deed was recorded with the Dukes County Registry of Deeds at Book 1491, Page 887. A true and accurate copy of the Quitclaim Deed is attached hereto as **Exhibit A**.

6. On February 12, 2020, the Bransfords granted a mortgage on the Property to Mortgage Electronic Registration Systems, Inc., as nominee for Freedom Mortgage Corporation ("Freedom"), in the amount of $1,207,994.00 recorded with the Dukes County Registry of Deeds at Book 1521, Page 1. ("Freedom Mortgage"). A true and accurate copy of the Freedom Mortgage is attached hereto as **Exhibit B**.

7. On December 15, 2021, Mrs. Bransford granted a Deed of Trust to Noah f/k/a Patch Homes, Inc. ("Noah") on the Property in the amount of $500,000 ("Noah Mortgage"). A true and accurate copy of the Noah Mortgage is attached hereto as **Exhibit C**.

8. On the same day, December 15, 2021, the Noah Mortgage was assigned to Aero ("Assignment"). This Assignment was recorded on July 5, 2022 at the Dukes Registry of Deeds at Book 01630, Page 497. A true and accurate copy of the Assignment is attached hereto as **Exhibit D**.

9. In addition to the Noah Mortgage, Mrs. Bransford signed a Real Estate Purchase Option Agreement ("Option Agreement") with Noah that described the covenants she agreed to

in exchange for the Noah Mortgage. A true and accurate copy of the Option Agreement is attached hereto as **Exhibit E**.

10. Mr. Bransford, who is a co-owner as a tenant by the entirety of the Property, was not a signatory to the Noah Mortgage or the Option Agreement.

11. As a condition of the Noah Mortgage, the Bransfords represented to Noah through discussions and the closing documents that Mrs. Bransford would be the sole owner of the Property at the time of the Noah Mortgage closing transaction.

12. In light of these representations made by the Bransfords, Noah entered the Noah Mortgage with Mrs. Bransford, individually.

13. Mrs. Bransford also represented that the Noah Mortgage would be recorded as the second mortgage on the Property. The Escrow Instructions noted that "Noah will hold the second lien position." A true and accurate copy of Noah's Escrow Instructions is attached hereto as **Exhibit F**.

14. On December 15, 2021, the Bransfords also conveyed a subordinate mortgage to the Secretary of Veterans Affairs ("Subordinate Mortgage"), encumbering the Property for an additional $136,487.69. The Subordinate Mortgage was recorded on April 7, 2022 at the Dukes County Registry of Deeds at Book 01620, Page 809. A true and accurate copy of the recorded Subordinate Mortgage is attached hereto as **Exhibit G**.

15. Mrs. Bransford never notified Noah or Aero that she encumbered the Property with the Subordinate Mortgage.

16. The Noah Mortgage was recorded on July 5, 2022 at the Dukes County Registry of Deeds at Book 01630, Page 472. It is recorded as the third mortgage on the Property, behind the Freedom Mortgage and the Subordinate Mortgage.

17. On July 5, 2022, Noah, on behalf of Aero, through counsel, sent Mrs. Bransford a Notice of Alleged Violation pursuant to Section 14.1 of the Option Agreement for violation of the Option Agreement ("First Notice"). A true and accurate copy of this First Notice is attached hereto as **Exhibit H**.

18. Mrs. Bransford failed to cure the violations set forth in the First Notice, so on February 23, 2023, Aero, through counsel, sent Mrs. Bransford a second Notice of Alleged Violation pursuant to Section 14.1 of the Option Agreement ("Second Notice"). In the Second Notice, Aero again notified Mrs. Bransford that she violated the Option Agreement by representing in the Agreement that she was the sole owner of the Property and had good and marketable title to the Property, free and clear of all claims. Aero also notified Mrs. Bransford that she violated Section 12.1 of the Option Agreement when she failed to inform Aero of the execution and recording of the Subordinate Mortgage. A true and accurate copy of this Second Notice is attached hereto as **Exhibit I**.

19. Furthermore, in the Second Notice, pursuant to Section 14.2 of the Option Agreement, Aero again provided Mrs. Bransford the opportunity to cure the issue within 14 days. Aero requested that the Bransfords sign an Amendment to Deed of Trust and Security Agreement and Reaffirmation Agreement to add Mr. Bransford, co-owner of the Property, as party to the Noah Mortgage, Option Agreement, and other option documents associated with the $500,000 mortgage.

20. To this date, the Bransfords have failed to cure the alleged violations of the Option Agreement.

## COUNT I
**(Breach of the Contract - Aero v. Mrs. Bransford)**

21. Aero hereby restates and incorporates herein the allegations contained in Paragraphs 1 through 20 of this Complaint.

22. In order to obtain the Noah Mortgage, Option Agreement and other option documents, all Property owners were required to sign the option documents.

23. Mrs. Bransford misrepresented to Noah at the time of closing that she was the sole owner of the Property. She also misrepresented that she was the sole owner of the Property in the Noah Mortgage, Option Agreement, and various other option documents.

24. Even after Mrs. Bransford entered into the Noah Mortgage, when Noah and Aero discovered that the Bransfords did not convey the Property to Mrs. Bransford, individually, Mrs. Bransford represented to Noah and Aero that the Bransfords would soon record a deed conveying the Property so that Mrs. Bransford would be the sole owner. The Bransfords failed to record this deed.

25. Before the Noah Mortgage was recorded, the Bransfords granted and recorded the Subordinate Mortgage. Mrs. Bransford failed to notify Noah or Aero of the granting and recording of the Subordinate Mortgage.

26. Mrs. Bransford's misrepresentations to obtain the Noah Mortgage and her subsequent failure to notify Aero of the Subordinate Mortgage that was recorded before the Noah Mortgage were in breach of the Option Agreement.

27. As a result, Aero has sustained and continues to sustain damages.

**COUNT II**
**(Breach of Implied Covenant of Good Faith and Fair Dealing- Aero v. Mrs. Bransford)**

28. Aero hereby restates and incorporates herein the allegations contained in Paragraphs 1 through 27 of this Complaint.

29. The Noah Mortgage, Option Agreement, and other option documents are subject to the implied covenant of good faith and fair dealing.

30. Noah and its successor, Aero, performed their contractual obligations by advancing funds in the amount of $500,000 to Mrs. Bransford.

31. Mrs. Bransford breached her duty by engaging in bad faith in her performance under the Noah Mortgage, Option Agreement, and other option documents.

32. Mrs. Bransford's bad faith conduct includes, but is not limited to: (1) misrepresenting to Noah that she was the sole owner of the Property at the time Noah Mortgage was granted; (2) misrepresenting that she was the sole owner of the Property in the Noah Mortgage, Option Agreement, and various other option documents; (3) failing to inform Noah and Aero that she granted the Subordinate Mortgage; and (4) failing to inform Aero when the Subordinate Mortgage was recorded with the Duke County Registry of Deeds.

33. Mrs. Bransford's bad faith conduct has interfered with Aero's right to receive the benefits of the Noah Mortgage and Option Agreement.

34. As a result of Mrs. Bransford's breach of the implied covenant of good faith and fair dealing, Aero has sustained and continues to suffer damages.

**COUNT III**
**(Intentional Misrepresentation – Aero v. Mrs. Bransford)**

35. Aero hereby restates and incorporates herein the allegations contained in 1 through 34 of this Complaint.

36. Mrs. Bransford intentionally misrepresented to Noah that she owned the Property individually at the time the Noah Mortgage was granted. She also intentionally misrepresented that she was the sole Property owner in the Noah Mortgage, Option Agreement, and various other option documents.

37. Noah and Aero reasonably relied on Mrs. Bransford's representations when they advanced funds in the amount of $500,000 dollars secured by the Property.

38. As a result of Mrs. Bransford's intentional misrepresentations, Aero suffers and continues to suffer damages.

**COUNT IV**
**(Fraud in the Inducement – Aero v. The Bransfords)**

39. Aero hereby restates and incorporates herein the allegations contained in Paragraphs 1 through 38 of this Complaint.

40. Both Mr. and Mrs. Bransford misrepresented to Noah that at the time of the Noah Mortgage closing transaction, Mrs. Bransford would be the sole owner of the Property.

41. In reliance of the Bransfords' representations, Noah entered the Noah Mortgage with Mrs. Bransford, individually, and advanced funds in the amount of $500,000. The funds were used to benefit both Mr. and Mrs. Bransford.

42. As a result of this reliance, Aero, assignee of the Noah Mortgage, now holds a mortgage on the Property only secured by Mrs. Bransford's interest in the Property. As a result, Aero suffers and continues to suffer damages to its detriment.

**COUNT V**
**(Unjust Enrichment – Aero v. Mr. Bransford)**

43. Aero hereby restates and incorporates herein the allegations contained in Paragraphs 1 through 42 of this Complaint.

44. Mr. Bransford has been unjustly enriched at Aero's expense inasmuch as he has received the benefit of the proceeds from Aero that he has used to make improvements to the Property without providing Aero with any compensation for said proceeds.

45. Equity requires that Aero receive compensation, in the form of security in Mr. Bransford's interest in the Property or otherwise, for the benefit received by him.

**COUNT VI**
**(Equitable Lien – Aero v. Mr. Bransford and the Secretary of Veteran Affairs)**

46. Aero hereby restates and incorporates herein the allegations contained in Paragraphs 1 through 45 of this Complaint.

47. Based upon the allegations set forth in this Complaint, Aero is entitled to an equitable lien on Mr. Bransford's interest in the Property and this lien interest is entitled to priority over the Subordinate Mortgage.

**COUNT VII**
**(Declaratory Judgment – Aero v. All Defendants)**

48. Aero hereby restates and incorporates herein the allegations contained in Paragraphs 1 through 47 of this Complaint.

49. A controversy exists among the parties to this action concerning their rights, titles, and interests in the Property and the relative priorities of those rights, titles, and interests.

50. Pursuant to Mass. Gen. Laws. c. 231A, § 1 et seq, Aero seeks a binding declaration that its interest in the Property is superior in right, duty, status, and other legal relations to those of any other party, including, but not limited to, the Secretary of Veteran Affairs' interest in the Property.

**WHEREFORE**, the Plaintiff, Aero HEC Acquisition I, LLC, requests that this Court enter Judgment as follows:

1. Enter judgment in favor of Aero HEC Acquisition I, LLC on all counts.
2. Enter judgment declaring that Aero HEC Acquisition I, LLC's right, title and interest in the Property is superior to the right, title and interest of all parties, including a declaration that the Noah Mortgage is a valid second mortgage on the Property and superior to the Subordinate Mortgage.
3. Enter judgement declaring that the Noah Mortgage encumbers a 100% interest in the Property;
4. Award Aero HEC Acquisition I, LLC its actual and compensatory damages, plus interest.
5. Award Aero HEC Acquisition I, LLC its reasonable attorneys' fees and costs incurred in this action.
6. Grant such other and further relief as the Court deems fair and just.

**PLAINTIFF,**
**AERO HEC ACQUISITION I, LLC**
By its attorneys,

Danielle Andrews Long (BBO #646981)
dlong@rc.com

Tasnuva (Taz) Islam (BBO #698370)
tislam@rc.com
ROBINSON & COLE LLP
One Boston Place, 25th Fl.
Boston, MA 02108
(617) 557-5900

Dated: April 13, 2023

**VERIFICATION**

I, Richard Ho, Authorized Signatory, of Aero HEC Acquisition I, LLC, being duly sworn, depose and say that I have read the foregoing Complaint and know its contents; that the facts stated therein are true to my own knowledge and no material facts have been omitted; and that I verify this Complaint on behalf of the Plaintiff in this action, Aero HEC Acquisition I, LLC.

Signed under the penalties of perjury this 10th day of April, 2023.

NAME: Richard Ho
TITLE: Authorized Signatory

2019 00001568
Bk: 1491 Pg: 887 Doc: DEED
Page: 1 of 5 03/28/2019 09:24 AM

MARTHA'S VINEYARD LAND BANK FEE
☒ PAID $ 26,900
☐ EXEMPT $
59960 3/28/19 MH
NO. DATE CERTIFICATION

# QUITCLAIM DEED

I, **HARRIET BROWNSON SAYRE McCORD, TRUSTEE OF 484 MAIN STREET REALTY TRUST** u/d/t dated June 28, 2004 recorded with the Dukes County Registry of Deeds in Book 1042, Page 931, of Durham, North Carolina

in consideration of **ONE MILLION THREE HUNDRED FORTY-FIVE THOUSAND AND 00/100 ($1,345,000.00) DOLLARS,**

hereby grant to **THOMAS L. BRANSFORD and PATRICIA S. BRANSFORD,** husband and wife as tenants by the entirety, with a mailing address of 25 Broad Street, Apt 8-1, New York, New York 10004

with ***quitclaim covenants***

The land with the buildings, structures and improvements thereon, situated in the Town of Tisbury, County of Dukes County, and Commonwealth of Massachusetts, shown as "Lot 1 1.87 acres±" on a certain plan entitled "Plan of Land in Tisbury, Mass. Prepared For the 484 Main Street Realty Trust Scale 1" = 40' July 15, 2016" prepared by Schofield, Barbini & Hoehn, Inc., and recorded in the Dukes County Registry of Deeds in Plan Book 18, Page 44 (the "Plan").

Grantees by acceptance and recording of this deed agree to the restrictions and covenants attached to this deed and made a part hereof.

Grantees by acceptance and recording of this deed acknowledge and confirm that Grantees shall have no rights over the "asphalt driveway" shown on the Plan which is located on Lot 2 as shown on the Plan.

Property Address: 484 Main Street, Tisbury, Dukes County, Massachusetts

MASSACHUSETTS EXCISE TAX
Dukes County ROD #8 001
Date: 03/28/2019 09:24 AM
Ctrl# 043626 10193 Doc# 00001568
Fee: $6,133.20 Cons: $1,345,000.00

The parcel is conveyed subject to, and together with the benefit of, all rights, easements, covenants, restrictions and other matters of record, to the extent the same are in force and applicable.

By signing below, the Trustee of the Trust hereby certifies, under the pains and penalties of perjury, that the premises conveyed herein is not a principal residence of the said Trustee, of any of the beneficiaries of the Trust, or of any spouses, former spouses, partners or former partners in a civil union of such beneficiaries, or of any other persons, and is therefore not homestead property pursuant to M.G.L. c. 188.

For title, see deed of Francis B. Sayre, Jr., dated June 28, 2004 and recorded with the Dukes County Registry of Deeds in Book 1042, Page 938.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**EXECUTED** as a sealed instrument this 25 day of March, 2019

Harriet Brownson Sayre McCord, Trustee
Harriet Brownson Sayre McCord,
Trustee as aforesaid

**STATE OF NORTH CAROLINA**

Durham County, ss.

On this 25 day of March, 2019, before me, the undersigned Notary Public, personally appeared the above-named Harriet Brownson Sayre McCord, Trustee of 484 Main Street Realty Trust, proved to me through satisfactory evidence of identification, which was **(circle one): (i)** personal knowledge of identity of the principal, **(ii)** passport or driver's license bearing the photographic image of the principal, or **(iii)** other: _______________, to be the person whose name is signed on the preceding or attached document, and who acknowledged to me that she signed it voluntarily for its stated purpose, as her free act and deed, as Trustee of 484 Main Street Realty Trust, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of her knowledge and belief.

Notary Public [print name: Michael H. Formy-Duval
My commission expires: Sept 29 2021

**AFFIX NOTARIAL SEAL:**

MICHAEL H. FORMY-DUVAL
Notary Public
Durham Co., North Carolina
My Commission Expires Sept. 29, 2021

# RESTRICTIONS AND COVENANTS

By acceptance and recording of this Quitclaim Deed, the grantees hereby agree for themselves and their respective executors, administrators, heirs, devisees, grantees, successors and assigns as the owner of the granted premises, as follows:

1. No building, shed, garage, or any structure (other than walls, fences and minor customary accessory structures such as mailboxes, light posts, sculptures, posts, flag poles and the like) shall be constructed within 110 feet of the front property line which runs along Main Street (the "No Build Area"). No tennis court or swimming pool or associated fences shall be constructed or maintained within 50 feet of the front property line which runs along Main Street.

2. The owner of the granted premises hereby agrees to maintain, plant, install, or construct a vegetative screen (consisting of trees and vegetation) within the No Build Area (the "Vegetative Screen") for the purposes of providing a visual screen between Main Street and any buildings and structures on the granted premises. Such Vegetative Screen shall be maintained in perpetuity.

3. The Total Habitable Area (as defined below) of all buildings and structures on the granted premises shall not exceed 4100 square feet total, either in any tear-down, renovation and/or expansion of the existing house, or any tear-down, renovation and/or expansion of the existing wood shop/garage, or the construction of additional new structure(s) (on new footprint(s)). The Habitable Area of the existing residence as of the June 1, 2016 is agreed to be 2,651 square feet, and the Habitable Area of the existing woodshop, not including garage or attached sheds, is agreed to be 405 square feet as of such date. Therefore, the current Total Habitable Area of the buildings and structures on the granted premises is agreed to be 3,056 square feet as of June 1, 2016. "Habitable Area" or "Total Habitable Area" means the aggregate of all habitable space, which is generally based on the sum of the exterior dimensions of each above-grade level of a structure, including decks or porches if enclosed by walls or screening. This measurement includes all buildings and structures on the premises, or portions thereof, which are habitable, including indoor recreational facilities.

4. No additional new structure (on a third footprint) on the granted premises shall exceed 400 square feet of Habitable Area. Any Habitable Area in an additional structure will count toward the 4100 square foot Total Habitable Area maximum.

5. No guest house or other habitable building and/or structure (or habitable portion thereof) on the granted premises (other than the primary dwelling)

shall be rented to a non-family member for more than twelve (12) weeks in a calendar year.

6. No building or structure on the granted premises shall exceed a height of 35 feet. The height of any building or structure is the vertical distance from the mean natural grade to the highest point of the roof ridge of the building or structure, or to the top of chimneys. [Consistent with Town of Tisbury Building Code 7.05.01 as of June 1, 2016.]

7. The granted premises shall not be further divided or subdivided.

8. No trailer, mobile home, camper, temporary building or structure of any kind, shall be used for a residence, either temporarily or permanently.

9. No trailer, mobile home, heavy commercial vehicle, construction equipment, camper, permanent tent or similar structure, shall be kept, placed or maintained upon the granted premises in such a manner as to be visible from adjoining property; provided, however, that the provisions of this paragraph shall not apply to temporary construction shelters or facilities maintained during and used exclusively in connection with the construction of any improvement.

These restrictions shall be deemed of actual and substantial benefit to all land which adjoins the granted premises, and also that certain property located at 45 Jewett Lane in Tisbury, Massachusetts as described in deeds recorded in the Dukes County Registry of Deeds in Book 465, Page 174 and Book 466, Page 616, which property is benefitted by these restrictions.

To the extent that any provisions of this deed are deemed to constitute restrictions subject to the limiting provisions of M.G.L. Chapter 184, Sections 26 through 30, then all such restrictions shall be binding upon grantee for a term of one hundred fifty (150) years from the date of recording hereof and shall remain in full force and effect in accordance with the provisions of M.G.L. Chapter 184, Section 27, as it may be amended from time to time, or as provided in similar successor provisions, which provision of M.G.L. Chapter 184, Section 27 permit the extension of the period of enforceability of said restrictions by the recording of an extension in accordance with the provisions of said law before the expiration of the first thirty (30) years from the date of recording hereof, and before the expiration of each succeeding twenty (20) year period thereafter, or for such other maximum further periods of time as may be allowed by any amendments of said law or by any successor provisions.

ATTEST: Paulo C. DeOliveira, Register
Dukes County Registry of Deeds

# Dukes County Registry of Deeds

# Electronically Recorded Document

This is the first page of the document - Do not remove

---

## Recording Information

| | |
|---|---|
| Document Number | : 1108 |
| Document Type | : MTG |
| Recorded Date | : February 18, 2020 |
| Recorded Time | : 02:53:24 PM |
| Recorded Book and Page | : 01521 / 1 |
| Number of Pages(including cover sheet) | : 23 |
| Receipt Number | : 222652 |
| Recording Fee | : $205.00 |

**Dukes County Registry of Deeds**
**Paulo C. DeOliveira, Register**
**81 Main Street**
**PO Box 5231**
**Edgartown, MA 02539**
**508-627-4025**
**www.Masslandrecords.com**

Return To:
Inspire Closing Services, LLC
420 Rouser Road, Suite 500
Moon Township, PA 15108
(877) 901-1629 341307

**Prepared By:** Michelle Morgan

**Property Address:**
484 Main St
Vineyard Haven, MA 02568

# Mortgage

**MIN** 1000730-0110988912-9

**Definitions**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated February 12, 2020 , together with all Riders to this document.

(B) **"Borrower"** is Thomas L. Bransford and Patricia S. Bransford, husband and wife, as tenants by the entirety

Borrower is the mortgagor under this Security Instrument.

(C) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) **"Lender"** is Freedom Mortgage Corporation

Lender is a Corporation

organized and existing under the laws of The State of New Jersey
Lender's address is 907 Pleasant Valley Av Ste 3, Mount Laurel, NJ 08054

(D-1) **"Mortgage Broker"** is No mortgage broker was involved in the mortgage.

Mortgage Broker's post office address is N/A

and Mortgage Broker's license number is N/A

(D-2) **"Mortgage Loan Originator"** is Donald Louis Latka Jr.
Mortgage Loan Originator's post office address is 907 Pleasant Valley Avenue, Suite 3, Mount Laurel, NJ 08054
and Mortgage Loan Originator's license number is ML033276

(E) **"Note"** means the promissory note signed by Borrower and dated February 12, 2020. The Note states that Borrower owes Lender One Million Two Hundred Seven Thousand Nine Hundred Ninety Four and 00/100 Dollars (U.S. $1,207,994.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than June 1, 2049.

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [ ] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [xx] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## Transfer of Rights in the Property

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

County of Dukes :
*[Type of Recording Jurisdiction]* *[Name of Recording Jurisdiction]:*

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

**Parcel ID Number:** 4-B-17 which currently has the address of
484 Main .St *[Street]*
Vineyard Haven *[City]*, Massachusetts 02568 *[Zip Code]*
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**Uniform Covenants.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

   Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

   If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

   Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as

such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect

its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security

Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and

valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**Non-Uniform Covenants.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Subordination of Homestead and Waivers.** If Borrower heretofore has acquired or hereafter acquires an estate of homestead in the Property, Borrower hereby agrees, to the greatest extent permitted by Applicable Law, that such homestead estate is subordinated in all respects to this Security Instrument and the amount due under the Note and to all renewals, extensions and modifications of this Security Instrument or the Note, and that said homestead estate is subject to all of the rights of Lender under this Security Instrument and the Note and all renewals, extensions and modifications of this Security Instrument and the Note, and is subordinate to the lien evidenced by this Security Instrument, and all renewals, extensions and modifications of this Security Instrument. Borrower waives and relinquishes all rights of courtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Thomas L. Bransford (signature) _______________ (Seal)
Thomas L. Bransford -Borrower

Patricia S. Bransford (signature) _______________ (Seal)
Patricia S. Bransford -Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

☐ Refer to the attached *Signature Addendum* for additional parties and signatures.

**Acknowledgment**
**State of** MA
**County of** Dukes
On February 12, 2020 , before me, the undersigned notary public, personally appeared Thomas L. Bransford and Patricia S. Bransford, husband and wife, as tenants by the entirety

proved to me through satisfactory evidence of identification, which were MA DL, to be the person(s) whose name(s) is/are signed on the preceding or attached document, and acknowledged to me that he/she/they signed it voluntarily for its stated purpose.

ELAINE EDWARDS
Notary Public State of New York
No. 01ED5046256 Qualified in Kings County
Certificate Filed in New York County
Commission Expires December 16, 2023

*Notary Public*

*My commission expires:* December 16, 2023

**Loan origination organization** Freedom Mortgage Corporation
**NMLS ID** 2767
**Loan originator** Donald Louis Latka Jr.
**NMLS ID** 33276

# VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER

## NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.

THIS VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER is made this 12th day of February, 2020 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Deed to Secure Debt (herein "Security Instrument") dated of even date herewith, given by the undersigned (herein "Borrower") to secure Borrower's Note to Freedom Mortgage Corporation

(herein "Lender") and covering the Property described in the Security Instrument and located at

484 Main St
Vineyard Haven, MA 02568
[Property Address]

VA GUARANTEED LOAN COVENANT: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

If the indebtedness secured hereby be guaranteed or insured under Title 38, United States Code, such Title and Regulations issued thereunder and in effect on the date hereof shall govern the rights, duties and liabilities of Borrower and Lender. Any provisions of the Security Instrument or other instruments executed in connection with said indebtedness which are inconsistent with said Title or Regulations, including, but not limited to, the provision for payment of any sum in connection with prepayment of the secured indebtedness and the provision that the Lender may accelerate payment of the secured indebtedness pursuant to Covenant 18 of the Security Instrument, are hereby amended or negated to the extent necessary to conform such instruments to said Title or Regulations.

LATE CHARGE: At Lender's option, Borrower will pay a "late charge" not exceeding four per centum (4%) of the overdue payment when paid more than fifteen (15) days after the due date thereof to cover the extra expense involved in handling delinquent payments, but such "late charge" shall not be payable out of the proceeds of any sale made to satisfy the indebtedness secured hereby, unless such proceeds are sufficient to discharge the entire indebtedness and all proper costs and expenses secured hereby.

TRANSFER OF THE PROPERTY: This loan may be declared immediately due and payable upon transfer of the Property securing such loan to any transferee, unless the acceptability of the assumption of the loan is established pursuant to Section 3714 of Chapter 37, Title 38, United States Code.

An authorized transfer ("assumption") of the Property shall also be subject to additional covenants and agreements as set forth below:

(a) ASSUMPTION FUNDING FEE: A fee equal to five tenths ( 0.500 %) of the balance of this loan as of the date of transfer of the Property shall be payable at the time of transfer to the loan holder or its authorized agent, as trustee for the Department of Veterans Affairs. If the assumer fails to pay this fee at the time of transfer, the fee shall constitute an additional debt to that already secured by this instrument, shall bear interest at the rate herein provided, and, at the option of the payee of the indebtedness hereby secured or any transferee thereof, shall be immediately due and payable. This fee is automatically waived if the assumer is exempt under the provisions of 38 U.S.C. 3729 (c).

(b) ASSUMPTION PROCESSING CHARGE: Upon application for approval to allow assumption of this loan, a processing fee may be charged by the loan holder or its authorized agent for determining the creditworthiness of the assumer and subsequently revising the holder's ownership records when an approved transfer is completed. The amount of this charge shall not exceed the maximum established by the Department of Veterans Affairs for a loan to which Section 3714 of Chapter 37, Title 38, United States Code applies.

(c) ASSUMPTION INDEMNITY LIABILITY: If this obligation is assumed, then the assumer hereby agrees to assume all of the obligations of the veteran under the terms of the instruments creating and securing the loan. The assumer further agrees to indemnify the Department of Veterans Affairs to the extent of any claim payment arising from the guaranty or insurance of the indebtedness created by this instrument.

325167448 0110988912

Initials: [signature] [signature]

IN WITNESS WHEREOF, Borrower(s) has executed this VA Guaranteed Loan and Assumption Policy Rider.

Thomas L. Bransford -Borrower

Patricia S. Bransford -Borrower

-Borrower

-Borrower

-Borrower

-Borrower

-Borrower

-Borrower

325167448

0110988912

# Exhibit A

File No.: 341307

The Land referred to herein below is situated in the County of DUKES, State of MA, and is described as follows:

The land with the buildings, structures and improvements thereon situated in the City of Vineyard Haven, County of Dukes County and Commonwealth of Massachusetts shown as "Lot 1, 1.87 acres, more or less on a certain plan entitled "Plan of Land in Tisbury, Mass. prepared for the 484 Main Street Realty Trust, Scale 1" = 40', July 15, 2016" prepared by Schofield, Barbini and Hoehn Inc. and recorded in the Dukes County Registry of Deeds in Plan Book 18, Page 44 (the "Plan").

Grantees by acceptance and recording of this deed acknowledge and confirm that Grantee's shall have no rights over the "asphalt driveway" shown on the Plan which is located on Lot 2 as shown on the Plan.

Being the same property as conveyed from Harriet Brownson Sayre McCord, Trustee of 484 Main Street Realty Trust UDT dated 6/28/2004 to Thomas L. Bransford and Patricia S. Bransford, husband and wife, as tenants by the entirety, as set forth in Deed Book 1491, Page 887, dated 03/25/2019, recorded 03/28/2019, Dukes County, Massachusetts.

Tax ID: 4-B-17

ATTEST: Paulo C. DeOliveira, Register

# Dukes County Registry of Deeds

# Electronically Recorded Document

This is the first page of the document - Do not remove

---

## Recording Information

| | |
|---|---|
| Document Number | : 4356 |
| Document Type | : MTG |
| Recorded Date | : July 05, 2022 |
| Recorded Time | : 09:06:43 AM |
| Recorded Book and Page | : 01630 / 472 |
| Number of Pages(including cover sheet) | : 15 |
| Receipt Number | : 243929 |
| Recording Fee | : $205.00 |

**Dukes County Registry of Deeds**
**Paulo C. DeOliveira, Register**
**81 Main Street**
**PO Box 5231**
**Edgartown, MA 02539**
**508-627-4025**
**www.Masslandrecords.com**

Noah

Noah Offer ID: 104166

**After Recording Return To:**

Noah (fka Patch Homes Inc.)
6621 California Street, Lower Unit
San Francisco, CA 94121

**Prepared by:**

Noah (fka Patch Homes Inc.)

Property Address:
484 Main St Tisbury, MA 02568

# DEED OF TRUST (NON-RECOURSE) AND SECURITY AGREEMENT

**Effective Date:** 12/15/2021

This Deed of Trust ("Deed of Trust" or "Security Instrument") is made by

Patricia S. Bransford as a Married Woman and her separate property **("Trustor" or "Optionor")** to Spruce Title Company **("Trustee")** whose address is 601 University Avenue, Suite 254, Sacramento, CA for the benefit of Noah (fka Patch Homes Inc.), and its successor and assignees **("Beneficiary" or "Optionee")** with its principal place of business at 6621 California Street, Lower Unit, San Francisco, CA 94121.

Noah

Noah Offer ID: 104166

## DEFINITIONS

Capitalized terms used in this Security Instrument shall have the meanings specified in this Security Instrument, or if not defined herein, in that certain Noah Real Estate Purchase Option Agreement dated as of the Effective Date ("Option Agreement") executed by Trustor as owner, and Beneficiary as Investor, concurrently with this Security Instrument.

1. **Grant Trust.** TRUSTOR HEREBY IRREVOCABLY grants, conveys, transfers and assigns to Trustee, and its successors and assignees, in trust, with power of sale, all right title and interest which Trustor now has or hereinafter may acquire in that certain real property ("**Real Property**") located in Dukes County, State of Massachusetts, described in Exhibit A attached hereto and made a part hereof.

   Together with all improvements, replacements and additions now or hereafter erected on the Real Property and all easements, appurtenances and fixtures now or hereafter a part of the Real Property. (The fixtures, improvements and the Real Property are collectively referred to as the "**Property.**")

   Together with all rents, issues, profits and proceeds, including without limitation insurance and condemnation proceeds from the Real Property, subject, however, to the right, power and authority given to the conferred upon Beneficiary below to collect and apply such rents, issues and profits.

2. **Secured Obligations.** Trustor makes the grant, transfer and assignment set forth in the "Grant In Trust" Section above for the purpose of securing the following obligations (collectively, the "**Obligations**"):
   a. the performance and payment of all obligations of Trustor under the Option Agreement, including without limitation, the following:
      i. payment of all monies paid by Beneficiary on Trustor's behalf pursuant to Section 13 of the Option Agreement;
      ii. payment of all insurance proceeds owed to Beneficiary pursuant to Section 14 of the Option Agreement;
      iii. payment of all amounts owed to Beneficiary pursuant to Section 2 of the Option Agreement;
      iv. payment of all amounts owed to Beneficiary pursuant to Sections 4 or 9 of the Option Agreement;
      v. payment of all sales proceeds owed to Beneficiary in connection with any sale of the Property pursuant to Sections 5 of the Option Agreement;

vi. performance of the obligations of Trustor under Section 11 of the Option Agreement; and

vii. damages arising to, or incurred by, Beneficiary from Trustor's failure to act or interference with Beneficiary's rights pursuant to Section 13 of the Option Agreement. Trustor and Beneficiary agree and acknowledge that the damages that would arise from Trustor's failure to act or interference are uncertain, depend on many factors, and would be extremely difficult to ascertain. Therefore, in a good faith effort to determine a method for reasonably estimating and liquidating the damages which would be incurred by Beneficiary arising from Trustor's interference or failure to act, Trustor and Beneficiary agree to the Liquidated Damages specified in Section 8 below;

b. the performance of the obligations of Trustor contained in this Security Instrument or incorporated by reference;

c. any expenditures made by Beneficiary pursuant to, or under, this Security Instrument; and

d. payment of all fees and expenses, including, without limitation court costs and other dispute resolution costs, attorneys' (including Beneficiary's in-house counsel, if any), and experts' fees and costs (collectively "**Attorneys' Fees**") incurred by Beneficiary in the enforcement and collection of the obligations listed above and the protection of Beneficiary's rights related thereto, whether such fees are incurred in any state, federal or bankruptcy court, and in any bankruptcy case or insolvency proceeding, or otherwise, and whether or not litigation or arbitration is commenced, which are in any way related to this Security Instrument, to the interpretation or enforcement of the parties' rights under this Security Instrument, or to the Property.

Trustor shall not be obligated to repay any part of the Noah Investment Amount (as those terms are defined in the Option Agreement); and therefore, such items shall not be included within the Obligations. The foregoing shall not, however, in any way limit any payments due Beneficiary under the Option Agreement pursuant to its Percentage Share (as defined in the Option Agreement).

3. **Uniform Commercial Code, Security Agreement and Fixture Filing.** This Security Instrument is intended to be and shall constitute a security agreement under the California Uniform Commercial Code for any items of personal property that constitute fixtures or are specified as part of the Property and that under applicable law may be subject to a security interest under the California Uniform Commercial Code. Trustor hereby grants to Beneficiary a security interest in those items to secure the performance and payment of the Obligations.

a. Trustor agrees that Beneficiary may file either this Security Instrument, or a copy of it, or a UCC-1 Financing Statement in the real estate records or other appropriate index and/or in the Office of the Secretary of State of the State of California, as a financing statement for any of the items specified above as part of the Property.

b. This Security Instrument constitutes a financing statement filed as a fixture filing pursuant to the California Uniform Commercial Code, and any similar or successor provisions. For purposes of the fixture filing, the "debtor" is Trustor and the "secured party" is Beneficiary. The goods subject to the fixture filing consist of all equipment and appliances attached to the Property or which are considered a fixture under California law, including all heating, cooling, and ventilation equipment, ducting, appliances, and fixtures; and all plumbing equipment, piping, and fixtures; and all electrical and telecommunications equipment, wiring, cabling, conduit, and fixtures; and all other equipment attached to or used in the operation of the Property, and all proceeds thereof.

c. Beneficiary may file such extensions, renewals, amendments and releases as are appropriate to reflect the status of its security interest.

d. Trustor shall pay all costs of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and shall pay all reasonable costs and expenses of any record searches for financing statements that the Beneficiary may reasonably require.

e. On any default hereunder Beneficiary shall have the remedies of a secured party under the California Uniform Commercial Code and may also invoke the remedies in Section 7 below. In exercising any of these remedies, Beneficiary may proceed against the items of the Property constituting the Real Property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Beneficiary's remedies under the California Uniform Commercial Code or the remedies in Section 7 below.

4. **Assignment of Leases And Rents**. As additional security for the Obligations, Trustor hereby irrevocably, absolutely and unconditionally assigns to Beneficiary all of Trustor's right, title and interest in and to all existing and future leases, subleases and licenses relating to the use, occupancy or enjoyment of all or any part of the Property and all rents, income, revenues, profits, proceeds and earnings now or hereafter payable with respect to the ownership, use or occupancy of the Property (collectively the "**Rents**"):

   a. Trustor hereby gives to, and confers upon, Beneficiary the right, power and authority, during the continuance of this Security Instrument, to collect the Rents, reserving unto Trustor the right, prior to any default by Trustor in

payment of the Obligations secured hereby or in performance of any agreement hereunder, to collect and retain such Rents, as they become due and payable.

b. Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Obligations secured hereby, enter upon and take possession of the Property or any part of it, in its own name sue for or otherwise collect such Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Attorneys' Fees to the Obligations secured hereby, and in such order as Beneficiary may determine.

c. The entering upon and taking possession of the Property, the collection of such rents, issues and profits and the application of such rents, issues and profits pursuant to this Security Instrument, shall not cure or waive any default or notice of default under this Security Instrument or invalidate any act done pursuant to such notice.

d. Nothing in this section shall permit Trustor to lease or rent the Property in contravention of any provision of the Option Agreement; nor shall anything in this section modify any provision in the Option Agreement relating to the use, lease or occupancy of the Property.

5. <u>Covenants of Trustor Regarding the Property</u>. Trustor hereby agrees as follows:

   a. To appear in and defend any action or proceeding purporting to affect the security of this Security Instrument or the rights or powers of Beneficiary or Trustee: and to pay all costs and expenses of Trustee and Beneficiary (including cost of evidence of title and Attorneys' fees) incurred: (i) in any state, federal or bankruptcy court, in any action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Security Instrument or to collect the Obligations or to protect Beneficiary's rights under this Security Instrument; and/or (ii) in connection with foreclosure upon the collateral granted under this Security Instrument (whether or not suit is filed).

   b. To pay: (i) at least ten (10) days before delinquency all taxes and assessments affecting the Property; and (ii) all encumbrances, charges and liens, with interest, on the Property (or any part of the Property), which are prior or could obtain priority to the lien or to the rights granted under this Security Instrument, and all costs, fees and expenses of this Security Instrument.

i. If Trustor fails to make any payment or to do any act as provided in this Security Instrument, Beneficiary or Trustee may (but shall not be obligated to) make the payment or do the act in the required manner and to the extent deemed necessary by Beneficiary or Trustee to protect the security for this Security Instrument, which payments and related expenses (including Attorneys' fees) shall also be secured by this Security Instrument.

ii. Such performance by Beneficiary or Trustee shall not require notice to, or demand on Trustor and shall not release Trustor from any obligation under this Security Instrument.

iii. Beneficiary or Trustee shall have the following related rights and powers: (A) to enter upon the Property for the foregoing purposes, (B) to appear in and defend any action or proceeding purporting to affect the Property or the rights or powers of Beneficiary or Trustee under this Security Instrument, (C) to pay, purchase, contest or compromise any encumbrance, charge, or lien that in the judgment of Beneficiary or Trustee appears to be prior or superior to this Security Instrument, and (D) to employ counsel, and to pay such counsel necessary expenses and costs, including Attorneys' Fees.

c. To pay immediately upon demand all sums expended by Beneficiary or Trustee pursuant to this Security Instrument; and to pay interest on any of the foregoing amounts demanded by Beneficiary or Trustee at the rate specified in Section 3289 of the California Civil Code (or other applicable law); from the date of such demand, not to exceed the maximum rate allowed by law at the time of such demand.

6. **Power of Attorney.** Trustor hereby irrevocably appoints Beneficiary as Trustor's attorney-in-fact (such agency being coupled with an interest), and as such attorney-in-fact Beneficiary may, after providing notice to Trustor pursuant to the Option Agreement, without the obligation to do so, in Beneficiary's name, or in the name of Trustor, prepare, execute and file or record financing statements, continuation statements, applications for registration and like documents necessary to create, perfect or preserve any of Beneficiary's security interests and rights in or to any of the Property, and, upon a default under this Security Instrument, take any other action required of Trustor; provided, however, that Beneficiary as such attorney-in-fact shall be accountable only for such funds as are actually received by Beneficiary.

7. **Default and Foreclosure and Power of Sale.** Upon default by Trustor in the performance of or upon breach by Trustor of any of the rights and obligations that

are secured by this Security Instrument as specified above, Beneficiary may declare all sums secured by this Security Instrument immediately due and payable and may invoke the power of sale and any other remedies permitted by applicable law, including an action in any court of competent jurisdiction to foreclose this Security Instrument as a deed of trust or mortgage. If Beneficiary elects to invoke the power of sale, Beneficiary shall execute and deliver to Trustee, or cause Trustee to execute, a written notice of default and of Beneficiary's election to cause the Property to be sold. Beneficiary also shall deposit with Trustee this Security Instrument and all documents evidencing any expenditures and damages secured by this Security Instrument. Trustee shall cause the notice to be filed in the real property records of the county where the Property is located and shall mail copies of the notice to Trustor as prescribed by applicable law and to all other persons prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law.

a. After the required time period has lapsed following the recordation of said notice of default, and notice of sale has been given as required by law, Trustee without demand on Trustor, shall sell the Property at the time and place specified in the notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement, at the time fixed by the preceding postponement. Trustee shall deliver to the purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of their truthfulness. Any person, including Trustor, Trustee, or Beneficiary as defined in this Security Instrument, may purchase at such sale.

b. After deducting all costs, fees and expenses (including, without limitation. Attorneys' Fees) of Trustee and of this trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: to Beneficiary, all sums expended under the terms of this Security Instrument, not then repaid, with accrued interest at the amount allowed by law in effect on the Effective Date of this Security Instrument; to Beneficiary, all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

c. Notice provided to Trustor under this Security Instrument shall be to the address specified in this Security Instrument unless otherwise required by law.

d. **Upon completion of the sale as set forth above, there shall be no deficiency against Trustor for any obligations secured hereby, all reimbursements to Beneficiary being derived solely from the proceeds of the Property.**

8. **Liquidated Damages.** Liquidated Damages means a calculation of the Net Option Value using a value for Investor's Price that has been reduced by 20%.

9. **No Waiver.** No previous waiver and no failure, delay or forbearance by Beneficiary in acting with respect to the terms of this Security Instrument shall constitute a waiver of any breach, default, or failure of condition under this Security Instrument or the obligations secured thereby. A waiver of any term of this Security Instrument or of any of the obligations secured thereby must be made in writing and shall be limited to the express written terms of such waiver.

10. **Trustee's Powers.** At any time or from time to time, without liability therefor and without notice, upon written request of Beneficiary and presentation of this Security Instrument, and without affecting the personal liability of any person for the performance of the Option Agreement secured hereby, Trustee may: (a) reconvey any part of the Property; (b) consent to the making of any map or plat of the Property; (c) join in granting any easement thereon; and (d) join in any extension agreement or any agreement subordinating the lien or charge of this Security Instrument.

11. **Substitution of Trustee.** Beneficiary, or any successor in ownership of the Obligations, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named or acting under this Security Instrument, which instrument, when executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where the Property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from Trustee's predecessor, succeed to all its title, estate, rights, powers and duties. Such instruments must contain the name of the original Trustor, Trustee and Beneficiary under this Security Instrument, the book and page where this Security Instrument is recorded, and the name and address of the new Trustee(s).

12. **Trustee's Compensation.** Trustor shall pay Trustee's fees and reimburse Trustee for expenses in the administration of this trust, including Attorneys' Fees. Trustor shall pay to the Beneficiary reasonable compensation for services rendered concerning this Security Instrument, including without limit any statement of amounts owing under any Obligations.

13. **Full Reconveyance.** Upon written request of Beneficiary stating that all Obligations have been performed or paid, and upon surrender of this Security Instrument to Trustee for disposition as Trustee in its sole discretion may choose, and upon payment of its fees, Trustee shall reconvey, without warranty, the Property then held under this Security Instrument. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness of such recitals. The grantee in such reconveyance may be described as "*the person or persons legally entitled thereto.*"

14. **Successors.** This Security instrument applies to, inures to the benefit of, and binds all parties to this Security Instrument, their heirs, legatees, devisees, administrators, executors, successors, and assignees. The term "**Beneficiary**" shall include any successor or assignee of Beneficiary's rights in the Option Agreement and in this Security Instrument, whether or not named as Beneficiary in this Security instrument. In this Security Instrument, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural.

15. **Joint and Several Liability.** If more than one person signs this Security Instrument as Trustor, the obligations of each signatory shall be joint and several.

16. **Multiple Owners.** If there are multiple Trustors of the Property:

    a. this Security Instrument must be signed by each such Trustor;

    b. all rights and powers specified for Trustor in this Security Instrument must be approved and exercised unanimously by all such multiple Trustors;

    c. all such multiple Trustors shall be jointly and severally liable for all liabilities and obligations specified for Trustor under this Security Instrument;

    d. Beneficiary may treat any notice received from any one Trustor as notice from all Trustors.

17. **Revocable Trust.** If any Trustor is/are the trustee(s) of a Revocable Trust (as defined in Exhibit B to the Option Agreement):

    a. all trustees and all trustors of the Revocable Trust must sign this Security Instrument in their capacities as individuals and as trustees and/or trustors of the Revocable Trust, and each trustee and trustor of the Revocable Trust who signs this Security Instrument hereby represents and warrants that all trustees and trustors of the Revocable Trust have been disclosed to Beneficiary;

b. any trustee of the Revocable Trust who is also a trustor of the Revocable Trust need only sign this Security Instrument once for it to be binding on such person both as trustee and as trustor of the Revocable Trust;

c. all rights and powers specified for, and all actions required of, Trustor in this Security Instrument must be approved and exercised unanimously by all trustees of the Revocable Trust;

d. all trustees and all trustors of the Revocable Trust, in their capacities as individuals, shall be jointly and severally liable with Trustor for all liabilities and obligations specified for Trustor under this Security Instrument;

e. all representations and warranties by Trustor in this Security Instrument are made by all trustees of the Revocable Trust on behalf of the Revocable Trust and by all trustees and all trustors of the Revocable Trust in their capacities as individuals;

f. notice required to be given by, or to, any Trustor will be deemed adequately given if given by, or to, any of the trustees of the Revocable Trust using the contact information set forth in this Security Instrument; and

g. Beneficiary may treat any notice received from any one trustee of the Revocable Trust as notice from all trustees of the Revocable Trust and from Trustor.

18. <u>Acceptance and Representations by Trustee</u>. Trustee accepts this trust when this Security Instrument, duly executed and acknowledged, is made a public record as provided by law. Trustee is not required to notify any party to this Security Instrument of pending sale under any other deed of trust or mortgage (as appropriate) or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee. Trustor represents and warrants to Holder that: (a) Trustor has good and marketable title to the Property, free and clear of all claims and encumbrances whatever; (b) the lien created by this Security Instrument is a valid lien on the Property; and (c) Trustor will defend the lien of this Security Instrument against all adverse and conflicting claims of any nature whatsoever.

19. <u>Extent of Lien</u>. The lien and security interests granted to Beneficiary under this Security Instrument shall encumber Trustor's entire interest in the Property, notwithstanding the fact that the Option Agreement relates to only a fractional interest in the Property.

20. <u>No Merger</u>. So long as any of the obligations under the Option Agreement remains outstanding and undischarged, unless Beneficiary otherwise consents in writing, the fee estate of Trustor in the Property or any part thereof (including the estate of Beneficiary after exercising the Option) will not merge, by operation of law or

otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Beneficiary or in any other Person.

21. **Governing Law**. This Security Instrument shall be governed by the laws of the State of California.

22. **Remedies Cumulative**. All remedies provided in this Security Instrument are distinct and cumulative to any other right or remedy under this Security Instrument or afforded by law or equity, and may be exercised concurrently, independently or successively.

23. **Severability**. If any provision of this Security Instrument is held to be invalid, illegal, or unenforceable, that invalidity, illegality, or unenforceability will not affect any other provisions of this Security Instrument, and the other provisions will be construed as if the invalid, illegal, or unenforceable provision had never been contained in the Security Instrument.

24. **Captions**. The captions and headings in this Security Instrument are for convenience only and are not to be used to interpret or define the provisions hereof.

25. **Time**. Time is of the essence of each and every term herein.

26. **Integration**. This Security Instrument contains or expressly incorporates by reference the entire agreement of the parties with respect to the matters contemplated herein and supersede all prior negotiations or agreements, written or oral. This Security Instrument shall not be modified except by a written instrument executed by all parties.

**Noah**

**Noah Offer ID: 104166**

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH BENEFICIARY, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS SECURITY INSTRUMENT, THE OPTION AGREEMENT, AND ANY OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN TRUSTOR AND BENEFICIARY AS OF THE EFFECTIVE DATE.

IN WITNESS WHEREOF, each undersigned Trustor has executed this Security Instrument as of the Effective Date.

Witnesses:

Patricia S Bransford

Patricia Bransford (Seal)
- Trustor

Trustor Address:

484 Main Street
Tisbury, Massachusetts 02568

**Noah**

Noah Offer ID: 104166

## GENERAL ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not to the truthfulness, accuracy, or validity of that document.

STATE OF New York )

) ss.

COUNTY OF New York )

On 15th December, 2021, before me Davain Walker, Notary Public, personally appeared Patricia S. Bransford who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his her/their authorized capacity(is) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of NY that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Davain Walker
Notary Public, State of New York
Qualified in Westchester County
01WA6410230 (exp:10/19/2024)

Signature [signature]

(seal)

Noah

Noah Offer ID: 104166

## EXHIBIT A

## LEGAL DESCRIPTION

That certain real property situated in the City of Tisbury, County of Dukes, State of Massachusetts, described as follows:

The land with the buildings, structures and improvements thereon, situated in the Town of Tisbury, County of Dukes County, and Commonwealth of Massachusetts, shown as "Lot 11.87 acres+" on a certain plan entitled "Plan of Land in Tisbury, Mass. Prepared For the 484 Main Street Realty Trust Scale I" = 40' July 15, 2016" prepared by Schofield, Barbini & Hoehn, Inc., and recorded in the Dukes County Registry of Deeds in Plan Book 18, Page 44 (the "Plan").

Grantees by acceptance and recording of this deed agree to the restrictions and covenants attached to this deed and made a part hereof. Grantees by acceptance and recording of this deed acknowledge and confirm that Grantees shall have no rights over the "asphalt driveway" shown on the Plan which is located on Lot 2 as shown on the Plan. The parcel is conveyed subject to, and together with the benefit of, all rights, easements, covenants, restrictions and other matters of record, to the extent the same are in force and applicable.

Tax Parcel No.: 4 B 17

[end of legal description]
Source of Title: Book 1491 Page 887



ATTEST: Paulo C. DeOliveira, Register

# Dukes County Registry of Deeds

# Electronically Recorded Document

This is the first page of the document - Do not remove

---

## Recording Information

| | |
|---|---|
| Document Number | : 4358 |
| Document Type | : ASM |
| Recorded Date | : July 05, 2022 |
| Recorded Time | : 09:06:43 AM |
| Recorded Book and Page | : 01630 / 497 |
| Number of Pages(including cover sheet) | : 6 |
| Receipt Number | : 243929 |
| Recording Fee | : $105.00 |

**Dukes County Registry of Deeds**
**Paulo C. DeOliveira, Register**
**81 Main Street**
**PO Box 5231**
**Edgartown, MA 02539**
**508-627-4025**
**www.Masslandrecords.com**

Noah

Noah Offer ID: 104166

**After Recording Return To:**

Noah (fka Patch Homes Inc.)
6621 California Street, Lower Unit
San Francisco, CA 94121

**Prepared by:**

Noah (fka Patch Homes Inc.)

Property Address:
484 Main St Tisbury, MA 02568

Effective Date: 12/01/2021

# ASSIGNMENT OF DEED OF TRUST AND MEMORANDUM

For good and valuable consideration, Noah (fka Patch Homes inc.), a Delaware corporation ("Assignor"), hereby assigns, grants, transfers and otherwise conveys to Aero HEC Acquisition I, LLC, a Delaware limited liability company ("Assignee"), all of Assignor's rights, title, interests and obligations to and under:

I. that certain Deed of Trust made by

Patricia S. Bransford as a Married Woman and her separate property **("Trustor" or "Owners(s)")** in favor of Assignor as "Beneficiary" Naming Spruce Title **("Trustee")** executed on December 15, 2021, and recorded concurrently in connection with this document in the public records of the Official Records of County of Dukes, State of Massachusetts, which relate to, run with and encumber the real property described in Schedule A; and

**Noah**

**Noah Offer ID: 104166**

II. that certain Memorandum of Agreement made by and between Assignor and Patricia S. Bransford as a Married Woman and her separate property **("Trustor" or "Owners(s)")** executed on December 15, 2021 and recorded concurrently in connection with this document in the public records of the Official Records of County of Dukes, State of Massachusetts

**[Execution Page Follows]**

**Noah**

**Noah Offer ID: 104166**

IN WITNESS WHEREOF, each undersigned Assignor has executed this instrument as of the Effective Date.

Assignor:

**Noah (fka Patch Homes Inc.)**

By : [signature]

Name : Sonja McIntosh

Title : Authorized Signatory

Date : 12/1/2021

**Noah** Noah Offer ID: 104166

## GENERAL ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not to the truthfulness, accuracy, or validity of that document.

STATE OF OREGON )
) ss.
COUNTY OF Multnomah )

On 1 DECEMBER, 2021, before me GRACE ELIZABETH VOILES, Notary Public, personally appeared Sonja McIntosh who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his her/their authorized capacity(is) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Oregon that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

OFFICIAL STAMP
GRACE ELIZABETH VOILES
NOTARY PUBLIC - OREGON
COMMISSION NO. 1005760
MY COMMISSION EXPIRES NOVEMBER 04, 2024

Signature ______________________

(seal)

Noah

Noah Offer ID: 104166

## SCHEDULE A

### LEGAL DESCRIPTION

That certain real property situated In the City of Tisbury, County of Dukes, State of Massachusetts, described as follows:

The land with the buildings, structures and improvements thereon, situated in the Town of Tisbury, County of Dukes County, and Commonwealth of Massachusetts, shown as "Lot 11.87 acres+" on a certain plan entitled "Plan of Land in Tisbury, Mass. Prepared For the 484 Main Street Realty Trust Scale I" = 40' July 15, 2016" prepared by Schofield, Barbini & Hoehn, Inc., and recorded in the Dukes County Registry of Deeds in Plan Book 18, Page 44 (the "Plan").

Grantees by acceptance and recording of this deed agree to the restrictions and covenants attached to this deed and made a part hereof. Grantees by acceptance and recording of this deed acknowledge and confirm that Grantees shall have no rights over the "asphalt driveway" shown on the Plan which is located on Lot 2 as shown on the Plan. The parcel is conveyed subject to, and together with the benefit of, all rights, easements, covenants, restrictions and other matters of record, to the extent the same are in force and applicable.

Tax Parcel No.: 4 B 17

[end of legal description]

Source of title: Book 1491 Page 887



ATTEST: Paulo C. DeOliveira, Register

**Noah**

**Noah Offer ID: 104166**

## The Noah Real Estate Purchase Option Agreement

On 12/15/2021 ("**Effective Date**"), Patricia S. Bransford as a Married Woman and her separate property, (individually or collectively, "**Owner**") accepts funds from Noah (fka Patch Homes, Inc.), a Delaware registered C. Corp, ("**Investor**") as consideration for this Option on the real property commonly known as 484 Main Street, Tisbury, Massachusetts 02568 and as more particularly described on attached Exhibit A (the "**Property**"). In exchange, Owner irrevocably grants to Investor the right to an interest in the Property and agrees to various other covenants for the benefit of Investor, all described in this document (the "**Option**" or "**Agreement**").

1. **FINANCIAL TERMS.**

$2,375,000.00 **Initial Appraised Value**
The Initial Appraised Value is the appraised value of the Property agreed to by the Owner at the time of origination of the Option, typically by appraisal or other valuation method.

$500,000.00 **Noah Investment Amount.**
The Noah Investment Amount is the money that the Investor provided to the Owner as part of the consideration for this Option.

$1,299,087.00 **Maximum Authorized Debt.**
The Maximum Authorized Debt is the highest total amount of principal that the Owner may owe on all loans secured by the Property.

10 years **Planned Expiration Date.**
The Planned Expiration Date is 10 Years from the Effective Date. This is the latest date by which Owner must pay the Net Option Value to Investor.

32.000% **Noah Share.**
A term used to approximate the economic value of the Investor's Percentage Share in the Property, represented as a percentage of the current value of the Property. It is further defined in Exhibit B.

Noah

Noah Offer ID: 104166

18% **Capped Rate.**
This rate is used to compute the maximum Net Option Value at the time of exit of this Option, unless the Early Termination as defined in Section 9 applies.

Primary Residence **Occupancy Type.**
This is used to understand whether the Property is being utilized as a "Owner Occupied / Primary" or an "Investment / Rental" Residence.

**Noah** **Noah Offer ID: 104166**

## 2. CREATION OF OPTION AND PAYMENT OBLIGATION.

2.1. Owner irrevocably grants to Investor and its successors an option to purchase the Percentage Share of the Property as an undivided ownership interest on the terms and conditions described below. Owner hereby acknowledges receipt of the Noah Investment Amount and agrees that the contribution of the Noah Investment Amount in advance of exercising the option, the resulting ability of Owner to use such funds interest-free from the time of this Agreement until the time the Option is exercised, and the subsequent payment of the Remaining Portion of the Exercise Price at exercise of the Option, is ample consideration for the Option and for the related covenants of Owner described below.

2.2. Owner recognizes and agrees that by entering into this Option, Owner is not obtaining a loan from Investor, but instead is granting an Option to Investor and thereby the right to purchase a fractional interest in the Property and become a co-owner in the Property. If Investor allows the Option to lapse, Owner shall not be obligated to return or repay the Noah Investment Amount.

2.3. Owner further agrees to pay Investor the Net Option Value described in Section 3 or Section 10. Owner acknowledges and understands that their obligation to pay Investor the Net Option Value will be settled in cash and is not conditioned on Investor purchasing, or taking title to, any ownership interest in the Property. To secure performance of the obligations created by this Option, Owner has made Investor the beneficiary of a deed of trust for the Property (the "Security Instrument"). If Owner fails to satisfy any of their obligations to Investor, then, following notice and an opportunity to cure as described in Subsection 13.1, Investor will have the right to foreclose on the Property as described in the Security Instrument.

## 3. CALCULATION OF NET OPTION VALUE.

The elements and procedures needed to calculate the Net Option Value are as follows.

3.1. **Investor's Price.** Investor's Price is the Percentage Share multiplied by the Noah Agreed Home Value.

3.2. **Remaining Portion of the Exercise Price.** The Remaining Portion of the Exercise Price is the difference between Investor's Price and the Noah Investment Amount.

3.3. **Ending Property Value.** The Ending Property Value is the total of: (i) greatest of: (a) the Adjusted Sale Price and (b) the Adjusted Appraised Value, or (c) the Early Termination Minimum Value if applicable as described in Section 9; (ii) minus any Positive Adjustment; and (iii) plus any Negative Adjustment. For purposes of this Option, the "**Adjusted Sale Price**" is the price at which Owner sells the Property subject to Appraiser Adjustments and the adjustment process as described in

Section 6, and the "**Adjusted Appraised Value**" is the fair market value of the Property determined by a Qualified Appraiser subject to Appraiser Adjustments and the adjustment process as described in Section 6.

3.4. **Net Option Value.** The Net Option Value is calculated by multiplying the Percentage Share by the Ending Property Value and subtracting the Remaining Portion of the Exercise Price, but the minimum Net Option Value is zero.

3.5. **Capped Return Amount.** The Net Option Value is not to exceed the Capped Return Amount, unless the Early Termination as defined in Section 9 and 10 applies. The "**Capped Return Amount**" is calculated as equal to: Noah Investment Amount * [(1 + Capped Rate) ^ (Number of years since Effective Date)]. For the purposes of this Option, the Capped Rate is equal to 18.00%.

3.6. **Percentage Share.** That undivided fractional interest in the Property that Investor has the right to acquire and Owner has agreed to sell if the Option is exercised. In this Agreement, the Percentage Share is 68.421%.

4. **OWNER'S RIGHT TO SELL.** Owner has the right to sell the Property at any time, but only subject to the following requirements and procedures.

4.1. **Permitted Sale.** A Permitted Sale is a sale of the Property that meets all of the following conditions: (i) made on commercially reasonable terms and entered into in good faith; (ii) is made at arm's length and the buyer is not Owner's friend, family member, or associate or an entity or agent acting on behalf of any such person. If the sale of the Property does not meet the above mentioned criteria, then the Investor has a Right of First Refusal to the sale in order to make sure that the sale is a Permitted Sale.

4.2. **Marketing Notice.** As soon as practical, but in no event less than forty-five (45) days prior to beginning efforts to market the Property for sale, the Owner shall provide written notice (a "**Marketing Notice**") to Investor. If Owner intends to seek a positive adjustment under Subsection 6.3, they will provide the Material Improvements Adjustment Request described in that Subsection with the Marketing Notice. A Marketing Notices is a mandatory prerequisite for an Offer Package under Subsection 4.3, no Offer Package shall be deemed valid unless it is received between 30 and 180 days after a Marketing Notice.

4.3. **Offer Package.** Prior to entering into any binding obligation to sell the Property, Owner shall provide to Investor an "**Offer Package**" consisting of: (i) complete and unaltered copies of the offer Owner wishes to accept (the "Owner Chosen Offer") together with copies of any documents and descriptions of any oral agreements, under which Owner would receive any consideration in addition to the price shown in the Owner Chosen Offer; and (ii) all listing or marketing agreements, purchase offers, inspection reports, appraisals, and title reports, created for the Property during the preceding six months.

4.4. **Determining Ending Property Value and Net Option Value.** If the sale is a Permitted Sale, the Ending Property Value shall be the Adjusted Sale Price determined as described in Section 6. Otherwise, the Ending Property Value shall be the greater of the Adjusted Sale Price or the Adjusted Appraisal Value determined as described in Section 6.

4.5. **Exercise of Option.** If the Net Option Value is greater than zero, Investor shall exercise its option, thus obligating the Owner to pay Investor the Net Option Value. Such exercise shall not require any notification by investor to Owner, or any other action by investor. If the Net Option Value is zero, then Investor shall not exercise its option, in which case Owner shall not share with Investor any sale proceeds and shall not return to Investor any portion of the Noah Investment Amount unless Section 9 (Early Termination Minimum Value) or Section 13 (Default) applies. Owner understands and acknowledges that Investor will not share in any losses suffered by Owner beyond the forfeiture of the Noah Investment Amount, and that, under such circumstances, Noah Investment Amount may constitute taxable income.

4.6. **Sale Closing Procedure.** Investor shall execute all documents required to allow Owner to convey title to the Property free and clear of the Security Instrument, conditioned upon the payment of the Net Option Value (if greater than zero), any amounts due under Sections 9 or 13, and any outstanding fees or obligations under this Option or the Security Instrument. Investor shall not pay any part of the costs and expenses associated with selling the Property, such as sales commissions, transfer taxes, or title or escrow fees.

5. **OWNER'S RIGHT TO TERMINATE THE OPTION.** Owner has the right to terminate the option and keep the Property, but only subject to the following requirements and procedures.

5.1. **Termination Package.** If Owner wishes to terminate the option without selling the Property, they shall provide to Investor a "**Termination Package**" consisting of written notice of Owner's intent to terminate the option, along with complete and unadulterated copies of any listing or marketing agreements, purchase offers, inspection reports, appraisals, and title reports, created for the Property during the preceding six months. If Owner intends to seek a positive adjustment under Subsection 6.3, they will provide the Material Improvements Adjustment Request described in that Subsection with the Termination Package.

5.2. **Determining Ending Property Value and Net Option Value.** The Ending Property Value shall be the Adjusted Appraised Value of the Property Determined as described in Section 6, or in the event the Early Termination Minimum Value applies, as described in Section 9, then the Ending Property Value shall be the Early Termination Minimum Value.

Noah

Noah Offer ID: 104166

5.3. **Exercise of Option.** If the Net Option Value is greater than zero, and Owner provides Investor a written "Confirmation Notice" confirming Owner's intent to terminate within 10 calendar days of receiving the Appraisal Report described in Section 6.1, Investor shall exercise its Option, thus obligating Owner to pay the Investor the Net Option Value. Such exercise shall not require any notification by Investor to Owner, or any other action by Investor.

5.4. **Termination Closing Procedure.** Investor shall execute all documents required to allow Owner to convey title to the Property free and clear of the Security Instrument conditioned upon payment of the Net Option Value (if greater than zero), any amounts due under Section 9 or 13, and any outstanding fees or obligations under this Option Contract or the Security Instrument, within 30 calendar days of the Confirmation Notice.

5.5. **Clawback Provision.** If Owner transfers the Property within six months following Investor's receipt of the Termination Package, Owner shall be obligated to notify Investor of such transfer in writing and pay to Investor, immediately upon written demand, the amount by which the Net Option Value, calculated based upon the amount paid to Owner by the transferee (without deduction of sales commissions, transfer taxes, sale costs, outstanding debts and mortgages, or other expenses) exceeds the amount (if any) previously paid to Investor.

6. **APPRAISAL RIGHTS.** The "**Noah Agreed Home Value**", "**Adjusted Sales Price**" and "**Adjusted Appraised Value**" shall be determined as described in this Section. In each case: (i) Investor shall initially select the Appraiser and/or Appraisal Management Company (AMC) to conduct an independent third party appraisal; the Investor may also rely on automated valuation models (AVMs) to determine the appraisal; (ii) Owner may trigger additional appraisals if they believe the original appraisal contains material omissions or errors; (iii) Owner must cooperate in good faith to facilitate inspections and appraisals; (iv) each party must provide to the other copies of all appraisals and related inspection reports; and (v) Owner shall pay all expenses associated with appraisals and inspections, regardless of whether these are obtained by, or at the request of, Owner or Investor.

6.1. **Noah Agreed Home Value.** The Noah Agreed Home Value of the Property shall be determined, in part, by an appraisal in accordance with this Section at the time of the origination of the Option between the Owner and the Investor (the "**Initial Appraised Value**"). A "**Cash Market Adjustment**" shall be applied to the Initial Appraised Value based on: (i) the risks and benefits to Investor and Owner associated with each party entering into the Agreement, and (ii) Investor and Owner having each diligently considered the value of the Property based on all such risks and benefits and all other material considerations, notwithstanding any other assessment, valuation, appraisal, or other public or confidential information to the contrary, or any written or oral communications to Owner in connection with

the marketing, advertising, negotiation, or execution of the Agreement, or other such communication, the financial terms that shall apply under the Agreement. The Cash Market Adjustment applicable to this Option is 16.000%. The Noah Agreed Home Value of the Property is calculated as the Initial Appraised Value multiplied by (1 - Cash Market Adjustment). The Noah Agreed Home Value of the Property agreed to in this Option is $1,995,000.00.

6.2. **Inspections and Appraisal.** Following receipt of a Marketing Notice under Subsection 4.2, or a Termination Package under Subsection 5.1, Investor shall provide written notice to the Owner of the identity of the inspector(s) and/or Appraiser it retains, and the time and date of any inspections or appraisals. The inspections and appraisal shall be conducted as quickly as reasonably possible, and the Appraiser shall prepare an "Appraisal Report" containing the fair market value of the Property and, if applicable, any "Appraiser Adjustments" as described below. Investor shall use its best efforts to provide the Appraisal Report within 30 calendar days; however, Investor shall not be liable for any loss resulting from failure to meet this time deadline.

6.3. **Negative Adjustment.** If any Appraiser determines that Owner failed to maintain and repair the Property as required by Subsection 10.2 and that any alteration of the Property by Owner reduced the fair market value, the appraiser shall make an Appraiser Adjustment by increasing their valuation by the amount they believe the fair market value has been reduced by the improper maintenance or alteration.

6.4. **Positive Adjustment.** If Owner believes that material improvements (defined as home improvements costing $5,000 or more at a point in time), other than maintenance and repair required under Subsection 10.2, have increased the fair market value of the Property, they shall provide written notice of such a belief (a "**Modification Adjustment**") to Investor, including photographs, construction drawings and other documentation depicting the alteration, and proof that the alteration has been made with all required governmental permits and approvals. For Owner to receive a Positive Adjustment, they must submit a Modification Adjustment as part of the Marketing Notice under Subsection 4.2 or as part of a Termination Package under Section 5.1; Owner shall not receive a Modification Adjustment if they fail to submit such a request within the required time frame. The material submitted by Owner shall be provided to the Appraiser selected by Investor under Subsection 6.1, who shall make an Appraiser Adjustment by decreasing their valuation by the amount they believe the fair market value has been increased by the alteration. The adjustment shall be based solely on the value added at the time of appraisal, whither consideration of depreciation and functional obsolescence, and shall not be based on the actual or inferred cost of the alteration. The adjustment shall be based solely on the lesser of: (i) the value added at the time of appraisal, whither consideration of depreciation and functional obsolescence; or (ii) the actual or cost of the alteration as determined by the documents submitted by Owner to Investor.

6.5. **Appraisal Disagreement.** If Owner believes the Adjusted Appraised Value determined by Investor's Qualified Appraiser is affected by material omissions or errors, Owner shall have a period of two business days following receipt of the Appraisal Report to provide Investor written notice of disagreement, and 10 calendar days following receipt of the Appraisal Report to obtain, at Owner's sole expense, and provide to Investor, an alternative Adjusted Appraised value along with a supporting appraisal by a Qualified Appraiser. If Owner fails to meet either of these time deadlines, then the original Adjusted Appraised value obtained by Investor shall be final and binding; otherwise, the following provisions shall apply. If the difference between the Adjusted Appraised Value obtained by Investor and Owner is no greater than five percent of the higher value, then the average of the two values shall be the final and binding Adjusted Appraised Value and the Appraiser Adjustments from Investor's Appraisal Report shall be used to calculate the Adjusted Sale Price. If the difference between the Adjusted Appraised Values obtained by Investor and Owner is more than five percent of the higher value, the two Qualified Appraiser shall selected a third Qualified Appraiser to provide an Adjusted Appraised Value, and the final and binding Adjusted Appraised Value shall be determined by averaging the two Adjusted Appraised Values that are closest together, and the Appraiser Adjustments from the third Qualified Appraiser's Report shall be used to calculate the Adjusted Sale Price. Any Qualified Appraiser retained by the Owner or selected by the other Qualified Appraiser shall consider all inspection reports, photos, plans and other documentation provided to the previous Qualified Appraiser(s) and shall make adjustments as per Subsections 6.2 and 6.3.

## 7. DEATH OF OWNER.

7.1. **Notice of Owner Death.** Within 60 days of the death of any person who has signed this Option as Owner, the deceased's successor in interest shall provide written notice to the Investor. If the successor has not previously signed this Option, they shall do so immediately upon written demand, and failure to do so shall constitute an Owner Default triggering each of Investor's post-Default rights under this Option and the Security Instrument.

7.2. **Right to Early Conclusion Following Owner Death.** If every person comprising Owner has died, Investor may trigger the Early Conclusion procedures described in Section 8 by providing an "**Early Conclusion Notice**" to the then owner(s) of record (collectively the "Successor Owner"). The Early Conclusion Notice shall specify an "Early Conclusion Date" determined by Investor in its sole and absolute discretion, provided that the Early Conclusion Date shall be no sooner than six months after the effective date of the notice. In instances where there is a Successor Owner, the term "Owner" shall be deemed to refer to and include such Successor Owner (regardless of whether they signed the Option as required

under Subsection 7.1); however, such post-death usage of the term "Owner" shall not prevent the application of the first sentence of this Subsection.

8. **CONCLUSION OF OPTION.** In this Section, the term "Expiration Date" shall mean the Planned Expiration date; however, if there is an Early Conclusion triggered under Subsection 7.2 or 13.6, then the term "Expiration Date" shall mean the Early Expiration Date. At least three months before the Expiration Date, Owner must either provide an Offer Package satisfying each of the requirements of Subsection 4.3 or provide a Termination Package satisfying each of the requirements of Subsection 5.1; failure to provide such items within the required time frame shall constitute an Owner Default triggering each of Investor's post-Default rights under this Option and the Security Instrument. Depending on which package Owner provides, the procedures described in Section 4 or Section 5 shall be followed, and Owner shall be required to pay the amounts described in such Sections, or in Section 9 or 13 (if applicable). Owner hereby irrevocably instructs the escrow agent holding Owner's funds and proceeds in escrow from any sale or refinance of the Property that follows Owner's presentation of an Offer Package or Termination Package to disburse, from such funds, directly to Investor, all amounts owed to Investor, and Investor may submit this Option Contract as disbursement instructions.

9. **EARLY TERMINATION MINIMUM VALUE.** Notwithstanding anything to the contrary in this Option, if the Owner sells the Property, or terminates the option without selling, before the Planned Expiration Date, the home value utilized to determine the Net Option Value shall be the "**Early Termination Minimum Value**". The amount of the Early Termination Minimum Value shall depend on when the Owner sells the Property, or terminates the option without selling, as described below. All parties agree that the actual damages suffered by Investor in the event of early termination would be difficult or impossible to ascertain, and the Early Termination Minimum Value amounts described below are reasonable under the circumstances. The payment of an Early Termination Minimum Value shall not relieve the Owner of the obligation described in Subsection 5.5.

   9.1. **Termination Within First Three Years.** If the Owner terminates the Option without selling within the first three years of the Effective Date, then the Early Termination Minimum Value shall be at least a value equal to the Initial Appraised Value. Requiring this minimum is intended to ensure that Investor receives a reasonable return on its investment if Owner decides to terminate the Option before the property has had a reasonable opportunity to appreciate in value.

   9.2. **Termination After Three Years but Before the Planned Conclusion Date.** If Owner terminates the Option without selling more than three years after the Effective Date, but before the Planned Conclusion Date, the the Early Termination Minimum Value shall be a value equal to at least the Noah Agreed Home Value.

This would result in the Investor receiving at-least the Noah Investment Amount, meaning Investor will get all of its money back regardless of the Property value. Requiring this minimum is intended to ensure that Investor does not lose money if Owner decides to terminate the option without selling before the Planned Conclusion Date.

## 10. OWNER COVENANTS.

10.1. **Mortgages and Liens.** Subject to Investor's advance written approval, which shall not be unreasonably withheld, Owner may obtain one or more loans secured by the Property, provided: (i) the total amount owed does not exceed the Maximum Authorized Debt; and (ii) no such loan involves negative amortization, lines of credit, further lender advances, lender appreciation sharing, or any other provision under which the loan amount could exceed the Maximum Authorized Debt. Owner may request the Investor's consent to new financing at any time. If Investor consents, it shall execute documents subordinating the Security Instrument to new financing. Owner shall service and repay 100% of the debt secured by the Property in accordance with all requirements of the lender. Owner understands and acknowledges that, upon sale of the Property, their obligation to lenders may exceed their sale proceeds. The Investor may charge the Owner a nominal fee for the preparation of the subordination documents.

10.2. **Maintenance and Repair.** Owner, at their sole expense, shall maintain the Property in a general state of repair at least equivalent to that on the Effective Date, immediately correct conditions that endanger the integrity of the Property or the safety or health of the occupants, guests or public, and promptly comply with all requirements imposed on the Property by governmental agencies or owners' associations. In the case of sudden or unexpected damage to the Property, Owner's repair obligations apply regardless of the extent (if any) of insurance coverage. Owner shall obtain all required governmental and owner association permissions, inspections and approvals for all work performed on the Property. Upon receipt of a written notice so requesting, the Owner shall promptly allow inspection of the Property by Investor or Investor's agents or contractors.

10.3. **Insurance.** Owner, at their sole expense, shall at all times maintain in effect the following policies of insurance for the Property: (i) a policy of "all risk" casualty insurance acceptable to Investor in its reasonable opinion, providing coverage for such risks are commonly covered with respect to properties similar to the Property in construction, location and use, with coverage in an amount equal to the full replacement value of the insured elemes plus required building code upgrades; (ii) if, based on the Property location, there is a 25% or greater chance of a flood over a 30-year period, a flood insurance policy with coverage in an amount equal to the full replacement value of the insured elements plus required building code upgrades; and (iii) any other policies of insurance for the Property

that are required pursuant to the terms of any loan secured by the Property. Each such policy shall name Investor as an additional insured. Copies of all insurance policies shall be provided to In Investor promptly upon issuance. All proceeds paid by any insurance carrier for damage to the Property shall be used by the Owner to repair such damage. Owner shall provide to Investor: (i) proof of having all required insurance each year on December 31, and again promptly upon receipt of a written notice so requesting; and (ii) copies of notices of any insurance change or cancellation within seven calendar days of Owner's receipt of such notices. Owner acknowledges that in case they do not provide the proof of insurance to the Investor as mentioned above, the Investor shall obtain the required insurance on behalf of the Owner - the amount of which shall be added to the final Net Option Value and/or be due to the Investor at the time of expiry of the Option Agreement.

10.4. **Property Tax and Other Ownership Expenses.** Owner, at their sole expense, shall pay when due all taxes and assessments imposed by any governmental entity, all dues and assessments imposed by any owners' association with a right to lien the Property, and all service charges and fees imposed by any public utility with a right to lien the Property ("**Property Taxes**"). Upon receipt of a written notice so requesting, Owner shall promptly provide proof of payment to Investor or Investor's agents. Owner acknowledges that in case they do not provide the proof of payment of Property Taxes to the Investor as mentioned above, the Investor shall pay the required Property Taxes on behalf of the Owner - the amount of which shall be added to the final Net Option Value and/or be due to the Investor at the time of expiry of the Option Agreement.

10.5. **Occupancy and Use**. Owner shall use the Property as listed in Section 1. If the Property is marked as "Owner Occupied / Primary" residence, then the Owner shall use the Property as his/her primary residence beginning within 60 days after acquiring title and continuing for at least one year. After which date, Owner must provide notice if the Property will not be used as his/her primary residence within 10 business days of the change in residency. Owner shall not commit waste on the Property, permit illegal activities to be conducted on the Property, or allow the Property to be used in any manner that violates governmental regulations, creates a nuisance, increases insurance rates, or endangers occupants, guests, neighbors, or the general public. Owner acknowledges that they have read Exhibit C to this Option, titled "NOTICE AND ACKNOWLEDGMENT REGARDING SPOUSES, PARTNERS AND CO-OCCUPANTS WHO ARE NOT SIGNATORIES TO THE OPTION AGREEMENT" and completed it in full.

11. **TRANSFER RESTRICTION AND REQUIREMENTS.** Owner shall not transfer any interest in the Property without Investor's advance written approval, and such approval may be withheld at investor's sole and absolute discretion. If a transfer is approved, Owner shall pay all costs associated with the creation, signing, and recordation of

transfer documents, including any modification of this Option or the Security Instrument.

**12. REQUIRED NOTIFICATIONS.** Owner shall provide the following written notifications to Investor.

12.1. **Events Affecting the Property.** Within seven calendar days of the occurrence, Owner shall provide Investor written notice of: (i) any lien recorded against the Property; (ii) any fire, flood, or other sudden or unexpected event causing damage to the Property for which the cost of repair is likely to be more than $5,000; (iii) any insurance claim or insurance cancellation; (iv) receipt of any notice relating to potential or actual action against the Property or its owners involving condemnation or eminent domain; and (v) any other even that could have a significant impact on the value of the Property.

12.2. **Planned Alteration.** Prior to beginning work, Owner shall provide Investor written notice of any significant alteration to the Property, including demolition or addition of walls, elimination or addition of kitchens or bathrooms, increasing or decreasing habitable dwelling area, or remodeling projects for which the total cost is expected to exceed $25,000. Owner shall include with such written notice construction drawing of the planned alteration and photographs of the areas of the Property that will be modified.

12.3. **Events Affecting Ownership of Occupancy.** Within seven calendar days of the occurrence, Owner shall provide Investor written notice of: (i) a voluntary or involuntary bankruptcy proceeding under which any signatory to this Option, or any owner of record of the Property, will or may be adjudicated bankrupt; or (ii) any marriage, death or divorce involving any owner of the Property.

**13. CONDEMNATION.**

13.1. If the Property is condemned, in part or in whole, all condemnation proceeds net of reasonable costs and expenses (including, without limitation, Attorneys' Fees that have been approved by Investor) reasonably incurred by Owner and/or Investor in collecting and contesting the condemnation proceeds ("**Net Condemnation Proceeds**") will be allocated in the following order: (i) to payment of any lien senior to this Option; (ii) to Investor, an amount equivalent to the Net Option Value as it would have been calculated prior to the condemnation; (iii) and to Owner, the balance of the proceeds.

13.2. If the Property is condemned in part, and if the Option has not been exercised, the following provisions shall apply. The Net Condemnation Proceeds shall be used, first, to pay all liens senior to this Option, provided that such payment may result in the discharge of the related liens. Any remaining Net Condemnation Proceeds shall be distributed as follows: (i) to Investor, an amount equal to the

Percentage Share multiplied by the Net Condemnation Proceeds, including any associated unpaid Protective Advances, and other fees and charges; and (ii) to Owner, the balance of the proceeds.

## 14. DEFAULT.

14.1. **Owner Violations of this Option Contract.** If Investor believes that Owner has violated any provision of this Option Contract, or has intentionally misled Investor, or withheld material facts, either before this Option was executed or while it remains in effect, Investor shall provide to Owner a written Notice of Alleged Violation describing the alleged malfeasance and the "Cure Actions" Investor believes are required to remedy the situation.

14.2. **Notice and Opportunity to Cure.** If they wish to avoid Default, Owner must, within 14 calendar days from the effective date of the Notice of Alleged Violation, either: (i) perform each of the Cure Actions; or (ii) initiate binding arbitration pursuant to Subsection 13. If the alleged violation is failure to make timely payment of an expense described in Subsections 10.1, 10.3 and 10.4, or if Owner has opted out of mandatory binding arbitration by not initializing the bold-typed paragraph below Subsection 13.4, Owner may avoid Default only by performing each of the Cure Action within such 14-calendar day period. Payment of an expense described in Subsections 10.1, 10.3, and 10.4 may be made under protest, after which Owner may seek to recover amounts paid through arbitration as described in Subsection 13.5.

14.3. **Owner Default.** Owner shall be in Default if: (i) they receive a written Notice of Alleged Violation and fails to perform each of the Cure Actions within the time required by Subsection 13.2 or, where permitted under the last sentence of Subsection 13.2 and 13.5, the arbitrator finds that violation(s) described in the Notice of Alleged Violation has indeed occurred, and Owner fails to cure the violations during a period of 14 calendar days following arbitrator's ruling.

14.4. **Consequences of Default.** If Owner is in Default, Investor may take any or all of the following actions: trigger the Early Conclusion procedures described in Section 8 by providing an "**Early Conclusion Notice**" specifying an "**Early Conclusion Date**" determined by Investor in its sole and absolute discretion, provided that the Early Conclusion Date shall be no sooner than six months after the effective date of the notice; (ii) exercise any rights or remedies it may have under the Security Instrument including foreclosure and sale; (iii) pay any financial obligation of Owner under Subsections 10.1, 10.3, or 10.4, or undertake repairs of the Property reasonably required to prevent serious deterioration or damage, and in either case all expenses incurred by Investor shall be deemed a loan to Owner at the maximum interest rate permitted by law, with all interest and principal due immediately upon written demand, and with failure to pay constituting grounds for foreclosure under the Option

**Noah** **Noah Offer ID: 104166**

Security Instrument; or (iv) use any other remedy available at law or equity, serially or concurrently. Notwithstanding anything to the contrary in this Option Contract, if Investor chooses to trigger the Early Conclusion procedures, the following provisions shall apply:

i. Owner shall continue to be deemed to be in Default unless and until they satisfy all of the requirements of Section 8 including timely payment of the payment of the Net Option Value and any outstanding fees.

ii. When calculating the Net Option Value: (i) Owner shall not have the right to trigger additional appraisals if they believe the original appraisal obtained by Investor contains material omissions or errors; (ii) the Appraisal Report should be prepaid as if it were prepared on the date of the Owner Default, and (iii) Owner shall not be entitled to any of the rights and processes described in Section 6.3 and 6.4; and

iii. Notwithstanding anything to the contrary in this Option, Investor's Price shall be reduced by 20%. This adjustment is intended as liquidated damages for the expense and inconvenience incurred by Investor when Owner does not keep their promises. All parties agree that the amount of actual damages suffered by the Investor in the event of Default would be difficult or impossible to ascertain and that this Investor's Price adjustment is a reasonable estimate of such damages. THE ADJUSTMENT IS INTENDED TO COMPENSATE INVESTOR AS A RESULT OF OWNER'S DEFAULT IN ACCORDANCE WITH CALIFORNIA CIVIL CODE SECTION 1671 AND WILL NOT BE DEEMED TO CONSTITUTE A FORFEITURE OR PENALTY.

15. **INVESTOR RIGHTS.** Investor shall have the right to: (i) inspect the Property at its expense on up to two occasions each calendar year within 14 calendar days of written request to Owner; (ii) directly contact providers of insurance covering the Property, and holders of loans secured by the Property, at any tie, and Owner shall provide any required written authorization to Investor promptly upon request; (iii) participate in all discussions or negotiations regarding any condemnation or eminent domain relating to the Property; and (iv) transfer any or all of its rights under this Option at any time without the approval of Owner.

16. **SPECIAL POWER OF ATTORNEY COUPLED WITH AN INTEREST.** Homeowner appoints Investor, and its successor and assignees, in Homeowner's name to exercise the powers set forth below consistent with the provisions contained in this Option ("**Power of Attorney**"). This Power of Attorney will be exercised only: (i) when Investor

or its successor or assignees exercises or anticipates exercising the Option; and (ii) for the purpose of authorizing and empowering Investor to market, advertise, sell and transfer title to one hundred percent (100%) of the Property, including Owner's interest therein. Under this Power of Attorney, Investor will have the power and authority to do all the acts and execute any and all documents, instruments and agreement to market the Property, including but not limited to: solicit buyers for the Property, advertise the Property for sale on reasonable and customary terms and for a price that is reasonable for the market conditions; and sell the Property on usual and customary terms and conditions. The Power of Attorney granted hereunder is coupled with an interest. This Power of Attorney is a durable power of attorney and shall remain in force despite any Owner's subsequent incapacity, disability or death. Homeowner and Investor agree that if Investor is not allowed to exercise its rights under this Section 18, or if Owner fails to comply with its obligations under this Section 18, the damages to Investor would be irreparable and extremely difficult to estimate, making money damages or any remedy at law inadequate. Thus, in addition to any other rights and remedies available to it in law, equity or otherwise, Investor shall be entitled to specific performance of the provisions of this Section 18.

17. **NOTICES.** Except where expressly prohibited by law, written notice shall be deemed properly provided to Owner or Investor if given by email at the intended recipient's last known email address. If Owner consists of more than one person, notice to any one such person shall be deemed notice to each such person. It shall be the responsibility of each person signing below as Owner, and of Investor, to (i) regularly monitor their email communication, and (ii) provide notice to all other parties when their email address changes. A written notification shall be deemed effective on the calendar day following the day it is sent via email. Where notice by email is expressly made inadequate by operation of law, notification shall be deemed effective on the earlier of the date on which it is actually received, or the date of deemed receipt specified by law for the manner in which the notice is given or, if no such date is specified, 10 calendar days after it is sent or published.

18. **MISCELLANEOUS TERMS.**

18.1. Owner shall be liable to Investor for all damages or losses that result from a violation of this Option, including late charges, penalties, and fines, and Investor shall be entitled to recover from Owner all costs incurred in connection with collection efforts, whether or not any arbitration or any foreclosure proceeding is filed, and all such costs and expenses shall be payable immediately upon written demand and until paid shall also be secured by the Security Instrument.

18.2. If Owner consists of more than one person, each such person shall be jointly and severally liable for all obligations imposed by this Option.

18.3. This Option: (i) is executed in and shall be governed by the laws of the state where the Property is located; (ii) may be amended only by a written document signed by both Owner and Investor; and (iii) shall be binding on the respective successors, assigns and personal representatives of each party signing as Owner and all those who become owners of record of the Property.

18.4. The invalidity or unenforceability of any provision shall not affect the validity or enforceability of any other provision. This Option, and the Security Instrument, contain the entire agreement between Owner and Investor relating to the Property, and any written or oral representations, modifications or agreements regarding these matters shall be of no force and effect unless contained in a subsequently dated, written document expressly stating such representation, modification or agreement, signed by Owner and Investor.

18.5. The failure of Investor to enforce, or to insist upon the strict compliance with, any term of this Option shall not constitute a waiver nor prevent enforcement of such term in any subsequent situation. Time is expressly declared to be of the essence.

18.6. In the event Owner is a trust, the trustee(s) signing below represent(s) and warrant(s) that the trust is authorized to enter into this Option and will be bound by its terms, and for purposes of this Option "Owner" means the trustee(s) acting on behalf of the trust.

19. **ATTORNEYS FEES.** If any dispute between Owner and Investor should result in litigation or arbitration, the prevailing party shall be entitled to recover from the other all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including reasonable attorney fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate allowed by law. For the purposes of this Section: (i) attorney fees shall include, without limitation, fees incurred in bankruptcy litigation, post judgment motions, discovery, contempt proceedings, and examinations (debtor and third party) relating to garnishment and levy; and (ii) prevailing party shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

Noah

Noah Offer ID: 104166

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH INVESTOR, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN HOMEBUYER AND INVESTOR AS OF THE EFFECTIVE DATE.

By signing below, the parties accept and agree to the terms and agreements contained in this Agreement, including the Exhibits to this Agreement, as of the Effective Date.

**INVESTOR:**

Noah (fka Patch Homes, Inc.)

By: ______________________________

Name: Sonja McIntosh

Title: Authorized Signatory

**OWNER:**

Patricia S Bransford

**Noah**

**Noah Offer ID: 104166**

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH INVESTOR, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN HOMEBUYER AND INVESTOR AS OF THE EFFECTIVE DATE.

By signing below, the parties accept and agree to the terms and agreements contained in this Agreement, including the Exhibits to this Agreement, as of the Effective Date.

**INVESTOR:**

Noah (fka Patch Homes, Inc.)

By: ______________________

Name: Sonja McIntosh

Title: Authorized Signatory

**OWNER:**

______________________

Patricia S Bransford

Noah

Noah Offer ID: 104166

## EXHIBIT A

### LEGAL DESCRIPTION

That certain real property situated in the City of Tisbury, County of Dukes, State of Massachusetts, described as follows:

The land with the buildings, structures and improvements thereon, situated in the Town of Tisbury, County of Dukes County, and Commonwealth of Massachusetts, shown as "Lot 11.87 acres+" on a certain plan entitled "Plan of Land in Tisbury, Mass. Prepared For the 484 Main Street Realty Trust Scale l" = 40' July 15, 2016" prepared by Schofield, Barbini & Hoehn, Inc., and recorded in the Dukes County Registry of Deeds in Plan Book 18, Page 44 (the "Plan").

Grantees by acceptance and recording of this deed agree to the restrictions and covenants attached to this deed and made a part hereof. Grantees by acceptance and recording of this deed acknowledge and confirm that Grantees shall have no rights over the "asphalt driveway" shown on the Plan which is located on Lot 2 as shown on the Plan. The parcel is conveyed subject to, and together with the benefit of, all rights, easements, covenants, restrictions and other matters of record, to the extent the same are in force and applicable.

Tax Parcel No.: 4 B 17

[end of legal description]

Noah

Noah Offer ID: 104166

## EXHIBIT B

### NOAH SHARE APPENDIX

Reference is made to that certain Real Estate Purchase Option Agreement (the "Agreement") by and between Patricia S. Bransford as a Married Woman and her separate property, ("Owner") and Noah, f.k.a Patch Homes ("Investor"), in connection with such transactions contemplated therein. All defined terms have the same meaning as in the Agreement.

1. Based on the Agreement, the Owner is issuing to the Investor the right to obtain an undivided, fractional ownership interest. The economic value of this interest represented as a percentage of the value of the home, is defined as the **Noah Share**. Specifically, the Noah Share can be calculated at any time is obtained by dividing (i) (A) the Net Option Value or (B) the proceeds due from the Owner to the Investor in order to terminate this Real Estate Option Purchase Agreement, by (ii) the Ending Property Value. Each of these terms has been defined in the Agreement. The Owner recognizes that the Ending Property Value will only be known at the time of the Agreement termination and/or Expiry – and therefore the exact value of the Noah Share at the time of the termination and/or Expiry will be calculated at that time on a future date.

2. The following tables provide an illustrative example for the Owner(s) on how the Noah Share changes based on Ending Property Value. It demonstrates that as the Property changes in value, the Noah Share also changes, resulting in the Investor sharing in the losses and/or potential future gains of Property value with the Owner.

| Ending Property Value | Net Option Value | Noah Share |
|---|---|---|
| $2,018,750 | $516,250 | 25.573% |
| $2,090,000 | $565,000 | 27.033% |
| $2,161,250 | $613,750 | 28.398% |
| $2,232,500 | $662,500 | 29.675% |
| $2,303,750 | $711,250 | 30.874% |
| $2,446,250 | $808,750 | 33.061% |
| $2,517,500 | $857,500 | 33.061% |
| $2,588,750 | $906,250 | 35.007% |
| $2,660,000 | $955,000 | 35.902% |
| $2,731,250 | $1,003,750 | 36.751% |

# Noah

Noah Offer ID: 104166

3. THE OWNER RECOGNIZES THAT THE ABOVE TABLES ARE SIMPLY AN ILLUSTRATIVE EXAMPLE AND THAT THE ACTUAL PROPERTY TERMINATION PRICE MAY BE DIFFERENT THAT THE VALUES SHOWN ABOVE. Owner also acknowledges that the Noah Share is a concept that was used as a consumer education tool to understand the economics of the Agreement. It does not reflect the entirety of the Agreement, which is detailed in the Agreement itself.

**ACKNOWLEDGED BY OWNER(s):**

Patricia S Bransford

Noah

Noah Offer ID: 104166

## EXHIBIT C

### NOTICE AND ACKNOWLEDGMENT REGARDING SPOUSES, PARTNERS AND CO-OCCUPANTS WHO ARE NOT SIGNATORIES TO THE OPTION AGREEMENT

Reference is made to that certain The Option Agreement (the "Agreement") by and between Patricia S. Bransford as a Married Woman and her separate property ("Owner") and Noah, f.k.a. Patch Homes ("Investor"), in connection with such transactions contemplated therein. All defined terms have the same meaning as in the Agreement.

This Notice and Acknowledgment (the "Acknowledgment") contains important disclosures about the rights and liabilities of spouses, domestic partners, family members, and other non-Owner occupants of the Property (collectively referred to as "Non-Owner Occupant(s)"). Please READ IT CAREFULLY.

This Acknowledgment must be signed by all Owners entering into and executing the Agreement and by all Non-Owner Occupants who have attained the age of 18 (or such other age of majority under applicable state law, if otherwise). As a prerequisite to entering into the Agreement, all Owners are responsible for ensuring that a complete and accurate version of this Acknowledgement is returned to the Investor with the signatures of all Owners and all Non-Owner Occupants who have attained the age of majority under state law.

The rights of a Non-Owner Occupant to occupy or retain possession of the Property following: (i) the Owner ceasing to occupy the Property as required by Section 10 of the Agreement (if applicable) or (ii) the death of Owner or of the last of the Owners if there is more than one Owner (or if Owner is/are the Trustee(s) of the Trust, the death of the last surviving Trustor), or (iii) certain other triggering events (including a Default), as specified in the Agreement, may be significantly affected by the operation or enforcement of the Agreement because, among other things, the Agreement gives Investor the right to exercise its option and to purchase an undivided fractional interest in the Property upon such triggering events. For example, one such triggering event is death of Owner or of the last of the Owners if there is more than one Owner (or if Owner is/are the Trustee(s) of the Trust, the death of the last surviving Trustor), regardless of whether Non-Owner Occupants are occupying the Property at that time. A Non-Owner Occupant of a Property subject to the Agreement will be required to comply with and settle Investor's exercised rights and remedies even if the Non-Owner Occupant inherits the Property as the heir, beneficiary or survivor of an Owner. Depending on the appreciation of the Property during the term of the Agreement, the amount required to be paid to settle Investor's rights and remedies may be substantial. In addition, following a Default (including default by Non-Owner Occupants), Investor may be entitled to exercise their remedies under the

Noah

Noah Offer ID: 104166

Agreement following a Default, resulting in a Non-Owner Occupant losing possession and/or ownership of the Property.

Investor cannot know who occupies the Property if those persons are not named on title to the Property and in a deed recorded in the public records. Investor must and will rely on Owner to supply this information accurately and completely.

Throughout the term of the Agreement, Owner is responsible for promptly notifying Investor of any change in the status of Non-Owner Occupants. All Owners are responsible, in the event of any such change in status, for promptly returning a complete and accurate additional Acknowledgment to Investor with the signatures of all new Non-Owner Occupants who occupy the Property and of all previous non-adult Non-Owner Occupants when such person attains the age of 18 (or the age of majority under applicable state law, if otherwise).

In the event that Owner wishes to add any other person to the title of the Property after the Effective Date of the Agreement, Owner agrees that such person shall meet all then-current Agreement requirements and must execute a complete set of the legal documents reasonably requested by Investor. Unless and until these requirements are met, any such individual who is a Non-Owner Occupant shall remain as such, subject to all contractual rights of Investor.

All Owners and Non-Owner Occupants acknowledge that they have read and understand this Acknowledgement, and that they have been advised by Investor to make independent investigations (including from independent legal counsel and estate planning professionals) regarding the legal and financial effect of executing this Acknowledgement.

No **(Yes / No) I represent and warrant that there are no Non-Owner Occupants living in my Property.**

**ACKNOWLEDGED BY OWNER(s):**

Patricia Bransford

Patricia S Bransford

**Noah** **Noah Offer ID: 104166**

N/A (Yes / No) I represent and warrant that I have presented this Acknowledgment to, and discussed its contents with, all Non-Owner Occupants living in my Property. The names and signatures of all Non-Owner Occupants and their relation to me appear below.

**ACKNOWLEDGED BY OWNER(s) and NON-OWNER OCCUPANTS:**

Patricia Bransford

Patricia S Bransford

________________________________________

[Name & Signature of Non-Owner Occupant]

________________________________________

[Name & Signature of Non-Owner Occupant]

Noah

Noah Offer ID: 104166

**After Recording Return To:**

Noah (fka Patch Homes Inc.)
6621 California Street, Lower Unit
San Francisco, CA 94121

**Recording Requested by:**

Noah (fka Patch Homes Inc.)

# MEMORANDUM OF AGREEMENT

This MEMORANDUM OF AGREEMENT ("Recorded Memorandum"), is entered into as of 12/15/2021 (**"Effective Date"**) by and between Patricia S. Bransford as a Married Woman and her separate property, (individually or collectively "Owner"), and Noah (fka Patch Homes, Inc), a **Delaware registered C. Corp.** company and its successors and assignees (**"Benefited Party"**), whose address is 6621 California Street, Lower Unit, San Francisco, CA 94121.

## MEMORANDUM OF REAL ESTATE PURCHASE OPTION AGREEMENT

Owner hereby declares that Owner and Benefited Party have entered into that certain Noah Real Estate Purchase Option Agreement dated the same date as the Effective Date ("**Option Agreement**"), pursuant to which Owner grants and conveys to Benefited Party the option ("**Option**") to purchase an undivided fractional interest in all of that certain real property described in Exhibit A attached hereto (the "**Property**"), all as more particularly described, and on the terms and conditions stated in the Option Agreement. The fractional interest shall equal the Percentage Share, as specified in the Option Agreement. The Option is irrevocable by Owner. The term of the Option shall commence on the Effective Date and shall expire at 11:59 p.m., Pacific Time, on the day immediately preceding the Expiration Date. The terms of the Option Agreement are hereby incorporated into this Recorded Memorandum by this reference, and unless otherwise

defined herein, capitalized terms used in this Recorded Memorandum shall have the meanings attributed to such terms in the Option Agreement.

MEMORANDUM OF COVENANTS RUNNING WITH THE LAND

By entering into the Option Agreement, Owner has made certain covenants and promises to or for the benefit of Benefited Party in connection with the Property.

This Recorded Memorandum identifies the covenants and promises set forth in the Option Agreement that run with the land and are binding upon any party who acquires Owner's (or Owner's heirs, successors and assigns) interest in the Property for the benefit of the Benefited Party and its successors and assigns, so long as the Option Agreement remains in full force and effect and has not expired or been terminated in accordance with the terms provided for therein.

The covenants that run with the land are as follows:

a. Section 10.2 of the Option Agreement which, among other things, requires Owner to maintain and repair the Property and to ensure that use of the Property complies with all applicable state, federal and local laws and regulations.

b. Section 10.3 of the Option Agreement which, among other things, requires Owner to maintain insurance on the Property against all hazards in the amounts and types provided for therein.

c. Section 10.4 of the Option Agreement which, among other things, requires Owner to pay all taxes and assessments accruing on the Property.

d. Section 10.5 of the Option Agreement which, among other things: requires Owner to continuously occupy the Property as Owner's Principal Residence; requires that the Property be used as a single family residence; and prohibits use of the Property for any commercial or other non-residential purposes.

e. Section 10.1 of the Option Agreement which, among other things, restricts the ability of Owner to increase the amount of debt that is secured by a lien on the Property beyond the Maximum Authorized Debt specified in the Option Agreement.

f. Section 10.1 of the Option Agreement which, among other things, requires Owner to keep the Property free of liens not approved by Benefited Party.

Noah

Noah Offer ID: 104166

g. Section 11 of the Option Agreement which, among other things, restricts the right of Owner to transfer the Property without Benefited Party's consent or deemed consent.

i. Section 4 of the Option Agreement which, among other things, requires Owner to provide Benefited Party with a right of first refusal in connection with any proposed sale of the Property by Owner.

## SPECIAL POWER OF ATTORNEY COUPLED WITH AN INTEREST

Each person whose signature appears below as Owner hereby irrevocably nominates, constitutes and appoints, in general, Benefited Party and its successor and assignees, and, in particular, each of its and their Chief Executive Officer, President, Chief Financial Officer, Chief Operating Officer, Managing Directors and Vice Presidents, as Owner's true and lawful agents and attorneys-in-fact (with full power of substitution) in Owner's name and on Owner's behalf (in any and all capacities) to exercise the powers set forth below consistent with the provisions contained in this Recorded Memorandum and in the Option Agreement ("**Power of Attorney**").

This Power of Attorney will be exercised:

(i) only when Benefited Party or its successor or assignee anticipates exercising the Option: and

(ii) only for the sole purpose of authorizing and empowering Benefited Party (although only a co-owner of the Property) to market, advertise, sell and transfer title to one hundred percent (100%) of the Property, including Owner's interest therein.

Accordingly, Benefited Party or its successor or assignee and the other parties designated above as attorneys-in-fact, shall have the power and authority to do all acts and to execute any and all documents, instruments and agreements as such agents and attorneys-in-fact deem necessary or advisable: (a) to solicit buyers for the entire Property and offers for a sale of the entire Property; (b) to advertise the entire Property for sale on reasonable and customary terms and conditions for a price that is reasonable in view of the then market conditions; and (c) to sell the entire Property and transfer Owner's entire interest in, and title to the Property on usual and customary terms and conditions, the proceeds of which will be allocated to Owner and Benefited Party as provided in the Option Agreement.

The Power of Attorney granted hereunder is coupled with an interest. All acts that the attorneys-in-fact shall lawfully do, or cause to be done, under the authority of this Power of Attorney are hereby expressly approved, ratified and confirmed.

Noah

Noah Offer ID: 104166

This Power of Attorney is a durable power of attorney as authorized and shall remain in force despite any Owner's subsequent incapacity or death.

## RELEASE

This Recorded Memorandum shall remain in full force and effect until released by a written release, quitclaim deed or other written termination of this Recorded Memorandum that is executed and notarized by Benefited Party and is recorded in the real property records for the county where the Property is located.

To the extent of any inconsistency between the terms of the Option Agreement and this Recorded Memorandum, the terms of the Option Agreement shall prevail and control.

*[Signatures and notarial acknowledgements appear on following pages]*

Noah

Noah Offer ID: 104166

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH BENEFITED PARTY, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS RECORDED MEMORANDUM, THE OPTION AGREEMENT, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND BENEFITED PARTY AS OF THE EFFECTIVE DATE.

IN WITNESS WHEREOF, the undersigned Benefited Party and Owner have each executed this Recorded Memorandum as of the Effective Date.

**Owners:**

Patricia S Bransford ______________________ Seal

Owner Address:

484 Main Street
Tisbury, Massachusetts 02568

**Benefitted Party:**

Noah (Patch Homes Inc.)

| | | |
|---|---|---|
| By | : | ______________________ |
| Name | : | Sonja McIntosh |
| Title | : | Signatory Authority |
| Date Signed | : | ______________________ |

**Noah** **Noah Offer ID: 104166**

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH BENEFITED PARTY, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS RECORDED MEMORANDUM, THE OPTION AGREEMENT, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND BENEFITED PARTY AS OF THE EFFECTIVE DATE.

IN WITNESS WHEREOF, the undersigned Benefited Party and Owner have each executed this Recorded Memorandum as of the Effective Date.

**Owners:**

Patricia S Bransford ______________________________ Seal

Owner Address:

484 Main Street
Tisbury, Massachusetts 02568

**Benefitted Party:**

Noah (Patch Homes Inc.)

By : [signature]

Name : Sonja McIntosh

Title : Signatory Authority

Date Signed : 12/1/2021

Noah

Noah Offer ID: 104166

## GENERAL ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not to the truthfulness, accuracy, or validity of that document.

STATE OF New York )

) ss.

COUNTY OF New York )

On 15th December, 2021, before me Davain Walker, Notary Public, personally appeared Patricia S. Bransford who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his her/their authorized capacity(is) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of NY that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Davain Walker
Notary Public, State of New York
Qualified in Westchester County
01WA6410230 (exp:10/19/2024)

Signature [signature]

(seal)

**Noah**

**Noah Offer ID: 104166**

## GENERAL ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not to the truthfulness, accuracy, or validity of that document.

STATE OF OREGON )

) ss.

COUNTY OF MULTNOMAH )

On 1 DECEMBER, 2021, before me GRACE ELIZABETH VOILES, Notary Public, personally appeared Sonja McIntosh who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his her/their authorized capacity(is) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of OREGON that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

OFFICIAL STAMP
GRACE ELIZABETH VOILES
NOTARY PUBLIC - OREGON
COMMISSION NO. 1005760
MY COMMISSION EXPIRES NOVEMBER 04, 2024

Signature ____________________

(seal)

**Noah**

**Noah Offer ID: 104166**

## EXHIBIT A

### LEGAL DESCRIPTION

That certain real property situated in the City of Tisbury, County of Dukes, State of Massachusetts, described as follows:

The land with the buildings, structures and improvements thereon, situated in the Town of Tisbury, County of Dukes County, and Commonwealth of Massachusetts, shown as "Lot 11.87 acres+" on a certain plan entitled "Plan of Land in Tisbury, Mass. Prepared For the 484 Main Street Realty Trust Scale I" = 40' July 15, 2016" prepared by Schofield, Barbini & Hoehn, Inc., and recorded in the Dukes County Registry of Deeds in Plan Book 18, Page 44 (the "Plan").

Grantees by acceptance and recording of this deed agree to the restrictions and covenants attached to this deed and made a part hereof. Grantees by acceptance and recording of this deed acknowledge and confirm that Grantees shall have no rights over the "asphalt driveway" shown on the Plan which is located on Lot 2 as shown on the Plan. The parcel is conveyed subject to, and together with the benefit of, all rights, easements, covenants, restrictions and other matters of record, to the extent the same are in force and applicable.

Tax Parcel No.: 4 B 17

[end of legal description]

# ESCROW INSTRUCTIONS

**OFFER ID: 104166**

**ESCROW INSTRUCTIONS**

November 30, 2021

To : Spruce Title Company
Attention : Spruce Team

| | |
|---|---|
| **Escrow Number** | 114360076994 |
| **Property Address** | 484 Main Street, Tisbury, Massachusetts, 02568 |
| **Noah Offer ID** | 104166 |
| **Owner(s)** | Patricia S Bransford |
| **Email Contact** | tbransford@urbantech.org |
| **Phone Number Contact** | (917) 783-5673 |

| | | |
|---|---|---|
| **Option Amount** | $500,000.00 | *Financing amount for homeowner* |

**The following describes the payment from the Escrow**

Homeowner(s) Pays

- Title Insurance
- Escrow Fees
- Affordable Housing Fees (California only)
- Notary & Recording Fees
- Any other fees applicable to close transaction

Noah, fka Patch Homes, Inc. Pays

- Courier Fees

**Please see below the breakdown of the escrow amount**

Servicing Fees : **$13,000.00**
(Paid by Homeowner(s) to Noah, fka Patch Homes, Inc.)

Home Appraisal Fees : **$0.00**
(Paid by Homeowner(s) to Noah, fka Patch Homes, Inc.)

# ESCROW INSTRUCTIONS

**OFFER ID: 104166**

**Noah Lien Position**

Noah will hold the 2nd lien position

**The funds due to Noah, fka Patch Homes, Inc., should be wired to the following account**

| | | |
|---|---|---|
| To | : | Noah, fka Patch Homes, Inc. |
| Payment Type | : | Wire |
| Payment Amount | : | $13,000.00 |
| Routing Number | : | 321081669 |
| Account Number | : | 80007386271 |

**After the above in funds are paid, the homeowner receives the balance amount. Banking transfer information to be collected by Escrow**

| | | |
|---|---|---|
| Payment Type | : | Check |
| Payable To | : | Patricia S Bransford |

# Dukes County Registry of Deeds

# Electronically Recorded Document

This is the first page of the document - Do not remove

---

## Recording Information

| | |
|---|---|
| Document Number | : 2254 |
| Document Type | : MTG |
| Recorded Date | : April 07, 2022 |
| Recorded Time | : 09:37:47 AM |
| Recorded Book and Page | : 01620 / 809 |
| Number of Pages(including cover sheet) | : 7 |
| Receipt Number | : 241978 |
| Recording Fee | : $205.00 |

**Dukes County Registry of Deeds**
**Paulo C. DeOliveira, Register**
**81 Main Street**
**PO Box 5231**
**Edgartown, MA 02539**
**508-627-4025**
**www.Masslandrecords.com**

**Recording Requested By:**
Freedom Mortgage Corporation
907 Pleasant Valley Avenue
Mount Laurel, NJ 08054

**After Recording Return To:**
Freedom Mortgage Corporation C/O:
Mortgage Connect Document Solutions
6860 North Argonne Street, Unit A
Denver, CO 80249
APN/Tax ID: 4-B-17
Recording Number: 1923212

This document was prepared by: Freedom Mortgage Corporation.

**Space Above This Line For Recording Data**

**NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE SECRETARY OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.**

VA Partial Claim Loan Number: 0110988912

Primary VA Guaranteed Loan Number: 0737360804605

# SUBORDINATE MORTGAGE

THIS SUBORDINATE MORTGAGE ("Security Instrument") is given on 1st day of November, 2021.

The Mortgagor **THOMAS L. BRANSFORD AND PATRICIA S. BRANSFORD, HUSBAND AND WIFE, AS TENANTS BY THE ENTIRETY**
Whose address is 484 MAIN ST VINEYARD HAVEN, MA 02568 ("Borrower"). This Security Instrument is given to the Secretary of Veterans Affairs, an Officer of the United States, its successors and assigns, whose address is 810 Vermont Ave., NW, Washington, DC 20420 ("Lender"). Borrower owes Lender the principal sum, as calculated under Title 38 Code of Federal Regulations ("C.F.R."), Section 36.4805(e), of one hundred thirty-six thousand four hundred eighty-seven and 69/100 Dollars (U.S. 136,487.69). This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for the full debt, if not paid earlier, due and payable on June 1, 2049.

BORROWER MAY make prepayments for this subordinate loan, in whole or in part, without charge or penalty. If Borrower makes a partial prepayment there will be no changes in the due date unless Lender agrees in writing to those changes.

This SECURITY INSTRUMENT secures to Lender: (a) the repayment of the debt evidenced by the Note, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, advanced under Paragraph 2 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to the Lender, with the power of sale the following described property located in **Dukes** County, State of

MASSACHUSETTS which has the address of 484 MAIN ST VINEYARD HAVEN, MA 02568, ("Property Address") more particularly described as follows: ***See Exhibit A for Legal Description***

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances or record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Borrower and Lender covenant agree as follows:

UNIFORM COVENANTS.

1. **PAYMENT OF PRINCIPAL.** Borrower shall pay when due the principal of the debt evidenced by the Note.

2. **BORROWER NOT RELEASED; FORBEARANCE BY LENDER NOT A WAIVER.** Extension of the time of payment of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successor in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

3. **SUCCESSORS AND ASSIGNS BOUND; JOINT AND SEVERAL LIABILITY; CO-SIGNERS.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the term of this Security Instrument or the Note without that Borrower's consent.

4. **NOTICES.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to: Department of Veterans Affairs, 810 Vermont Ave., NW, Washington, DC 20420 or any address Lender designates by notice to Borrower. Any notice provided for in this Security

Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

5. **GOVERNING LAW; SEVERABILITY.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

6. **Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

7. **ACCELERATION; REMEDIES.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument unless applicable law provides otherwise. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by applicable law. Lender to the extent permitted by applicable law shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 7, including without limitation reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower and to the other persons prescribed by applicable law. Lender shall publish the notice of sale and the Property shall be sold in the manner prescribed by applicable law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including without limitation reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

8. **RELEASE.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by applicable law.

9. **SUBORDINATION OF HOMESTEAD AND WAIVERS.** If Borrower heretofore has acquired or hereafter acquires an estate of homestead in the Property, Borrower hereby agrees, to the greatest extent permitted by applicable law, that such homestead estate is subordinated in all respects to this Security Instrument and the amount due under the Note and to all renewals, extensions and modifications of this Security Instrument or the Note, and that said homestead estate is subject to all of the rights of the Lender under this Security Instrument and the Note and all renewals, extensions and modifications of this Security Instrument and the Note, and is subordinate to the lien evidenced by this Security Instrument, and all renewals, extensions and modifications of this Security Instrument. Borrower waives and relinquishes all rights of curtesy and dower in the Property.

By SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Thomas L. Bransford
(Must be signed exactly as printed)
12 / 15 / 2021
Signature Date (MM/DD/YYYY)

Patricia S. Bransford
(Must be signed exactly as printed)
12 / 15 / 2021
Signature Date (MM/DD/YYYY)

*[Space below this line for Acknowledgement]*

STATE OF New York
COUNTY OF New York

On the 15th day of December in the year 2021 before me, the undersigned, a Notary Public in and for said State, personally appeared Thomas L. Bransford and Patricia S. Bransford, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and acknowledged to me that he/she/they signed it voluntarily for its stated purpose, and that by his/her/their signature(s) on the instrument, the person or entity upon behalf of which the person or entity acted, executed the instrument.

WITNESS my hand and official seal.

(Signature) (Notary Public Seal)
**(Please ensure seal does not overlap any language or print)**

Notary Public: Davain Walker (Printed Name)
Notary commission expires: 10-19-2024

Davain Walker
Notary Public, State of New York
Qualified in Westchester County
01WA6410230 (exp:10/19/2024)

# EXHIBIT A

The following described real property situated in the County Dukes, State of Massachusetts, to wit:

The land with the buildings, structures and improvements thereon, situated in the Town of Tisbury, County of Dukes County, and Commonwealth of Massachusetts, shown as "Lot 11.87 acres±" on a certain plan entitled "Plan of Land in Tisbury, Mass. Prepared for the 484 Main Street Realty Trust Scale 1" = 40' July 15, 2016" prepared by Schofield, Barbini & Hoehn, Inc., and recorded in the Dukes County Registry of Deeds in Plan Book 18, Page 44 (the "Plan").

Grantees by acceptance and recording of this deed agree to the restrictions and covenants attached to this deed and made a part hereof.

Grantees by acceptance and recording of this deed acknowledge and confirm that Grantees shall have no rights over the "asphalt driveway" shown on the Plan which is located on Lot 2 as shown on the Plan.

Being the same property as conveyed from Harriet Brownson Sayre McCord, Trustee of 484 Main Street Realty Trust u/d/t dated June 28, 2004 to Thomas L. Bransford and Patricia S. Bransford, husband and wife as tenants by the entirety as set forth in Deed Instrument #201900001568 dated 03/25/2019, recorded 03/28/2019, Dukes County, MASSACHUSETTS.

The last vesting deed was recorded on 03/28/2019 in Record Volume/Book: 1491 at Record Page: 887 as Record Document/Instrument Number: 201900001568

ATTEST: Paulo C. DeOliveira, Register

# Noah

***Sent via FedEx and Email***

July 5, 2022

Patricia Bransford
484 Main Street
Tisbury, Massachusetts 02568
pbransford@urbantech.org

**RE: Notice of Alleged Violation**

Dear Mrs. Bransford,

On December 15, 2021, you, as the owner (the "Owner") of the property generally located at 484 Main Street, Tisbury, Massachusetts 02568 (the "Property"), executed a document in favor of Patch Homes, Inc., a Delaware corporation doing business as Noah ("Noah" or "Investor"), entitled The Noah Real Estate Purchase Option Agreement (the "Option Agreement"). As part of the Option Agreement, you represented that you were the owner of the property and gave an irrevocable grant to Noah of an interest in the Property. *See* Opening Paragraph. Further, pursuant to Section 2.3 of the Option Agreement, you agreed to secure your performance of the obligations under the Option Agreement by granting Noah a security interest in the Property.

You have been informed on numerous occasions by Spruce Title Company, Noah, and Noah's counsel, of the fact that the original security instrument was insufficient for providing Noah with the promised security interest. You have also refused to execute new documents in support of Noah's interest, despite Noah's numerous efforts to accommodate your requests. Section 14.1 of the Option Agreement provides, "If Investor believes that Owner has violated any provision of this Option Contract, or has intentionally misled Investor, or withheld material facts, either before this Option was executed or while it remains in effect, Investor shall provide to Owner a written Notice of Alleged Violation describing the alleged malfeasance and the "Cure Actions" Investor believes are required to remedy the situation."

Pursuant to Section 14.1 of the Option Agreement, this communication constitutes Noah's "Notice of Alleged Violation" to you. You are hereby provided with written notice that Noah believes that you have violated the Option Agreement by (1) executing documents as the sole owner of the Property (even though you jointly hold the Property with Mr. Thomas Bransford), (2) failing to grant Noah a valid security interest in the Property, and (3) refusing to execute new documents that would grant Noah the security interests to which it is entitled. In order to remedy your alleged breaches, you must do one of the following (as selected, the "Cure Action"): (A) obtain sole title to the Property and execute a new set of documents in your sole name (Noah will provide such documents upon request – they will include, without limitation, a new Real Estate Purchase Option Agreement, Memorandum of Agreement, and Mortgage (Non-Recourse))); (B) execute, with Mr. Thomas Bransford, a new set of

Noah

documents in your joint names (copies of which documents were already provided on June 15, 2022 and are also available again on request); or (C) buy out Noah's interest in the Option Agreement in accordance with the terms of the Option Agreement.

In accordance with Section 14.2 of the Option Agreement, if you wish to avoid Default you must, within 14 calendar days from the effective date of this Notice of Alleged Violation, perform a Cure Action. If you fail to do so you will be in Default pursuant to Section 14.3 of the Option Agreement. Upon Default, Investor has the right to take the actions described in Section 14.4 of the Option Agreement, including but not limited to: (1) triggering the Early Conclusion procedures described in Section 8; (ii) exercising its foreclosure and sale rights; and (iii) using any other remedy available at law or equity.

Please be advised that Section 18.1 of the Option Agreement provides that you "shall be liable to Investor for all damages or losses that result from a violation of this Option, including late charges, penalties, and fines, and Investor shall be entitled to recover from Owner all costs incurred in connection with collection efforts, whether or not any arbitration or any foreclosure proceeding is filed, and all such costs and expenses shall be payable immediately upon written demand and until paid shall also be secured by the Security Instrument." Section 19 of the Option Agreement also provides that the prevailing party shall be entitled to attorneys' fees.

We hope to resolve this matter amicably and with your cooperation. In furtherance thereof, we have enclosed with the physical copy of this letter (A) a letter with this communication that allows you to select how you intend to proceed and (B) a pre-paid and addressed envelope for your use in mailing us your selection. You may also respond to us via email at sahil@noah.co. If you do not respond or fail to complete a Cure Action within 14 calendar days from the effective date of this Notice of Alleged Violation, we will proceed with enforcing our rights.

Sincerely,
Patch Homes, Inc.,
a Delaware corporation.

By: Sahil Gupta

CC:

Scale LLP
Attn: Jamie Wells, Esq.
jamie.wells@scalefirm.com

Enclosure: Response Letter

# Noah

Noah
Attn: Sahil Gupta
771 Storybook Court
Novato, CA 94947
sahil@noah.co

**RE: Response to Notice of Alleged Violation**

Dear Mr. Sahil Gupta,

I am in receipt of your Notice of Alleged Violation. With respect to such notice, you are hereby informed that I intend to do the following [select as appropriate]:

1) ______________: Obtain sole title to the Property and execute a new set of documents in my individual name.

2) ______________: Execute, with Mr. Thomas Bransford, a new set of documents in our joint names.

3) ______________: Buy out Noah's interest in the Option Agreement in accordance with the terms of the Option Agreement.

4) ______________: Nothing.

Sincerely,

Patricia Bransford

Robinson+Cole

DANIELLE ANDREWS LONG

One Boston Place, 25th floor
Boston, MA 02108-4404
Main (617) 557-5900
Fax (617) 557-5999
dlong@rc.com
Direct (617) 557-5934

Also admitted in New Hampshire

***Via FedEx and***
***Electronic Mail (pbransford@urbantech.org)***

February 23, 2023

Patricia S. Bransford and Thomas Bransford
25 Broad Street, Apt. 8-1
New York, NY 10004

Patricia S. Bransford and Thomas Bransford
484 Main Street
Tisbury, MA 02568

Re: **NOTICE OF ALLEGED VIOLATION**
Noah Real Estate Purchase Option Agreement, dated December 15, 2021 (copy enclosed)
Deed of Trust and Security Agreement, dated December 15, 2021 (copy enclosed)
Property: 484 Main Street, Tisbury, Massachusetts

Dear Mrs. Bransford:

We represent Aero HEC Acquisition I, LLC ("Aero") in connection with the above-referenced loan and security agreement. Aero is the current holder of and party to a Real Estate Purchase Option Agreement, a Deed of Trust, and other related loan documents, with respect to property located at 484 Main Street, Tisbury, Massachusetts (the "Property"). This letter serves as a formal Alleged Notice of Violation under Section 14.1 of the Noah Real Estate Purchase Option Agreement.

**Factual Background**:

On March 25, 2019, Thomas Bransford and Patricia Bransford (the "Bransfords) obtained title to property located at 484 Main Street, Tisbury, Massachusetts (the "Property") as tenants by the entirety. Also on March 27, 2019, the Bransfords granted a mortgage to Federal Savings Bank in the approximate amount of $1.2 million ("FSB Mortgage"). The FSB Mortgage and deed were recorded on March 28, 2019. On February 12, 2020, the Bransfords granted a mortgage to

Freedom Mortgage Corporation in the approximate amount of $1.2 million (Freedom Mortgage"). This was a refinance of the FSB Mortgage.

On December 15, 2021, you, individually, entered into a Real Estate Purchase Option Agreement ("Option Agreement") with Noah f/k/a Patch Homes, Inc. ("Noah"), secured by a Deed of Trust of same date granted by you to Noah, on the Property in the amount of $500,000.00 (the "Noah Mortgage"). The Noah Mortgage was assigned that same day to Aero. Your husband and co-owner of the Property, Thomas Bransford, was not a party to the Option Agreement or the Noah Mortgage. Both you and your husband had represented to Noah and/or its representatives that you would obtain a quitclaim deed at or near the time of the closing on the Noah Mortgage that would convey you and your husband's interest in the Property to you individually so that you would be the sole owner of the Property. You and your husband, however, failed to effectuate this conveyance.

Also on December 15, 2021, you and your husband conveyed a mortgage to the Secretary of Veterans Affairs, encumbering the Property in the original principal amount of $136,487.69 ("Subordinate Mortgage"). The Subordinate Mortgage was recorded on April 7, 2022. You, however, represented to Noah that the Noah Mortgage would be in second position, behind the Freedom Mortgage. The closing instructions for the Noah Mortgage transaction indicate that the Noah Mortgage was to be a second lien on the Property. Noah, however, was never informed by you of the existence the Subordinate Mortgage and/or that the Subordinate Mortgage would be superior to the Noah Mortgage.

The Noah Mortgage was recorded on July 5, 2022 and remains in third position, behind the Freedom Mortgage and the Subordinate Mortgage. The Property remains in the name of both Patricia and Thomas Bransford, yet the Noah Mortgage remains in only the name of Patricia Bransford.

<u>Violation of the Noah Real Estate Purchase Option Agreement</u>:

This letter serves as a formal Notice of an Alleged Violation under Section 14.1 of the Noah Real Estate Purchase Option Agreement. Section 14 of this Agreement states as follows:

14. **DEFAULT.**

14.1. **Owner Violations of this Option Contract.** If Investor believes that Owner has violated any provision of this Option Contract, or has

> intentionally misled Investor, or withheld material facts, either before this Option was executed or while it remains in effect, Investor shall provide to Owner a written Notice of Alleged Violation describing the alleged malfeasance and the "Cure Actions" Investor believes are required to remedy the situation.

Furthermore, Section 16 of the Deed of Trust, which secures the Option Agreement, states as follows:

> **16. Multiple Owners. If there are multiple Trustors** of the Property:
>
> **a.** this Security Instrument must be signed by each such Trustor;
>
> **b.** all rights and powers specified for Trustor in this Security Instrument must be approved and exercised unanimously by all such multiple Trustors;
>
> **c.** all such multiple Trustors shall be jointly and severally liable for all liabilities and obligations specified for Trustor under this Security Instrument;
>
> ...

In Section 18 of the Deed of Trust, you, Patricia Bransford, also "represente[d] and warrant[ed] to Holder that [you had] good and marketable title to the Property, free and clear of all claims and encumbrances."

You warranted and represented to Noah and its successors that you were, or would be, the sole owner of the Property at the time of the Noah Mortgage transaction in both the Option Agreement and the Noah Mortgage, as well as other associated loan documents, and that no others would have a claim to the Property. You further represented in the Option Agreement that you were a "Married Woman" with "separate property." *See i.e* Option Agreement, Ex. C. You also signed the Option Agreement in several places indicating that you were the sole owner of the Property and you acknowledged to Noah and its successors that you were the only owner of the Property. You were in fact not the sole owner; you were a joint owner with your husband Thomas, and you both continue to own the Property as tenants by the entirety.

You also represented to Noah and its successors that the Noah Mortgage would be a second lien on the Property. You never informed Noah or Aero of the Subordinate Mortgage and/or that the Subordinate Mortgage would be, or ultimately was, a superior lien on the Property. Section 12.1 of the Option Agreement states as follows:

> 12. **REQUIRED NOTIFICATIONS.** Owner shall provide the following written notifications to Investor.
>
> > 12.1. **Events Affecting the Property.** Within seven calendar days of the occurrence, Owner shall provide Investor written notice of: (i) any lien recorded against the Property; (ii) any fire, flood, or other sudden or unexpected event causing damage to the Property for which the cost of repair is likely to be more than $5,000; (iii) any insurance claim or insurance cancellation; (iv) receipt of any notice relating to potential or actual action against the Property or its owners involving condemnation or eminent domain; and (v) any other even[t] that could have a significant impact on the value of the Property.

You never notified Noah or Aero of the superiority or recording of the Subordinate Mortgage.

Opportunity to Cure:

Upon identifying Thomas Bransford as an owner of the Property and the superiority of the Subordinate Mortgage, Aero contacted you in an attempt to cure this issue. Aero provided you and your husband with an Amendment to Deed of Trust and Security Agreement and Reaffirmation Agreement, enclosed herewith, to add Thomas Bransford, co-owner of the Property, as a party to the Noah Mortgage, Option Agreement and other loan documents associated with the $500,000 loan on the Property to you. As of the date of this Notice, this document has not been executed.

Section 14.2 of the Option Agreement provides as follows:

> 14.2. **Notice and Opportunity to Cure.** If they wish to avoid Default, Owner must, within 14 calendar days from the effective date of the Notice of Alleged Violation, either: (i) perform each of the Cure Actions; or (ii) initiate binding arbitration pursuant to Subsection 13. If the alleged violation is failure to make timely payment of an expense described in Subsections 10.1, 10.3 and 10.4, or if Owner has opted out of mandatory

> binding arbitration by not initializing the bold-typed paragraph below Subsection 13.4, Owner may avoid Default only by performing each of the Cure Action within such 14-calendar day period. Payment of an expense described in Subsections 10.1, 10.3, and 10.4 may be made under protest, after which Owner may seek to recover amounts paid through arbitration as described in Subsection 13.5.

Sections 14.3 of the Option Agreement further state as follows:

> 14.3. **Owner Default.** Owner shall be in Default if: (i) they receive a written Notice of Alleged Violation and fails to perform each of the Cure Actions within the time required by Subsection 13.2 or, where permitted under the last sentence of Subsection 13.2 and 13.5, the arbitrator finds that violation(s) described in the Notice of Alleged Violation has indeed occurred, and Owner fails to cure the violations during a period of 14 calendar days following arbitrator's ruling.

You have 14 calendar days from the effective date of this Notice of Alleged Violation to cure these violations or initiate binding arbitration. Accordingly, if you fail to cure these violations, Aero shall have the right to pursue its remedies as set forth in the Option Agreement and Noah Mortgage.

Any information accepted by Aero heretofore or hereafter does not constitute a waiver of any violation, default, demand or waiver of any other right or remedy held by Aero. Nothing in this letter shall in any way be deemed or construed as statements that no other violations or defaults exist or as a modification, waiver or release by Aero of any rights and remedies with respect to your liabilities and obligations under the Option Agreement, Noah Mortgage, and other related loan Documents with respect to the Property or under applicable law or equity.

Please contact me immediately to discuss this matter.

Sincerely,

Danielle Andrews Long

Enclosures

Copy to: Anthony Ortiz, Esq.
Friedman Vartolo LLP
85 Broad St., Suite 501
New York, NY 10004

**Noah** **Noah Offer ID: 104166**

## The Noah Real Estate Purchase Option Agreement

On 12/15/2021 ("**Effective Date**"), Patricia S. Bransford as a Married Woman and her separate property, (individually or collectively, "**Owner**") accepts funds from Noah (fka Patch Homes, Inc.), a Delaware registered C. Corp, ("**Investor**") as consideration for this Option on the real property commonly known as 484 Main Street, Tisbury, Massachusetts 02568 and as more particularly described on attached Exhibit A (the "**Property**"). In exchange, Owner irrevocably grants to Investor the right to an interest in the Property and agrees to various other covenants for the benefit of Investor, all described in this document (the "**Option**" or "**Agreement**").

1. **FINANCIAL TERMS.**

$2,375,000.00 **Initial Appraised Value**
The Initial Appraised Value is the appraised value of the Property agreed to by the Owner at the time of origination of the Option, typically by appraisal or other valuation method.

$500,000.00 **Noah Investment Amount.**
The Noah Investment Amount is the money that the Investor provided to the Owner as part of the consideration for this Option.

$1,299,087.00 **Maximum Authorized Debt.**
The Maximum Authorized Debt is the highest total amount of principal that the Owner may owe on all loans secured by the Property.

10 years **Planned Expiration Date.**
The Planned Expiration Date is 10 Years from the Effective Date. This is the latest date by which Owner must pay the Net Option Value to Investor.

32.000% **Noah Share.**
A term used to approximate the economic value of the Investor's Percentage Share in the Property, represented as a percentage of the current value of the Property. It is further defined in Exhibit B.

**Noah**

**Noah Offer ID: 104166**

18% **Capped Rate.**
This rate is used to compute the maximum Net Option Value at the time of exit of this Option, unless the Early Termination as defined in Section 9 applies.

Primary Residence **Occupancy Type.**
This is used to understand whether the Property is being utilized as a "Owner Occupied / Primary" or an "Investment / Rental" Residence.

Noah

Noah Offer ID: 104166

## 2. CREATION OF OPTION AND PAYMENT OBLIGATION.

2.1. Owner irrevocably grants to Investor and its successors an option to purchase the Percentage Share of the Property as an undivided ownership interest on the terms and conditions described below. Owner hereby acknowledges receipt of the Noah Investment Amount and agrees that the contribution of the Noah Investment Amount in advance of exercising the option, the resulting ability of Owner to use such funds interest-free from the time of this Agreement until the time the Option is exercised, and the subsequent payment of the Remaining Portion of the Exercise Price at exercise of the Option, is ample consideration for the Option and for the related covenants of Owner described below.

2.2. Owner recognizes and agrees that by entering into this Option, Owner is not obtaining a loan from Investor, but instead is granting an Option to Investor and thereby the right to purchase a fractional interest in the Property and become a co-owner in the Property. If Investor allows the Option to lapse, Owner shall not be obligated to return or repay the Noah Investment Amount.

2.3. Owner further agrees to pay Investor the Net Option Value described in Section 3 or Section 10. Owner acknowledges and understands that their obligation to pay Investor the Net Option Value will be settled in cash and is not conditioned on Investor purchasing, or taking title to, any ownership interest in the Property. To secure performance of the obligations created by this Option, Owner has made Investor the beneficiary of a deed of trust for the Property (the "Security Instrument"). If Owner fails to satisfy any of their obligations to Investor, then, following notice and an opportunity to cure as described in Subsection 13.1, Investor will have the right to foreclose on the Property as described in the Security Instrument.

## 3. CALCULATION OF NET OPTION VALUE.

The elements and procedures needed to calculate the Net Option Value are as follows.

3.1. **Investor's Price.** Investor's Price is the Percentage Share multiplied by the Noah Agreed Home Value.

3.2. **Remaining Portion of the Exercise Price.** The Remaining Portion of the Exercise Price is the difference between Investor's Price and the Noah Investment Amount.

3.3. **Ending Property Value.** The Ending Property Value is the total of: (i) greatest of: (a) the Adjusted Sale Price and (b) the Adjusted Appraised Value, or (c) the Early Termination Minimum Value if applicable as described in Section 9; (ii) minus any Positive Adjustment; and (iii) plus any Negative Adjustment. For purposes of this Option, the **"Adjusted Sale Price"** is the price at which Owner sells the Property subject to Appraiser Adjustments and the adjustment process as described in

Section 6, and the "**Adjusted Appraised Value**" is the fair market value of the Property determined by a Qualified Appraiser subject to Appraiser Adjustments and the adjustment process as described in Section 6.

3.4. **Net Option Value.** The Net Option Value is calculated by multiplying the Percentage Share by the Ending Property Value and subtracting the Remaining Portion of the Exercise Price, but the minimum Net Option Value is zero.

3.5. **Capped Return Amount.** The Net Option Value is not to exceed the Capped Return Amount, unless the Early Termination as defined in Section 9 and 10 applies. The "**Capped Return Amount**" is calculated as equal to: Noah Investment Amount * [(1 + Capped Rate) ^ (Number of years since Effective Date)]. For the purposes of this Option, the Capped Rate is equal to 18.00%.

3.6. **Percentage Share.** That undivided fractional interest in the Property that Investor has the right to acquire and Owner has agreed to sell if the Option is exercised. In this Agreement, the Percentage Share is 68.421%.

4. **OWNER'S RIGHT TO SELL.** Owner has the right to sell the Property at any time, but only subject to the following requirements and procedures.

4.1. **Permitted Sale.** A Permitted Sale is a sale of the Property that meets all of the following conditions: (i) made on commercially reasonable terms and entered into in good faith; (ii) is made at arm's length and the buyer is not Owner's friend, family member, or associate or an entity or agent acting on behalf of any such person. If the sale of the Property does not meet the above mentioned criteria, then the Investor has a Right of First Refusal to the sale in order to make sure that the sale is a Permitted Sale.

4.2. **Marketing Notice.** As soon as practical, but in no event less than forty-five (45) days prior to beginning efforts to market the Property for sale, the Owner shall provide written notice (a "**Marketing Notice**") to Investor. If Owner intends to seek a positive adjustment under Subsection 6.3, they will provide the Material Improvements Adjustment Request described in that Subsection with the Marketing Notice. A Marketing Notices is a mandatory prerequisite for an Offer Package under Subsection 4.3, no Offer Package shall be deemed valid unless it is received between 30 and 180 days after a Marketing Notice.

4.3. **Offer Package.** Prior to entering into any binding obligation to sell the Property, Owner shall provide to Investor an "**Offer Package**" consisting of: (i) complete and unaltered copies of the offer Owner wishes to accept (the "Owner Chosen Offer") together with copies of any documents and descriptions of any oral agreements, under which Owner would receive any consideration in addition to the price shown in the Owner Chosen Offer; and (ii) all listing or marketing agreements, purchase offers, inspection reports, appraisals, and title reports, created for the Property during the preceding six months.

Noah

Noah Offer ID: 104166

4.4. **Determining Ending Property Value and Net Option Value.** If the sale is a Permitted Sale, the Ending Property Value shall be the Adjusted Sale Price determined as described in Section 6. Otherwise, the Ending Property Value shall be the greater of the Adjusted Sale Price or the Adjusted Appraisal Value determined as described in Section 6.

4.5. **Exercise of Option**. If the Net Option Value is greater than zero, Investor shall exercise its option, thus obligating the Owner to pay Investor the Net Option Value. Such exercise shall not require any notification by investor to Owner, or any other action by investor. If the Net Option Value is zero, then Investor shall not exercise its option, in which case Owner shall not share with Investor any sale proceeds and shall not return to Investor any portion of the Noah Investment Amount unless Section 9 (Early Termination Minimum Value) or Section 13 (Default) applies. Owner understands and acknowledges that Investor will not share in any losses suffered by Owner beyond the forfeiture of the Noah Investment Amount, and that, under such circumstances, Noah Investment Amount may constitute taxable income.

4.6. **Sale Closing Procedure.** Investor shall execute all documents required to allow Owner to convey title to the Property free and clear of the Security Instrument, conditioned upon the payment of the Net Option Value (if greater than zero), any amounts due under Sections 9 or 13, and any outstanding fees or obligations under this Option or the Security Instrument. Investor shall not pay any part of the costs and expenses associated with selling the Property, such as sales commissions, transfer taxes, or title or escrow fees.

5. **OWNER'S RIGHT TO TERMINATE THE OPTION.** Owner has the right to terminate the option and keep the Property, but only subject to the following requirements and procedures.

5.1. **Termination Package.** If Owner wishes to terminate the option without selling the Property, they shall provide to Investor a "**Termination Package**" consisting of written notice of Owner's intent to terminate the option, along with complete and unadulterated copies of any listing or marketing agreements, purchase offers, inspection reports, appraisals, and title reports, created for the Property during the preceding six months. If Owner intends to seek a positive adjustment under Subsection 6.3, they will provide the Material Improvements Adjustment Request described in that Subsection with the Termination Package.

5.2. **Determining Ending Property Value and Net Option Value.** The Ending Property Value shall be the Adjusted Appraised Value of the Property Determined as described in Section 6, or in the event the Early Termination Minimum Value applies, as described in Section 9, then the Ending Property Value shall be the Early Termination Minimum Value.

Noah

Noah Offer ID: 104166

5.3. **Exercise of Option.** If the Net Option Value is greater than zero, and Owner provides Investor a written "Confirmation Notice" confirming Owner's intent to terminate within 10 calendar days of receiving the Appraisal Report described in Section 6.1, Investor shall exercise its Option, thus obligating Owner to pay the Investor the Net Option Value. Such exercise shall not require any notification by Investor to Owner, or any other action by Investor.

5.4. **Termination Closing Procedure.** Investor shall execute all documents required to allow Owner to convey title to the Property free and clear of the Security Instrument conditioned upon payment of the Net Option Value (if greater than zero), any amounts due under Section 9 or 13, and any outstanding fees or obligations under this Option Contract or the Security Instrument, within 30 calendar days of the Confirmation Notice.

5.5. **Clawback Provision.** If Owner transfers the Property within six months following Investor's receipt of the Termination Package, Owner shall be obligated to notify Investor of such transfer in writing and pay to Investor, immediately upon written demand, the amount by which the Net Option Value, calculated based upon the amount paid to Owner by the transferee (without deduction of sales commissions, transfer taxes, sale costs, outstanding debts and mortgages, or other expenses) exceeds the amount (if any) previously paid to Investor.

6. **APPRAISAL RIGHTS.** The "**Noah Agreed Home Value**", "**Adjusted Sales Price**" and "**Adjusted Appraised Value**" shall be determined as described in this Section. In each case: (i) Investor shall initially select the Appraiser and/or Appraisal Management Company (AMC) to conduct an independent third party appraisal; the Investor may also rely on automated valuation models (AVMs) to determine the appraisal; (ii) Owner may trigger additional appraisals if they believe the original appraisal contains material omissions or errors; (iii) Owner must cooperate in good faith to facilitate inspections and appraisals; (iv) each party must provide to the other copies of all appraisals and related inspection reports; and (v) Owner shall pay all expenses associated with appraisals and inspections, regardless of whether these are obtained by, or at the request of, Owner or Investor.

6.1. **Noah Agreed Home Value.** The Noah Agreed Home Value of the Property shall be determined, in part, by an appraisal in accordance with this Section at the time of the origination of the Option between the Owner and the Investor (the "**Initial Appraised Value**"). A "**Cash Market Adjustment**" shall be applied to the Initial Appraised Value based on: (i) the risks and benefits to Investor and Owner associated with each party entering into the Agreement, and (ii) Investor and Owner having each diligently considered the value of the Property based on all such risks and benefits and all other material considerations, notwithstanding any other assessment, valuation, appraisal, or other public or confidential information to the contrary, or any written or oral communications to Owner in connection with

Noah

Noah Offer ID: 104166

the marketing, advertising, negotiation, or execution of the Agreement, or other such communication, the financial terms that shall apply under the Agreement. The Cash Market Adjustment applicable to this Option is 16.000%. The Noah Agreed Home Value of the Property is calculated as the Initial Appraised Value multiplied by (1 - Cash Market Adjustment). The Noah Agreed Home Value of the Property agreed to in this Option is $1,995,000.00.

6.2. **Inspections and Appraisal.** Following receipt of a Marketing Notice under Subsection 4.2, or a Termination Package under Subsection 5.1, Investor shall provide written notice to the Owner of the identity of the inspector(s) and/or Appraiser it retains, and the time and date of any inspections or appraisals. The inspections and appraisal shall be conducted as quickly as reasonably possible, and the Appraiser shall prepare an "Appraisal Report" containing the fair market value of the Property and, if applicable, any "Appraiser Adjustments" as described below. Investor shall use its best efforts to provide the Appraisal Report within 30 calendar days; however, Investor shall not be liable for any loss resulting from failure to meet this time deadline.

6.3. **Negative Adjustment.** If any Appraiser determines that Owner failed to maintain and repair the Property as required by Subsection 10.2 and that any alteration of the Property by Owner reduced the fair market value, the appraiser shall make an Appraiser Adjustment by increasing their valuation by the amount they believe the fair market value has been reduced by the improper maintenance or alteration.

6.4. **Positive Adjustment.** If Owner believes that material improvements (defined as home improvements costing $5,000 or more at a point in time), other than maintenance and repair required under Subsection 10.2, have increased the fair market value of the Property, they shall provide written notice of such a belief (a "**Modification Adjustment**") to Investor, including photographs, construction drawings and other documentation depicting the alteration, and proof that the alteration has been made with all required governmental permits and approvals. For Owner to receive a Positive Adjustment, they must submit a Modification Adjustment as part of the Marketing Notice under Subsection 4.2 or as part of a Termination Package under Section 5.1; Owner shall not receive a Modification Adjustment if they fail to submit such a request within the required time frame. The material submitted by Owner shall be provided to the Appraiser selected by Investor under Subsection 6.1, who shall make an Appraiser Adjustment by decreasing their valuation by the amount they believe the fair market value has been increased by the alteration. The adjustment shall be based solely on the value added at the time of appraisal, whither consideration of depreciation and functional obsolescence, and shall not be based on the actual or inferred cost of the alteration. The adjustment shall be based solely on the lesser of: (i) the value added at the time of appraisal, whither consideration of depreciation and functional obsolescence; or (ii) the actual or cost of the alteration as determined by the documents submitted by Owner to Investor.

6.5. **Appraisal Disagreement.** If Owner believes the Adjusted Appraised Value determined by Investor's Qualified Appraiser is affected by material omissions or errors, Owner shall have a period of two business days following receipt of the Appraisal Report to provide Investor written notice of disagreement, and 10 calendar days following receipt of the Appraisal Report to obtain, at Owner's sole expense, and provide to Investor, an alternative Adjusted Appraised value along with a supporting appraisal by a Qualified Appraiser. If Owner fails to meet either of these time deadlines, then the original Adjusted Appraised value obtained by Investor shall be final and binding; otherwise, the following provisions shall apply. If the difference between the Adjusted Appraised Value obtained by Investor and Owner is no greater than five percent of the higher value, then the average of the two values shall be the final and binding Adjusted Appraised Value and the Appraiser Adjustments from Investor's Appraisal Report shall be used to calculate the Adjusted Sale Price. If the difference between the Adjusted Appraised Values obtained by Investor and Owner is more than five percent of the higher value, the two Qualified Appraiser shall selected a third Qualified Appraiser to provide an Adjusted Appraised Value, and the final and binding Adjusted Appraised Value shall be determined by averaging the two Adjusted Appraised Values that are closest together, and the Appraiser Adjustments from the third Qualified Appraiser's Report shall be used to calculate the Adjusted Sale Price. Any Qualified Appraiser retained by the Owner or selected by the other Qualified Appraiser shall consider all inspection reports, photos, plans and other documentation provided to the previous Qualified Appraiser(s) and shall make adjustments as per Subsections 6.2 and 6.3.

## 7. DEATH OF OWNER.

7.1. **Notice of Owner Death.** Within 60 days of the death of any person who has signed this Option as Owner, the deceased's successor in interest shall provide written notice to the Investor. If the successor has not previously signed this Option, they shall do so immediately upon written demand, and failure to do so shall constitute an Owner Default triggering each of Investor's post-Default rights under this Option and the Security Instrument.

7.2. **Right to Early Conclusion Following Owner Death.** If every person comprising Owner has died, Investor may trigger the Early Conclusion procedures described in Section 8 by providing an "**Early Conclusion Notice**" to the then owner(s) of record (collectively the "Successor Owner"). The Early Conclusion Notice shall specify an "Early Conclusion Date" determined by Investor in its sole and absolute discretion, provided that the Early Conclusion Date shall be no sooner than six months after the effective date of the notice. In instances where there is a Successor Owner, the term "Owner" shall be deemed to refer to and include such Successor Owner (regardless of whether they signed the Option as required

under Subsection 7.1); however, such post-death usage of the term "Owner" shall not prevent the application of the first sentence of this Subsection.

8. **CONCLUSION OF OPTION.** In this Section, the term "Expiration Date" shall mean the Planned Expiration date; however, if there is an Early Conclusion triggered under Subsection 7.2 or 13.6, then the term "Expiration Date" shall mean the Early Expiration Date. At least three months before the Expiration Date, Owner must either provide an Offer Package satisfying each of the requirements of Subsection 4.3 or provide a Termination Package satisfying each of the requirements of Subsection 5.1; failure to provide such items within the required time frame shall constitute an Owner Default triggering each of Investor's post-Default rights under this Option and the Security Instrument. Depending on which package Owner provides, the procedures described in Section 4 or Section 5 shall be followed, and Owner shall be required to pay the amounts described in such Sections, or in Section 9 or 13 (if applicable). Owner hereby irrevocably instructs the escrow agent holding Owner's funds and proceeds in escrow from any sale or refinance of the Property that follows Owner's presentation of an Offer Package or Termination Package to disburse, from such funds, directly to Investor, all amounts owed to Investor, and Investor may submit this Option Contract as disbursement instructions.

9. **EARLY TERMINATION MINIMUM VALUE.** Notwithstanding anything to the contrary in this Option, if the Owner sells the Property, or terminates the option without selling, before the Planned Expiration Date, the home value utilized to determine the Net Option Value shall be the "**Early Termination Minimum Value**". The amount of the Early Termination Minimum Value shall depend on when the Owner sells the Property, or terminates the option without selling, as described below. All parties agree that the actual damages suffered by Investor in the event of early termination would be difficult or impossible to ascertain, and the Early Termination Minimum Value amounts described below are reasonable under the circumstances. The payment of an Early Termination Minimum Value shall not relieve the Owner of the obligation described in Subsection 5.5.

9.1. **Termination Within First Three Years.** If the Owner terminates the Option without selling within the first three years of the Effective Date, then the Early Termination Minimum Value shall be at least a value equal to the Initial Appraised Value. Requiring this minimum is intended to ensure that Investor receives a reasonable return on its investment if Owner decides to terminate the Option before the property has had a reasonable opportunity to appreciate in value.

9.2. **Termination After Three Years but Before the Planned Conclusion Date.** If Owner terminates the Option without selling more than three years after the Effective Date, but before the Planned Conclusion Date, the the Early Termination Minimum Value shall be a value equal to at least the Noah Agreed Home Value.

This would result in the Investor receiving at-least the Noah Investment Amount, meaning Investor will get all of its money back regardless of the Property value. Requiring this minimum is intended to ensure that Investor does not lose money if Owner decides to terminate the option without selling before the Planned Conclusion Date.

## 10. OWNER COVENANTS.

10.1. **Mortgages and Liens.** Subject to Investor's advance written approval, which shall not be unreasonably withheld, Owner may obtain one or more loans secured by the Property, provided: (i) the total amount owed does not exceed the Maximum Authorized Debt; and (ii) no such loan involves negative amortization, lines of credit, further lender advances, lender appreciation sharing, or any other provision under which the loan amount could exceed the Maximum Authorized Debt. Owner may request the Investor's consent to new financing at any time. If Investor consents, it shall execute documents subordinating the Security Instrument to new financing. Owner shall service and repay 100% of the debt secured by the Property in accordance with all requirements of the lender. Owner understands and acknowledges that, upon sale of the Property, their obligation to lenders may exceed their sale proceeds. The Investor may charge the Owner a nominal fee for the preparation of the subordination documents.

10.2. **Maintenance and Repair.** Owner, at their sole expense, shall maintain the Property in a general state of repair at least equivalent to that on the Effective Date, immediately correct conditions that endanger the integrity of the Property or the safety or health of the occupants, guests or public, and promptly comply with all requirements imposed on the Property by governmental agencies or owners' associations. In the case of sudden or unexpected damage to the Property, Owner's repair obligations apply regardless of the extent (if any) of insurance coverage. Owner shall obtain all required governmental and owner association permissions, inspections and approvals for all work performed on the Property. Upon receipt of a written notice so requesting, the Owner shall promptly allow inspection of the Property by Investor or Investor's agents or contractors.

10.3. **Insurance.** Owner, at their sole expense, shall at all times maintain in effect the following policies of insurance for the Property: (i) a policy of "all risk" casualty insurance acceptable to Investor in its reasonable opinion, providing coverage for such risks are commonly covered with respect to properties similar to the Property in construction, location and use, with coverage in an amount equal to the full replacement value of the insured elemes plus required building code upgrades; (ii) if, based on the Property location, there is a 25% or greater chance of a flood over a 30-year period, a flood insurance policy with coverage in an amount equal to the full replacement value of the insured elements plus required building code upgrades; and (iii) any other policies of insurance for the Property

Noah

Noah Offer ID: 104166

that are required pursuant to the terms of any loan secured by the Property. Each such policy shall name Investor as an additional insured. Copies of all insurance policies shall be provided to In Investor promptly upon issuance. All proceeds paid by any insurance carrier for damage to the Property shall be used by the Owner to repair such damage. Owner shall provide to Investor: (i) proof of having all required insurance each year on December 31, and again promptly upon receipt of a written notice so requesting; and (ii) copies of notices of any insurance change or cancellation within seven calendar days of Owner's receipt of such notices. Owner acknowledges that in case they do not provide the proof of insurance to the Investor as mentioned above, the Investor shall obtain the required insurance on behalf of the Owner - the amount of which shall be added to the final Net Option Value and/or be due to the Investor at the time of expiry of the Option Agreement.

10.4. **Property Tax and Other Ownership Expenses**. Owner, at their sole expense, shall pay when due all taxes and assessments imposed by any governmental entity, all dues and assessments imposed by any owners' association with a right to lien the Property, and all service charges and fees imposed by any public utility with a right to lien the Property ("**Property Taxes**"). Upon receipt of a written notice so requesting, Owner shall promptly provide proof of payment to Investor or Investor's agents. Owner acknowledges that in case they do not provide the proof of payment of Property Taxes to the Investor as mentioned above, the Investor shall pay the required Property Taxes on behalf of the Owner - the amount of which shall be added to the final Net Option Value and/or be due to the Investor at the time of expiry of the Option Agreement.

10.5. **Occupancy and Use**. Owner shall use the Property as listed in Section 1. If the Property is marked as "Owner Occupied / Primary" residence, then the Owner shall use the Property as his/her primary residence beginning within 60 days after acquiring title and continuing for at least one year. After which date, Owner must provide notice if the Property will not be used as his/her primary residence within 10 business days of the change in residency. Owner shall not commit waste on the Property, permit illegal activities to be conducted on the Property, or allow the Property to be used in any manner that violates governmental regulations, creates a nuisance, increases insurance rates, or endangers occupants, guests, neighbors, or the general public. Owner acknowledges that they have read Exhibit C to this Option, titled "NOTICE AND ACKNOWLEDGMENT REGARDING SPOUSES, PARTNERS AND CO-OCCUPANTS WHO ARE NOT SIGNATORIES TO THE OPTION AGREEMENT" and completed it in full.

11. **TRANSFER RESTRICTION AND REQUIREMENTS**. Owner shall not transfer any interest in the Property without Investor's advance written approval, and such approval may be withheld at investor's sole and absolute discretion. If a transfer is approved, Owner shall pay all costs associated with the creation, signing, and recordation of

transfer documents, including any modification of this Option or the Security Instrument.

**12. REQUIRED NOTIFICATIONS.** Owner shall provide the following written notifications to Investor.

12.1. **Events Affecting the Property.** Within seven calendar days of the occurrence, Owner shall provide Investor written notice of: (i) any lien recorded against the Property; (ii) any fire, flood, or other sudden or unexpected event causing damage to the Property for which the cost of repair is likely to be more than $5,000; (iii) any insurance claim or insurance cancellation; (iv) receipt of any notice relating to potential or actual action against the Property or its owners involving condemnation or eminent domain; and (v) any other even that could have a significant impact on the value of the Property.

12.2. **Planned Alteration.** Prior to beginning work, Owner shall provide Investor written notice of any significant alteration to the Property, including demolition or addition of walls, elimination or addition of kitchens or bathrooms, increasing or decreasing habitable dwelling area, or remodeling projects for which the total cost is expected to exceed $25,000. Owner shall include with such written notice construction drawing of the planned alteration and photographs of the areas of the Property that will be modified.

12.3. **Events Affecting Ownership of Occupancy.** Within seven calendar days of the occurrence, Owner shall provide Investor written notice of: (i) a voluntary or involuntary bankruptcy proceeding under which any signatory to this Option, or any owner of record of the Property, will or may be adjudicated bankrupt; or (ii) any marriage, death or divorce involving any owner of the Property.

**13. CONDEMNATION.**

13.1. If the Property is condemned, in part or in whole, all condemnation proceeds net of reasonable costs and expenses (including, without limitation, Attorneys' Fees that have been approved by Investor) reasonably incurred by Owner and/or Investor in collecting and contesting the condemnation proceeds ("**Net Condemnation Proceeds**") will be allocated in the following order: (i) to payment of any lien senior to this Option; (ii) to Investor, an amount equivalent to the Net Option Value as it would have been calculated prior to the condemnation; (iii) and to Owner, the balance of the proceeds.

13.2. If the Property is condemned in part, and if the Option has not been exercised, the following provisions shall apply. The Net Condemnation Proceeds shall be used, first, to pay all liens senior to this Option, provided that such payment may result in the discharge of the related liens. Any remaining Net Condemnation Proceeds shall be distributed as follows: (i) to Investor, an amount equal to the

Noah

Noah Offer ID: 104166

Percentage Share multiplied by the Net Condemnation Proceeds, including any associated unpaid Protective Advances, and other fees and charges; and (ii) to Owner, the balance of the proceeds.

## 14. DEFAULT.

14.1. **Owner Violations of this Option Contract.** If Investor believes that Owner has violated any provision of this Option Contract, or has intentionally misled Investor, or withheld material facts, either before this Option was executed or while it remains in effect, Investor shall provide to Owner a written Notice of Alleged Violation describing the alleged malfeasance and the "Cure Actions" Investor believes are required to remedy the situation.

14.2. **Notice and Opportunity to Cure.** If they wish to avoid Default, Owner must, within 14 calendar days from the effective date of the Notice of Alleged Violation, either: (i) perform each of the Cure Actions; or (ii) initiate binding arbitration pursuant to Subsection 13. If the alleged violation is failure to make timely payment of an expense described in Subsections 10.1, 10.3 and 10.4, or if Owner has opted out of mandatory binding arbitration by not initializing the bold-typed paragraph below Subsection 13.4, Owner may avoid Default only by performing each of the Cure Action within such 14-calendar day period. Payment of an expense described in Subsections 10.1, 10.3, and 10.4 may be made under protest, after which Owner may seek to recover amounts paid through arbitration as described in Subsection 13.5.

14.3. **Owner Default.** Owner shall be in Default if: (i) they receive a written Notice of Alleged Violation and fails to perform each of the Cure Actions within the time required by Subsection 13.2 or, where permitted under the last sentence of Subsection 13.2 and 13.5, the arbitrator finds that violation(s) described in the Notice of Alleged Violation has indeed occurred, and Owner fails to cure the violations during a period of 14 calendar days following arbitrator's ruling.

14.4. **Consequences of Default.** If Owner is in Default, Investor may take any or all of the following actions: trigger the Early Conclusion procedures described in Section 8 by providing an "**Early Conclusion Notice**" specifying an "**Early Conclusion Date**" determined by Investor in its sole and absolute discretion, provided that the Early Conclusion Date shall be no sooner than six months after the effective date of the notice; (ii) exercise any rights or remedies it may have under the Security Instrument including foreclosure and sale; (iii) pay any financial obligation of Owner under Subsections 10.1, 10.3, or 10.4, or undertake repairs of the Property reasonably required to prevent serious deterioration or damage, and in either case all expenses incurred by Investor shall be deemed a loan to Owner at the maximum interest rate permitted by law, with all interest and principal due immediately upon written demand, and with failure to pay constituting grounds for foreclosure under the Option

Security Instrument; or (iv) use any other remedy available at law or equity, serially or concurrently. Notwithstanding anything to the contrary in this Option Contract, if Investor chooses to trigger the Early Conclusion procedures, the following provisions shall apply:

i. Owner shall continue to be deemed to be in Default unless and until they satisfy all of the requirements of Section 8 including timely payment of the payment of the Net Option Value and any outstanding fees.

ii. When calculating the Net Option Value: (i) Owner shall not have the right to trigger additional appraisals if they believe the original appraisal obtained by Investor contains material omissions or errors; (ii) the Appraisal Report should be prepaid as if it were prepared on the date of the Owner Default, and (iii) Owner shall not be entitled to any of the rights and processes described in Section 6.3 and 6.4; and

iii. Notwithstanding anything to the contrary in this Option, Investor's Price shall be reduced by 20%. This adjustment is intended as liquidated damages for the expense and inconvenience incurred by Investor when Owner does not keep their promises. All parties agree that the amount of actual damages suffered by the Investor in the event of Default would be difficult or impossible to ascertain and that this Investor's Price adjustment is a reasonable estimate of such damages. THE ADJUSTMENT IS INTENDED TO COMPENSATE INVESTOR AS A RESULT OF OWNER'S DEFAULT IN ACCORDANCE WITH CALIFORNIA CIVIL CODE SECTION 1671 AND WILL NOT BE DEEMED TO CONSTITUTE A FORFEITURE OR PENALTY.

15. **INVESTOR RIGHTS.** Investor shall have the right to: (i) inspect the Property at its expense on up to two occasions each calendar year within 14 calendar days of written request to Owner; (ii) directly contact providers of insurance covering the Property, and holders of loans secured by the Property, at any tie, and Owner shall provide any required written authorization to Investor promptly upon request; (iii) participate in all discussions or negotiations regarding any condemnation or eminent domain relating to the Property; and (iv) transfer any or all of its rights under this Option at any time without the approval of Owner.

16. **SPECIAL POWER OF ATTORNEY COUPLED WITH AN INTEREST.** Homeowner appoints Investor, and its successor and assignees, in Homeowner's name to exercise the powers set forth below consistent with the provisions contained in this Option (**"Power of Attorney"**). This Power of Attorney will be exercised only: (i) when Investor

or its successor or assignees exercises or anticipates exercising the Option; and (ii) for the purpose of authorizing and empowering Investor to market, advertise, sell and transfer title to one hundred percent (100%) of the Property, including Owner's interest therein. Under this Power of Attorney, Investor will have the power and authority to do all the acts and execute any and all documents, instruments and agreement to market the Property, including but not limited to: solicit buyers for the Property, advertise the Property for sale on reasonable and customary terms and for a price that is reasonable for the market conditions; and sell the Property on usual and customary terms and conditions. The Power of Attorney granted hereunder is coupled with an interest. This Power of Attorney is a durable power of attorney and shall remain in force despite any Owner's subsequent incapacity, disability or death. Homeowner and Investor agree that if Investor is not allowed to exercise its rights under this Section 18, or if Owner fails to comply with its obligations under this Section 18, the damages to Investor would be irreparable and extremely difficult to estimate, making money damages or any remedy at law inadequate. Thus, in addition to any other rights and remedies available to it in law, equity or otherwise, Investor shall be entitled to specific performance of the provisions of this Section 18.

17. **NOTICES.** Except where expressly prohibited by law, written notice shall be deemed properly provided to Owner or Investor if given by email at the intended recipient's last known email address. If Owner consists of more than one person, notice to any one such person shall be deemed notice to each such person. It shall be the responsibility of each person signing below as Owner, and of Investor, to (i) regularly monitor their email communication, and (ii) provide notice to all other parties when their email address changes. A written notification shall be deemed effective on the calendar day following the day it is sent via email. Where notice by email is expressly made inadequate by operation of law, notification shall be deemed effective on the earlier of the date on which it is actually received, or the date of deemed receipt specified by law for the manner in which the notice is given or, if no such date is specified, 10 calendar days after it is sent or published.

18. **MISCELLANEOUS TERMS.**

18.1. Owner shall be liable to Investor for all damages or losses that result from a violation of this Option, including late charges, penalties, and fines, and Investor shall be entitled to recover from Owner all costs incurred in connection with collection efforts, whether or not any arbitration or any foreclosure proceeding is filed, and all such costs and expenses shall be payable immediately upon written demand and until paid shall also be secured by the Security Instrument.

18.2. If Owner consists of more than one person, each such person shall be jointly and severally liable for all obligations imposed by this Option.

18.3. This Option: (i) is executed in and shall be governed by the laws of the state where the Property is located; (ii) may be amended only by a written document signed by both Owner and Investor; and (iii) shall be binding on the respective successors, assigns and personal representatives of each party signing as Owner and all those who become owners of record of the Property.

18.4. The invalidity or unenforceability of any provision shall not affect the validity or enforceability of any other provision. This Option, and the Security Instrument, contain the entire agreement between Owner and Investor relating to the Property, and any written or oral representations, modifications or agreements regarding these matters shall be of no force and effect unless contained in a subsequently dated, written document expressly stating such representation, modification or agreement, signed by Owner and Investor.

18.5. The failure of Investor to enforce, or to insist upon the strict compliance with, any term of this Option shall not constitute a waiver nor prevent enforcement of such term in any subsequent situation. Time is expressly declared to be of the essence.

18.6. In the event Owner is a trust, the trustee(s) signing below represent(s) and warrant(s) that the trust is authorized to enter into this Option and will be bound by its terms, and for purposes of this Option "Owner" means the trustee(s) acting on behalf of the trust.

19. **ATTORNEYS FEES.** If any dispute between Owner and Investor should result in litigation or arbitration, the prevailing party shall be entitled to recover from the other all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including reasonable attorney fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate allowed by law. For the purposes of this Section: (i) attorney fees shall include, without limitation, fees incurred in bankruptcy litigation, post judgment motions, discovery, contempt proceedings, and examinations (debtor and third party) relating to garnishment and levy; and (ii) prevailing party shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

Noah

Noah Offer ID: 104166

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH INVESTOR, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN HOMEBUYER AND INVESTOR AS OF THE EFFECTIVE DATE.

By signing below, the parties accept and agree to the terms and agreements contained in this Agreement, including the Exhibits to this Agreement, as of the Effective Date.

**INVESTOR:**

Noah (fka Patch Homes, Inc.)

By: ______________________________

Name: Sonja McIntosh

Title: Authorized Signatory

**OWNER:**

Patricia S Bransford

**Noah**

**Noah Offer ID: 104166**

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH INVESTOR, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN HOMEBUYER AND INVESTOR AS OF THE EFFECTIVE DATE.

By signing below, the parties accept and agree to the terms and agreements contained in this Agreement, including the Exhibits to this Agreement, as of the Effective Date.

**INVESTOR:**

Noah (fka Patch Homes, Inc.)

By: ______________________

Name: Sonja McIntosh

Title: Authorized Signatory

**OWNER:**

______________________

Patricia S Bransford

Noah

Noah Offer ID: 104166

## EXHIBIT A

### LEGAL DESCRIPTION

That certain real property situated in the City of Tisbury, County of Dukes, State of Massachusetts, described as follows:

The land with the buildings, structures and improvements thereon, situated in the Town of Tisbury, County of Dukes County, and Commonwealth of Massachusetts, shown as "Lot 11.87 acres+" on a certain plan entitled "Plan of Land in Tisbury, Mass. Prepared For the 484 Main Street Realty Trust Scale I" = 40' July 15, 2016" prepared by Schofield, Barbini & Hoehn, Inc., and recorded in the Dukes County Registry of Deeds in Plan Book 18, Page 44 (the "Plan").

Grantees by acceptance and recording of this deed agree to the restrictions and covenants attached to this deed and made a part hereof. Grantees by acceptance and recording of this deed acknowledge and confirm that Grantees shall have no rights over the "asphalt driveway" shown on the Plan which is located on Lot 2 as shown on the Plan. The parcel is conveyed subject to, and together with the benefit of, all rights, easements, covenants, restrictions and other matters of record, to the extent the same are in force and applicable.

Tax Parcel No.: 4 B 17

[end of legal description]

**Noah**

**Noah Offer ID: 104166**

## EXHIBIT B

### NOAH SHARE APPENDIX

Reference is made to that certain Real Estate Purchase Option Agreement (the "Agreement") by and between Patricia S. Bransford as a Married Woman and her separate property, ("Owner") and Noah, f.k.a Patch Homes ("Investor"), in connection with such transactions contemplated therein. All defined terms have the same meaning as in the Agreement.

1. Based on the Agreement, the Owner is issuing to the Investor the right to obtain an undivided, fractional ownership interest. The economic value of this interest represented as a percentage of the value of the home, is defined as the **Noah Share**. Specifically, the Noah Share can be calculated at any time is obtained by dividing (i) (A) the Net Option Value or (B) the proceeds due from the Owner to the Investor in order to terminate this Real Estate Option Purchase Agreement, by (ii) the Ending Property Value. Each of these terms has been defined in the Agreement. The Owner recognizes that the Ending Property Value will only be known at the time of the Agreement termination and/or Expiry – and therefore the exact value of the Noah Share at the time of the termination and/or Expiry will be calculated at that time on a future date.

2. The following tables provide an illustrative example for the Owner(s) on how the Noah Share changes based on Ending Property Value. It demonstrates that as the Property changes in value, the Noah Share also changes, resulting in the Investor sharing in the losses and/or potential future gains of Property value with the Owner.

| Ending Property Value | Net Option Value | Noah Share |
|---|---|---|
| $2,018,750 | $516,250 | 25.573% |
| $2,090,000 | $565,000 | 27.033% |
| $2,161,250 | $613,750 | 28.398% |
| $2,232,500 | $662,500 | 29.675% |
| $2,303,750 | $711,250 | 30.874% |
| $2,446,250 | $808,750 | 33.061% |
| $2,517,500 | $857,500 | 33.061% |
| $2,588,750 | $906,250 | 35.007% |
| $2,660,000 | $955,000 | 35.902% |
| $2,731,250 | $1,003,750 | 36.751% |

**Noah**

**Noah Offer ID: 104166**

3. THE OWNER RECOGNIZES THAT THE ABOVE TABLES ARE SIMPLY AN ILLUSTRATIVE EXAMPLE AND THAT THE ACTUAL PROPERTY TERMINATION PRICE MAY BE DIFFERENT THAT THE VALUES SHOWN ABOVE. Owner also acknowledges that the Noah Share is a concept that was used as a consumer education tool to understand the economics of the Agreement. It does not reflect the entirety of the Agreement, which is detailed in the Agreement itself.

**ACKNOWLEDGED BY OWNER(s):**

Patricia S Bransford

Noah

Noah Offer ID: 104166

## EXHIBIT C

### NOTICE AND ACKNOWLEDGMENT REGARDING SPOUSES, PARTNERS AND CO-OCCUPANTS WHO ARE NOT SIGNATORIES TO THE OPTION AGREEMENT

Reference is made to that certain The Option Agreement (the "Agreement") by and between Patricia S. Bransford as a Married Woman and her separate property ("Owner") and Noah, f.k.a. Patch Homes ("Investor"), in connection with such transactions contemplated therein. All defined terms have the same meaning as in the Agreement.

This Notice and Acknowledgment (the "Acknowledgment") contains important disclosures about the rights and liabilities of spouses, domestic partners, family members, and other non-Owner occupants of the Property (collectively referred to as "Non-Owner Occupant(s)"). Please READ IT CAREFULLY.

This Acknowledgment must be signed by all Owners entering into and executing the Agreement and by all Non-Owner Occupants who have attained the age of 18 (or such other age of majority under applicable state law, if otherwise). As a prerequisite to entering into the Agreement, all Owners are responsible for ensuring that a complete and accurate version of this Acknowledgement is returned to the Investor with the signatures of all Owners and all Non-Owner Occupants who have attained the age of majority under state law.

The rights of a Non-Owner Occupant to occupy or retain possession of the Property following: (i) the Owner ceasing to occupy the Property as required by Section 10 of the Agreement (if applicable) or (ii) the death of Owner or of the last of the Owners if there is more than one Owner (or if Owner is/are the Trustee(s) of the Trust, the death of the last surviving Trustor), or (iii) certain other triggering events (including a Default), as specified in the Agreement, may be significantly affected by the operation or enforcement of the Agreement because, among other things, the Agreement gives Investor the right to exercise its option and to purchase an undivided fractional interest in the Property upon such triggering events. For example, one such triggering event is death of Owner or of the last of the Owners if there is more than one Owner (or if Owner is/are the Trustee(s) of the Trust, the death of the last surviving Trustor), regardless of whether Non-Owner Occupants are occupying the Property at that time. A Non-Owner Occupant of a Property subject to the Agreement will be required to comply with and settle Investor's exercised rights and remedies even if the Non-Owner Occupant inherits the Property as the heir, beneficiary or survivor of an Owner. Depending on the appreciation of the Property during the term of the Agreement, the amount required to be paid to settle Investor's rights and remedies may be substantial. In addition, following a Default (including default by Non-Owner Occupants), Investor may be entitled to exercise their remedies under the

**Noah** **Noah Offer ID: 104166**

Agreement following a Default, resulting in a Non-Owner Occupant losing possession and/or ownership of the Property.

Investor cannot know who occupies the Property if those persons are not named on title to the Property and in a deed recorded in the public records. Investor must and will rely on Owner to supply this information accurately and completely.

Throughout the term of the Agreement, Owner is responsible for promptly notifying Investor of any change in the status of Non-Owner Occupants. All Owners are responsible, in the event of any such change in status, for promptly returning a complete and accurate additional Acknowledgment to Investor with the signatures of all new Non-Owner Occupants who occupy the Property and of all previous non-adult Non-Owner Occupants when such person attains the age of 18 (or the age of majority under applicable state law, if otherwise).

In the event that Owner wishes to add any other person to the title of the Property after the Effective Date of the Agreement, Owner agrees that such person shall meet all then-current Agreement requirements and must execute a complete set of the legal documents reasonably requested by Investor. Unless and until these requirements are met, any such individual who is a Non-Owner Occupant shall remain as such, subject to all contractual rights of Investor.

All Owners and Non-Owner Occupants acknowledge that they have read and understand this Acknowledgement, and that they have been advised by Investor to make independent investigations (including from independent legal counsel and estate planning professionals) regarding the legal and financial effect of executing this Acknowledgement.

No **(Yes / No) I represent and warrant that there are no Non-Owner Occupants living in my Property.**

**ACKNOWLEDGED BY OWNER(s):**

Patricia Bransford

Patricia S Bransford

**Noah** **Noah Offer ID: 104166**

N/A (Yes / No) **I represent and warrant that I have presented this Acknowledgment to, and discussed its contents with, all Non-Owner Occupants living in my Property. The names and signatures of all Non-Owner Occupants and their relation to me appear below.**

**ACKNOWLEDGED BY OWNER(s) and NON-OWNER OCCUPANTS:**

Patricia S Bransford

______________________________
[Name & Signature of Non-Owner Occupant]

______________________________
[Name & Signature of Non-Owner Occupant]

# Noah

Noah Offer ID: 104166

**After Recording Return To:**

Noah (fka Patch Homes Inc.)
6621 California Street, Lower Unit
San Francisco, CA 94121

**Recording Requested by:**

Noah (fka Patch Homes Inc.)

## MEMORANDUM OF AGREEMENT

This MEMORANDUM OF AGREEMENT ("Recorded Memorandum"), is entered into as of 12/15/2021 (**"Effective Date"**) by and between Patricia S. Bransford as a Married Woman and her separate property, (individually or collectively "Owner"), and Noah (fka Patch Homes, Inc), a **Delaware registered C. Corp.** company and its successors and assignees (**"Benefited Party"**), whose address is 6621 California Street, Lower Unit, San Francisco, CA 94121.

### MEMORANDUM OF REAL ESTATE PURCHASE OPTION AGREEMENT

Owner hereby declares that Owner and Benefited Party have entered into that certain Noah Real Estate Purchase Option Agreement dated the same date as the Effective Date ("**Option Agreement**"), pursuant to which Owner grants and conveys to Benefited Party the option ("**Option**") to purchase an undivided fractional interest in all of that certain real property described in Exhibit A attached hereto (the "**Property**"), all as more particularly described, and on the terms and conditions stated in the Option Agreement. The fractional interest shall equal the Percentage Share, as specified in the Option Agreement. The Option is irrevocable by Owner. The term of the Option shall commence on the Effective Date and shall expire at 11:59 p.m., Pacific Time, on the day immediately preceding the Expiration Date. The terms of the Option Agreement are hereby incorporated into this Recorded Memorandum by this reference, and unless otherwise

defined herein, capitalized terms used in this Recorded Memorandum shall have the meanings attributed to such terms in the Option Agreement.

MEMORANDUM OF COVENANTS RUNNING WITH THE LAND

By entering into the Option Agreement, Owner has made certain covenants and promises to or for the benefit of Benefited Party in connection with the Property.

This Recorded Memorandum identifies the covenants and promises set forth in the Option Agreement that run with the land and are binding upon any party who acquires Owner's (or Owner's heirs, successors and assigns) interest in the Property for the benefit of the Benefited Party and its successors and assigns, so long as the Option Agreement remains in full force and effect and has not expired or been terminated in accordance with the terms provided for therein.

The covenants that run with the land are as follows:

a. Section 10.2 of the Option Agreement which, among other things, requires Owner to maintain and repair the Property and to ensure that use of the Property complies with all applicable state, federal and local laws and regulations.

b. Section 10.3 of the Option Agreement which, among other things, requires Owner to maintain insurance on the Property against all hazards in the amounts and types provided for therein.

c. Section 10.4 of the Option Agreement which, among other things, requires Owner to pay all taxes and assessments accruing on the Property.

d. Section 10.5 of the Option Agreement which, among other things: requires Owner to continuously occupy the Property as Owner's Principal Residence; requires that the Property be used as a single family residence; and prohibits use of the Property for any commercial or other non-residential purposes.

e. Section 10.1 of the Option Agreement which, among other things, restricts the ability of Owner to increase the amount of debt that is secured by a lien on the Property beyond the Maximum Authorized Debt specified in the Option Agreement.

f. Section 10.1 of the Option Agreement which, among other things, requires Owner to keep the Property free of liens not approved by Benefited Party.

Noah

Noah Offer ID: 104166

g. Section 11 of the Option Agreement which, among other things, restricts the right of Owner to transfer the Property without Benefited Party's consent or deemed consent.

i. Section 4 of the Option Agreement which, among other things, requires Owner to provide Benefited Party with a right of first refusal in connection with any proposed sale of the Property by Owner.

## SPECIAL POWER OF ATTORNEY COUPLED WITH AN INTEREST

Each person whose signature appears below as Owner hereby irrevocably nominates, constitutes and appoints, in general, Benefited Party and its successor and assignees, and, in particular, each of its and their Chief Executive Officer, President, Chief Financial Officer, Chief Operating Officer, Managing Directors and Vice Presidents, as Owner's true and lawful agents and attorneys-in-fact (with full power of substitution) in Owner's name and on Owner's behalf (in any and all capacities) to exercise the powers set forth below consistent with the provisions contained in this Recorded Memorandum and in the Option Agreement ("**Power of Attorney**").

This Power of Attorney will be exercised:

(i) only when Benefited Party or its successor or assignee anticipates exercising the Option: and

(ii) only for the sole purpose of authorizing and empowering Benefited Party (although only a co-owner of the Property) to market, advertise, sell and transfer title to one hundred percent (100%) of the Property, including Owner's interest therein.

Accordingly, Benefited Party or its successor or assignee and the other parties designated above as attorneys-in-fact, shall have the power and authority to do all acts and to execute any and all documents, instruments and agreements as such agents and attorneys-in-fact deem necessary or advisable: (a) to solicit buyers for the entire Property and offers for a sale of the entire Property; (b) to advertise the entire Property for sale on reasonable and customary terms and conditions for a price that is reasonable in view of the then market conditions; and (c) to sell the entire Property and transfer Owner's entire interest in, and title to the Property on usual and customary terms and conditions, the proceeds of which will be allocated to Owner and Benefited Party as provided in the Option Agreement.

The Power of Attorney granted hereunder is coupled with an interest. All acts that the attorneys-in-fact shall lawfully do, or cause to be done, under the authority of this Power of Attorney are hereby expressly approved, ratified and confirmed.

Noah

Noah Offer ID: 104166

This Power of Attorney is a durable power of attorney as authorized and shall remain in force despite any Owner's subsequent incapacity or death.

**RELEASE**

This Recorded Memorandum shall remain in full force and effect until released by a written release, quitclaim deed or other written termination of this Recorded Memorandum that is executed and notarized by Benefited Party and is recorded in the real property records for the county where the Property is located.

To the extent of any inconsistency between the terms of the Option Agreement and this Recorded Memorandum, the terms of the Option Agreement shall prevail and control.

*[Signatures and notarial acknowledgements appear on following pages]*

**Noah** Noah Offer ID: 104166

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH BENEFITED PARTY, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS RECORDED MEMORANDUM, THE OPTION AGREEMENT, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND BENEFITED PARTY AS OF THE EFFECTIVE DATE.

IN WITNESS WHEREOF, the undersigned Benefited Party and Owner have each executed this Recorded Memorandum as of the Effective Date.

**Owners:**

Patricia S Bransford [signature] Seal

Owner Address:

484 Main Street
Tisbury, Massachusetts 02568

**Benefitted Party:**

Noah (Patch Homes Inc.)

By : ______________________

Name : Sonja McIntosh

Title : Signatory Authority

Date Signed : ______________________

**Noah** **Noah Offer ID: 104166**

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH BENEFITED PARTY, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS RECORDED MEMORANDUM, THE OPTION AGREEMENT, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND BENEFITED PARTY AS OF THE EFFECTIVE DATE.

IN WITNESS WHEREOF, the undersigned Benefited Party and Owner have each executed this Recorded Memorandum as of the Effective Date.

**Owners:**

Patricia S Bransford ______________________ Seal

Owner Address:

484 Main Street
Tisbury, Massachusetts 02568

**Benefitted Party:**

Noah (Patch Homes Inc.)

By : [signature]

Name : Sonja McIntosh

Title : Signatory Authority

Date Signed : 12/1/2021

**Noah**

**Noah Offer ID: 104166**

## GENERAL ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not to the truthfulness, accuracy, or validity of that document.

STATE OF New York )

) ss.

COUNTY OF New York )

On 15th December, 2021, before me Davain Walker, Notary Public, personally appeared Patricia S. Bransford who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(is) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of NY that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Davain Walker
Notary Public, State of New York
Qualified in Westchester County
01WA6410230 (exp:10/19/2024)

Signature ____________________

(seal)

Noah

Noah Offer ID: 104166

## GENERAL ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not to the truthfulness, accuracy, or validity of that document.

STATE OF OREGON )

) ss.

COUNTY OF MULTNOMAH )

On 1 DECEMBER, 2021, before me GRACE ELIZABETH VOILES, Notary Public, personally appeared Sonja McIntosh who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his her/their authorized capacity(is) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of OREGON that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

OFFICIAL STAMP
GRACE ELIZABETH VOILES
NOTARY PUBLIC - OREGON
COMMISSION NO. 1005760
MY COMMISSION EXPIRES NOVEMBER 04, 2024

Signature ______________________

(seal)

**Noah**

**Noah Offer ID: 104166**

## EXHIBIT A

### LEGAL DESCRIPTION

That certain real property situated in the City of Tisbury, County of Dukes, State of Massachusetts, described as follows:

The land with the buildings, structures and improvements thereon, situated in the Town of Tisbury, County of Dukes County, and Commonwealth of Massachusetts, shown as "Lot 11.87 acres+" on a certain plan entitled "Plan of Land in Tisbury, Mass. Prepared For the 484 Main Street Realty Trust Scale I" = 40' July 15, 2016" prepared by Schofield, Barbini & Hoehn, Inc., and recorded in the Dukes County Registry of Deeds in Plan Book 18, Page 44 (the "Plan").

Grantees by acceptance and recording of this deed agree to the restrictions and covenants attached to this deed and made a part hereof. Grantees by acceptance and recording of this deed acknowledge and confirm that Grantees shall have no rights over the "asphalt driveway" shown on the Plan which is located on Lot 2 as shown on the Plan. The parcel is conveyed subject to, and together with the benefit of, all rights, easements, covenants, restrictions and other matters of record, to the extent the same are in force and applicable.

Tax Parcel No.: 4 B 17

[end of legal description]

**Noah** **Noah Offer ID: 104166**

**After Recording Return To:**

Noah (fka Patch Homes Inc.)
6621 California Street, Lower Unit
San Francisco, CA 94121

**Prepared by:**

Noah (fka Patch Homes Inc.)

# DEED OF TRUST (NON-RECOURSE) AND SECURITY AGREEMENT

**Effective Date:** 12/15/2021

This Deed of Trust ("Deed of Trust" or "Security Instrument") is made by

Patricia S. Bransford as a Married Woman and her separate property **("Trustor" or "Optionor")** to Spruce Title Company **("Trustee")** whose address is 601 University Avenue, Suite 254, Sacramento, CA for the benefit of Noah (fka Patch Homes Inc.), and its successor and assignees **("Beneficiary" or "Optionee")** with its principal place of business at 6621 California Street, Lower Unit, San Francisco, CA 94121.

Noah

Noah Offer ID: 104166

## DEFINITIONS

Capitalized terms used in this Security Instrument shall have the meanings specified in this Security Instrument, or if not defined herein, in that certain Noah Real Estate Purchase Option Agreement dated as of the Effective Date ("Option Agreement") executed by Trustor as owner, and Beneficiary as Investor, concurrently with this Security Instrument.

1. **Grant Trust.** TRUSTOR HEREBY IRREVOCABLY grants, conveys, transfers and assigns to Trustee, and its successors and assignees, in trust, with power of sale, all right title and interest which Trustor now has or hereinafter may acquire in that certain real property (**"Real Property"**) located in Dukes County, State of Massachusetts, described in Exhibit A attached hereto and made a part hereof.

   Together with all improvements, replacements and additions now or hereafter erected on the Real Property and all easements, appurtenances and fixtures now or hereafter a part of the Real Property. (The fixtures, improvements and the Real Property are collectively referred to as the "**Property**.")

   Together with all rents, issues, profits and proceeds, including without limitation insurance and condemnation proceeds from the Real Property, subject, however, to the right, power and authority given to the conferred upon Beneficiary below to collect and apply such rents, issues and profits.

2. **Secured Obligations.** Trustor makes the grant, transfer and assignment set forth in the "Grant in Trust" Section above for the purpose of securing the following obligations (collectively, the "**Obligations**"):
   a. the performance and payment of all obligations of Trustor under the Option Agreement, including without limitation, the following:

      i. payment of all monies paid by Beneficiary on Trustor's behalf pursuant to Section 13 of the Option Agreement;

      ii. payment of all insurance proceeds owed to Beneficiary pursuant to Section 14 of the Option Agreement;

      iii. payment of all amounts owed to Beneficiary pursuant to Section 2 of the Option Agreement;

      iv. payment of all amounts owed to Beneficiary pursuant to Sections 4 or 9 of the Option Agreement;

      v. payment of all sales proceeds owed to Beneficiary in connection with any sale of the Property pursuant to Sections 5 of the Option Agreement;

vi. performance of the obligations of Trustor under Section 11 of the Option Agreement; and

vii. damages arising to, or incurred by, Beneficiary from Trustor's failure to act or interference with Beneficiary's rights pursuant to Section 13 of the Option Agreement. Trustor and Beneficiary agree and acknowledge that the damages that would arise from Trustor's failure to act or interference are uncertain, depend on many factors, and would be extremely difficult to ascertain. Therefore, in a good faith effort to determine a method for reasonably estimating and liquidating the damages which would be incurred by Beneficiary arising from Trustor's interference or failure to act, Trustor and Beneficiary agree to the Liquidated Damages specified in Section 8 below;

b. the performance of the obligations of Trustor contained in this Security Instrument or incorporated by reference;

c. any expenditures made by Beneficiary pursuant to, or under, this Security Instrument; and

d. payment of all fees and expenses, including, without limitation court costs and other dispute resolution costs, attorneys' (including Beneficiary's in-house counsel, if any), and experts' fees and costs (collectively "**Attorneys' Fees**") incurred by Beneficiary in the enforcement and collection of the obligations listed above and the protection of Beneficiary's rights related thereto, whether such fees are incurred in any state, federal or bankruptcy court, and in any bankruptcy case or insolvency proceeding, or otherwise, and whether or not litigation or arbitration is commenced, which are in any way related to this Security Instrument, to the interpretation or enforcement of the parties' rights under this Security Instrument, or to the Property.

Trustor shall not be obligated to repay any part of the Noah Investment Amount (as those terms are defined in the Option Agreement); and therefore, such items shall not be included within the Obligations. The foregoing shall not, however, in any way limit any payments due Beneficiary under the Option Agreement pursuant to its Percentage Share (as defined in the Option Agreement).

3. **Uniform Commercial Code, Security Agreement and Fixture Filing.** This Security Instrument is intended to be and shall constitute a security agreement under the California Uniform Commercial Code for any items of personal property that constitute fixtures or are specified as part of the Property and that under applicable law may be subject to a security interest under the California Uniform Commercial Code. Trustor hereby grants to Beneficiary a security interest in those items to secure the performance and payment of the Obligations.

a. Trustor agrees that Beneficiary may file either this Security Instrument, or a copy of it, or a UCC-1 Financing Statement in the real estate records or other appropriate index and/or in the Office of the Secretary of State of the State of California, as a financing statement for any of the items specified above as part of the Property.

b. This Security Instrument constitutes a financing statement filed as a fixture filing pursuant to the California Uniform Commercial Code, and any similar or successor provisions. For purposes of the fixture filing, the "debtor" is Trustor and the "secured party" is Beneficiary. The goods subject to the fixture filing consist of all equipment and appliances attached to the Property or which are considered a fixture under California law, including all heating, cooling, and ventilation equipment, ducting, appliances, and fixtures; and all plumbing equipment, piping, and fixtures; and all electrical and telecommunications equipment, wiring, cabling, conduit, and fixtures; and all other equipment attached to or used in the operation of the Property, and all proceeds thereof.

c. Beneficiary may file such extensions, renewals, amendments and releases as are appropriate to reflect the status of its security interest.

d. Trustor shall pay all costs of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and shall pay all reasonable costs and expenses of any record searches for financing statements that the Beneficiary may reasonably require.

e. On any default hereunder Beneficiary shall have the remedies of a secured party under the California Uniform Commercial Code and may also invoke the remedies in Section 7 below. In exercising any of these remedies, Beneficiary may proceed against the items of the Property constituting the Real Property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Beneficiary's remedies under the California Uniform Commercial Code or the remedies in Section 7 below.

4. Assignment of Leases And Rents. As additional security for the Obligations, Trustor hereby irrevocably, absolutely and unconditionally assigns to Beneficiary all of Trustor's right, title and interest in and to all existing and future leases, subleases and licenses relating to the use, occupancy or enjoyment of all or any part of the Property and all rents, income, revenues, profits, proceeds and earnings now or hereafter payable with respect to the ownership, use or occupancy of the Property (collectively the "**Rents**"):

   a. Trustor hereby gives to, and confers upon, Beneficiary the right, power and authority, during the continuance of this Security Instrument, to collect the Rents, reserving unto Trustor the right, prior to any default by Trustor in

payment of the Obligations secured hereby or in performance of any agreement hereunder, to collect and retain such Rents, as they become due and payable.

b. Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Obligations secured hereby, enter upon and take possession of the Property or any part of it, in its own name sue for or otherwise collect such Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Attorneys' Fees to the Obligations secured hereby, and in such order as Beneficiary may determine.

c. The entering upon and taking possession of the Property, the collection of such rents, issues and profits and the application of such rents, issues and profits pursuant to this Security Instrument, shall not cure or waive any default or notice of default under this Security Instrument or invalidate any act done pursuant to such notice.

d. Nothing in this section shall permit Trustor to lease or rent the Property in contravention of any provision of the Option Agreement; nor shall anything in this section modify any provision in the Option Agreement relating to the use, lease or occupancy of the Property.

5. Covenants of Trustor Regarding the Property. Trustor hereby agrees as follows:

a. To appear in and defend any action or proceeding purporting to affect the security of this Security Instrument or the rights or powers of Beneficiary or Trustee: and to pay all costs and expenses of Trustee and Beneficiary (including cost of evidence of title and Attorneys' fees) incurred: (i) in any state, federal or bankruptcy court, in any action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Security Instrument or to collect the Obligations or to protect Beneficiary's rights under this Security Instrument; and/or (ii) in connection with foreclosure upon the collateral granted under this Security Instrument (whether or not suit is filed).

b. To pay: (i) at least ten (10) days before delinquency all taxes and assessments affecting the Property; and (ii) all encumbrances, charges and liens, with interest, on the Property (or any part of the Property), which are prior or could obtain priority to the lien or to the rights granted under this Security Instrument, and all costs, fees and expenses of this Security Instrument.

i. If Trustor fails to make any payment or to do any act as provided in this Security Instrument, Beneficiary or Trustee may (but shall not be obligated to) make the payment or do the act in the required manner and to the extent deemed necessary by Beneficiary or Trustee to protect the security for this Security Instrument, which payments and related expenses (including Attorneys' fees) shall also be secured by this Security Instrument.

ii. Such performance by Beneficiary or Trustee shall not require notice to, or demand on Trustor and shall not release Trustor from any obligation under this Security Instrument.

iii. Beneficiary or Trustee shall have the following related rights and powers: (A) to enter upon the Property for the foregoing purposes, (B) to appear in and defend any action or proceeding purporting to affect the Property or the rights or powers of Beneficiary or Trustee under this Security Instrument, (C) to pay, purchase, contest or compromise any encumbrance, charge, or lien that in the judgment of Beneficiary or Trustee appears to be prior or superior to this Security Instrument, and (D) to employ counsel, and to pay such counsel necessary expenses and costs, including Attorneys' Fees.

c. To pay immediately upon demand all sums expended by Beneficiary or Trustee pursuant to this Security Instrument; and to pay interest on any of the foregoing amounts demanded by Beneficiary or Trustee at the rate specified in Section 3289 of the California Civil Code (or other applicable law); from the date of such demand, not to exceed the maximum rate allowed by law at the time of such demand.

6. **Power of Attorney**. Trustor hereby irrevocably appoints Beneficiary as Trustor's attorney-in-fact (such agency being coupled with an interest), and as such attorney-in-fact Beneficiary may, after providing notice to Trustor pursuant to the Option Agreement, without the obligation to do so, in Beneficiary's name, or in the name of Trustor, prepare, execute and file or record financing statements, continuation statements, applications for registration and like documents necessary to create, perfect or preserve any of Beneficiary's security interests and rights in or to any of the Property, and, upon a default under this Security Instrument, take any other action required of Trustor; provided, however, that Beneficiary as such attorney-in-fact shall be accountable only for such funds as are actually received by Beneficiary.

7. **Default and Foreclosure and Power of Sale**. Upon default by Trustor in the performance of or upon breach by Trustor of any of the rights and obligations that

are secured by this Security Instrument as specified above, Beneficiary may declare all sums secured by this Security Instrument immediately due and payable and may invoke the power of sale and any other remedies permitted by applicable law, including an action in any court of competent jurisdiction to foreclose this Security Instrument as a deed of trust or mortgage. If Beneficiary elects to invoke the power of sale, Beneficiary shall execute and deliver to Trustee, or cause Trustee to execute, a written notice of default and of Beneficiary's election to cause the Property to be sold. Beneficiary also shall deposit with Trustee this Security Instrument and all documents evidencing any expenditures and damages secured by this Security Instrument. Trustee shall cause the notice to be filed in the real property records of the county where the Property is located and shall mail copies of the notice to Trustor as prescribed by applicable law and to all other persons prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law.

a. After the required time period has lapsed following the recordation of said notice of default, and notice of sale has been given as required by law, Trustee without demand on Trustor, shall sell the Property at the time and place specified in the notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement, at the time fixed by the preceding postponement. Trustee shall deliver to the purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of their truthfulness. Any person, including Trustor, Trustee, or Beneficiary as defined in this Security Instrument, may purchase at such sale.

b. After deducting all costs, fees and expenses (including, without limitation, Attorneys' Fees) of Trustee and of this trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: to Beneficiary, all sums expended under the terms of this Security Instrument, not then repaid, with accrued interest at the amount allowed by law in effect on the Effective Date of this Security Instrument; to Beneficiary, all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

c. Notice provided to Trustor under this Security Instrument shall be to the address specified in this Security Instrument unless otherwise required by law.

d. **Upon completion of the sale as set forth above, there shall be no deficiency against Trustor for any obligations secured hereby, all reimbursements to Beneficiary being derived solely from the proceeds of the Property.**

8. **Liquidated Damages.** Liquidated Damages means a calculation of the Net Option Value using a value for Investor's Price that has been reduced by 20%.

9. **No Waiver.** No previous waiver and no failure, delay or forbearance by Beneficiary in acting with respect to the terms of this Security Instrument shall constitute a waiver of any breach, default, or failure of condition under this Security Instrument or the obligations secured thereby. A waiver of any term of this Security Instrument or of any of the obligations secured thereby must be made in writing and shall be limited to the express written terms of such waiver.

10. **Trustee's Powers.** At any time or from time to time, without liability therefor and without notice, upon written request of Beneficiary and presentation of this Security Instrument, and without affecting the personal liability of any person for the performance of the Option Agreement secured hereby, Trustee may: (a) reconvey any part of the Property; (b) consent to the making of any map or plat of the Property; (c) join in granting any easement thereon; and (d) join in any extension agreement or any agreement subordinating the lien or charge of this Security Instrument.

11. **Substitution of Trustee.** Beneficiary, or any successor in ownership of the Obligations, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named or acting under this Security Instrument, which instrument, when executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where the Property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from Trustee's predecessor, succeed to all its title, estate, rights, powers and duties. Such instruments must contain the name of the original Trustor, Trustee and Beneficiary under this Security Instrument, the book and page where this Security Instrument is recorded, and the name and address of the new Trustee(s).

12. **Trustee's Compensation.** Trustor shall pay Trustee's fees and reimburse Trustee for expenses in the administration of this trust, including Attorneys' Fees. Trustor shall pay to the Beneficiary reasonable compensation for services rendered concerning this Security Instrument, including without limit any statement of amounts owing under any Obligations.

13. **Full Reconveyance.** Upon written request of Beneficiary stating that all Obligations have been performed or paid, and upon surrender of this Security Instrument to Trustee for disposition as Trustee in its sole discretion may choose, and upon payment of its fees, Trustee shall reconvey, without warranty, the Property then held under this Security Instrument. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness of such recitals. The grantee in such reconveyance may be described as "*the person or persons legally entitled thereto.*"

14. **Successors.** This Security Instrument applies to, inures to the benefit of, and binds all parties to this Security Instrument, their heirs, legatees, devisees, administrators, executors, successors, and assignees. The term "**Beneficiary**" shall include any successor or assignee of Beneficiary's rights in the Option Agreement and in this Security Instrument, whether or not named as Beneficiary in this Security Instrument. In this Security Instrument, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural.

15. **Joint and Several Liability.** If more than one person signs this Security Instrument as Trustor, the obligations of each signatory shall be joint and several.

16. **Multiple Owners.** If there are multiple Trustors of the Property:

    a. this Security Instrument must be signed by each such Trustor;

    b. all rights and powers specified for Trustor in this Security Instrument must be approved and exercised unanimously by all such multiple Trustors;

    c. all such multiple Trustors shall be jointly and severally liable for all liabilities and obligations specified for Trustor under this Security Instrument;

    d. Beneficiary may treat any notice received from any one Trustor as notice from all Trustors.

17. **Revocable Trust.** If any Trustor is/are the trustee(s) of a Revocable Trust (as defined in Exhibit B to the Option Agreement):

    a. all trustees and all trustors of the Revocable Trust must sign this Security Instrument in their capacities as individuals and as trustees and/or trustors of the Revocable Trust, and each trustee and trustor of the Revocable Trust who signs this Security Instrument hereby represents and warrants that all trustees and trustors of the Revocable Trust have been disclosed to Beneficiary;

b. any trustee of the Revocable Trust who is also a trustor of the Revocable Trust need only sign this Security Instrument once for it to be binding on such person both as trustee and as trustor of the Revocable Trust;

c. all rights and powers specified for, and all actions required of, Trustor in this Security Instrument must be approved and exercised unanimously by all trustees of the Revocable Trust;

d. all trustees and all trustors of the Revocable Trust, in their capacities as individuals, shall be jointly and severally liable with Trustor for all liabilities and obligations specified for Trustor under this Security Instrument;

e. all representations and warranties by Trustor in this Security Instrument are made by all trustees of the Revocable Trust on behalf of the Revocable Trust and by all trustees and all trustors of the Revocable Trust in their capacities as individuals;

f. notice required to be given by, or to, any Trustor will be deemed adequately given if given by, or to, any of the trustees of the Revocable Trust using the contact information set forth in this Security Instrument; and

g. Beneficiary may treat any notice received from any one trustee of the Revocable Trust as notice from all trustees of the Revocable Trust and from Trustor.

18. **Acceptance and Representations by Trustee.** Trustee accepts this trust when this Security Instrument, duly executed and acknowledged, is made a public record as provided by law. Trustee is not required to notify any party to this Security Instrument of pending sale under any other deed of trust or mortgage (as appropriate) or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee. Trustor represents and warrants to Holder that: (a) Trustor has good and marketable title to the Property, free and clear of all claims and encumbrances whatever; (b) the lien created by this Security Instrument is a valid lien on the Property; and (c) Trustor will defend the lien of this Security Instrument against all adverse and conflicting claims of any nature whatsoever.

19. **Extent of Lien.** The lien and security interests granted to Beneficiary under this Security Instrument shall encumber Trustor's entire interest in the Property, notwithstanding the fact that the Option Agreement relates to only a fractional interest in the Property.

20. **No Merger.** So long as any of the obligations under the Option Agreement remains outstanding and undischarged, unless Beneficiary otherwise consents in writing, the fee estate of Trustor in the Property or any part thereof (including the estate of Beneficiary after exercising the Option) will not merge, by operation of law or

otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Beneficiary or in any other Person.

21. **Governing Law.** This Security Instrument shall be governed by the laws of the State of California.

22. **Remedies Cumulative.** All remedies provided in this Security Instrument are distinct and cumulative to any other right or remedy under this Security Instrument or afforded by law or equity, and may be exercised concurrently, independently or successively.

23. **Severability.** If any provision of this Security Instrument is held to be invalid, illegal, or unenforceable, that invalidity, illegality, or unenforceability will not affect any other provisions of this Security Instrument, and the other provisions will be construed as if the invalid, illegal, or unenforceable provision had never been contained in the Security Instrument.

24. **Captions.** The captions and headings in this Security Instrument are for convenience only and are not to be used to interpret or define the provisions hereof.

25. **Time.** Time is of the essence of each and every term herein.

26. **Integration.** This Security Instrument contains or expressly incorporates by reference the entire agreement of the parties with respect to the matters contemplated herein and supersede all prior negotiations or agreements, written or oral. This Security Instrument shall not be modified except by a written instrument executed by all parties.

**Noah**

Noah Offer ID: 104166

READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH BENEFICIARY, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, TERM SHEETS, PRINTED MATERIALS, DISCLOSURES, AND THE PRODUCT GUIDE, ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS SECURITY INSTRUMENT, THE OPTION AGREEMENT, AND ANY OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN TRUSTOR AND BENEFICIARY AS OF THE EFFECTIVE DATE.

IN WITNESS WHEREOF, each undersigned Trustor has executed this Security Instrument as of the Effective Date.

Witnesses:

Patricia S Bransford

Patricia Bransford (Seal)
- Trustor

Trustor Address:

484 Main Street
Tisbury, Massachusetts 02568

**Noah**

Noah Offer ID: 104166

## GENERAL ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not to the truthfulness, accuracy, or validity of that document.

STATE OF New York )

) ss.

COUNTY OF New York )

On 15th December, 2021, before me Davain Walker, Notary Public, personally appeared Patricia S. Bransford who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his her/their authorized capacity(is) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of NY that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Davain Walker
Notary Public, State of New York
Qualified in Westchester County
01WA6410230 (exp:10/19/2024)

Signature

(seal)

**Noah**

**Noah Offer ID: 104166**

## EXHIBIT A

### LEGAL DESCRIPTION

That certain real property situated in the City of Tisbury, County of Dukes, State of Massachusetts, described as follows:

The land with the buildings, structures and improvements thereon, situated in the Town of Tisbury, County of Dukes County, and Commonwealth of Massachusetts, shown as "Lot 11.87 acres+" on a certain plan entitled "Plan of Land in Tisbury, Mass. Prepared For the 484 Main Street Realty Trust Scale I" = 40' July 15, 2016" prepared by Schofield, Barbini & Hoehn, Inc., and recorded in the Dukes County Registry of Deeds in Plan Book 18, Page 44 (the "Plan").

Grantees by acceptance and recording of this deed agree to the restrictions and covenants attached to this deed and made a part hereof. Grantees by acceptance and recording of this deed acknowledge and confirm that Grantees shall have no rights over the "asphalt driveway" shown on the Plan which is located on Lot 2 as shown on the Plan. The parcel is conveyed subject to, and together with the benefit of, all rights, easements, covenants, restrictions and other matters of record, to the extent the same are in force and applicable.

Tax Parcel No.: 4 B 17

[end of legal description]

**AMENDMENT TO DEED OF TRUST AND SECURITY AGREEMENT**
**and**
**REAFFIRMATION AGREEMENT**

This REAFFIRMATION AGREEMENT made this ______ day of ______________, 2022, by and between **Patricia S. Bransford ("Original Borrower"); her husband Thomas L. Bransford ("Additional Borrower"); and Aero HEC Acquisition I, LLC ("Aero")**, the current holder of a Deed of Trust and Security Agreement given by Original Borrower to Spruce Title Services for the benefit of Noah f/k/a Patch Homes, Inc. via an Assignment recorded in the Dukes County Registry of Deeds on July 5, 2022 at Book 01630, Page 497 (collectively "the Parties").

WHEREAS, Original Borrower and Additional Borrower are owners of the property located at 484 Main Street, Tisbury, Massachusetts (the "Property") as tenants by the entirety via a quitclaim deed recorded in the Dukes County Registry of Deeds on March 28, 2019 at Book 01491, Page 887.

WHEREAS, the Aero's assignor, Spruce Title Services for the benefit of Noah f/k/a Patch Homes, Inc., made a loan in the amount of **Five Hundred Thousand and 00/100 Dollars** ($500,000) to the Original Borrower secured, in part, by the Property (the "Loan").

WHEREAS, the Loan is evidenced by *inter alia* a certain Noah Real Estate Purchase Option Agreement and Memorandum of Agreement, both dated December 15, 2021, and a Deed of Trust and Security Agreement made to Spruce Title Services for the benefit of Noah f/k/a Patch Homes, Inc. dated December 15, 2021 and recorded in the Dukes County Registry of Deeds on July 5, 2022 at Book 01630, Page 472 ("Security Documents");

WHEREAS, the Parties seek to add the Additional Borrower, Thomas L. Bransford, as a party to the Security Documents and have him be obligated by same.

NOW, THEREFORE, for value received, and for other good and valuable consideration and the receipt which is hereby acknowledged, the Parties agree as follows:

All provisions of the Deed of Trust and Security Agreement made to Spruce Title Services for the benefit of Noah f/k/a Patch Homes, Inc., and the Noah Real Estate Purchase Option Agreement and Memorandum of Agreement, all of which are dated December 15, 2021, and were assigned to Aero on same date, are amended to add the Additional Borrower as a party to these Security Documents.

All provisions of the Security Documents are expressly ratified and confirmed as to both Original Borrower and Additional Borrower, and shall remain in full force and effect.

Witness my hand and seal this _____ day of _______________, 2023.

_______________________________________
PATRICIA S. BRANSFORD

**STATE OF NEW YORK**

__________, ss. _________________________, 2023

On this _____ day of _____________, 2023, before me, the undersigned notary public, personally appeared Patricia S. Bransford, and proved to me through satisfactory evidence of identification, which was, ____________________, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that she signed the document voluntarily as her free act and deed for its stated purpose.

______________________________
Notary Public
My Commission Expires:

Witness my hand and seal this _____ day of _______________, 2022.

_______________________________________
THOMAS L. BRANSFORD

**STATE OF NEW YORK**

__________, ss. _________________________, 2023

On this _____ day of _____________, 2023, before me, the undersigned notary public, personally appeared Thomas L. Bransford, and proved to me through satisfactory evidence of identification, which was, ____________________, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed the document voluntarily as his free act and deed for its stated purpose.

______________________________
Notary Public
My Commission Expires:

**AERO HEC ACQUISITION I, LLC,**

By:______________________________________
[title]

**STATE OF NEW YORK**

__________, ss. ________________________, 2023

On this _____ day of _____________, 2023, before me, the undersigned notary public, personally appeared ________________________, duly authorized officer of Aero HEC Acquisition I, LLC, and proved to me through satisfactory evidence of identification, which was, ____________________, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that she signed the document voluntarily as _______ free act and deed of AERO HEC Acquisition I, LLC for its stated purpose.

______________________________
Notary Public
My Commission Expires: